**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

SHAWN JEREMY WAKED and THERESA
IRENE STONE,

      Plaintiffs,

vs.                                                                        No. CIV 22-0596 JB/JMR

KATHLEEN ALEXANREA KERR;
TIMOTHY JAMES RIVERA and JANE
TERRY,

      Defendants.

<u>**MEMORANDUM OPINION AND AMENDED ORDER**</u>[1]

    **THIS MATTER** comes before the Court on: (i) the Plaintiffs' Motion to Confirm

Arbitration Award and Enter Judgment Thereon, filed August 11, 2022 (Doc. 1)("Motion to

Confirm"); and (ii) the Defendants Jane Terry, Kathleen Kerr, and Timothy Rivera's Opposition

to Plaintiffs' Motion to Confirm Arbitration Award and Cross Motion to Vacate Arbitration

Award, filed August 24, 2022 (Doc. 20)("Motion to Vacate").  The Court held a hearing on January

10, 2023.  <u>See</u> Clerk's Minutes, filed January 10, 2023 (Doc. 45).  The primary issues are:

---

[1]On March 6, 2023, the Court entered an Order: (i) granting the Plaintiffs' Motion to
Confirm Arbitration Award and Enter Judgment Thereon, filed August 11, 2022 (Doc. 1)("Motion
to Confirm"); (ii) denying Defendants Jane Terry, Kathleen Kerr, and Timothy Rivera's
Opposition to Plaintiffs' Motion to Confirm Arbitration Award and Cross Motion to Vacate
Arbitration Award, filed August 24, 2022 (Doc. 20)("Motion to Vacate"); and (iii) confirming the
Award (dated July 25, 2022), filed August 11, 2022 (Doc. 1-1)("Award").  <u>See</u> Order at 1-2, filed
March 6, 2023 (Doc. 51)("Order").  In the Order, the Court stated that it would "issue . . . a
Memorandum Opinion at a later date more fully detailing its rationale for this decision."  Order at
1 n.1.  This Memorandum Opinion and Amended Order is the promised opinion.  This
Memorandum Opinion and Amended Order amends the Order by granting in part and denying in
part the Motion to Confirm, by granting in part and denying in part the Motion to Vacate, and by
confirming in part and vacating in part the Award.

(i) whether Defendants Jane Terry and Kathleen Kerr's challenges to the arbitration Award (dated July 25, 2022), filed August 11, 2022 (Doc. 1-1)("Award"), that Financial Industry Regulatory Authority ("FINRA") arbitrators entered in Plaintiffs Shawn Jeremy Waked and Theresa Irene Stone's favor, are shielded from the Court's review; (ii) whether Court should vacate Terry's liability under the Award; and (iii) whether Court should vacate Kerr's liability under the Award. The Court concludes that: (i) Terry and Kerr's challenges to the Award are not shielded from judicial review; (ii) the Award is valid as to Terry, because she is not a signatory to a contract containing a non-FINRA arbitration provision, and that provision cannot otherwise bind Terry as a non-signatory; and (iii) the Award is invalid as to Kerr, because the non-FINRA arbitration provision in her contract binds Waked and Stone and displaces the provision for FINRA arbitration. Accordingly, the Court grants in part and denies in part the Motion to Confirm, grants in part and denies in part the Motion to Vacate, and confirms Award as to Terry's liability under it and vacates the Award as to Kerr's liability under it.

## FACTUAL BACKGROUND

The present dispute arises out of the sale of a financial services firm. The dispute has been subjected to arbitration already. Now it comes before the Court for federal litigation.

### 1.    Dispute Over Sale of Financial Advisory Firm Underlying Arbitration.

Waked and Stone are Florida residents, who contracted to buy a financial services firm from Terry, a resident of Santa Fe, New Mexico. See Motion to Confirm ¶¶ 3, 4, 7, at 2; id. ¶ 10, at 3; Agreement for Purchase and Sale of Financial Practice, filed September 7, 2022 (Doc. 23-8)("Purchase Sale Agreement"). Terry was the owner and operator of a financial advisory firm, Terry Financial Practice ("Terry Financial"), which included the firm Jane Terry & Associates, the firm Summit Investment Group ("Summit Investment"), the latter being the corporate entity that

operated Branch 6A1 of Raymond James Financial Services, Inc. ("Raymond James"), based in Santa Fe, which had over $115,000,000.00 in customer assets under management. <u>See</u> Motion to Confirm ¶ 10, at 3. Terry had developed the business over the course of twenty years. <u>See</u> Motion to Vacate at 2. Kerr and Rivera were long-time employees at the firm. <u>See</u> Motion to Confirm ¶ 11, at 3. Terry, Kerr, and Rivera, as registered representatives of Raymond James, are licensed securities brokers, and subject to the rules and regulations that FINRA -- the nonprofit corporation which, under the Securities Exchange Commission's supervision, serves as a regulatory body for broker-dealers with power delegated to it by Congress -- applies to them. <u>See</u> Motion to Confirm ¶¶ 15-16, at 4.

    In 2019, Waked and Stone negotiated the purchase of Terry Financial from Terry for $1,560,000.00, a purchase financed by loans from the Small Business Administration. <u>See</u> Motion to Confirm ¶ 10, at 3. Waked and Stone organized a corporate entity, Maestro Global, initially for the purpose of the purchase, but that would continue to operate Summit Investment, the corporate form for the Raymond James branch in Santa Fe that Terry operated, although the Summit Investment entity is now called Maestro Financial Partners. <u>See</u> Motion to Vacate at 3. Maestro Global is not a FINRA member. <u>See</u> Motion to Vacate at 5. The value of Terry's firm was recognized as lying in its clients' goodwill. <u>See</u> Motion to Confirm ¶ 10, at 3. Accordingly, it was important to Waked and Stone that the clients maintain their goodwill for the firm once it was placed in Waked and Stone's management. <u>See</u> Motion to Confirm ¶ 10, at 3. The final Practice Sale Agreement provided that Terry, Kerr, and Rivera would do nothing to interfere with the ongoing viability of the business in Waked and Stone's ownership: thus, Terry "agree[d] to recommend [Waked] to her customers and to do nothing to divert them to competing firms," Motion to Confirm ¶ 10, at 3, and, likewise, Kerr and Rivera "agree[d] to, *inter alia*, refrain from

- 3 -

diverting the firm's customers to any competing firm," Motion to Confirm, ¶ 11, at 3.  Terry also served as a consultant for Maestro Global during the transition in ownership and operations, and she agreed to discontinue use of Jane Terry & Associates and Summit Investment upon Terry Financial's sale to Waked and Stone.  See Statement of Claim at 8.

Kerr and Rivera both signed employment contracts with Maestro Global.  See Employment Contract at 1, filed August 24, 2022 (Doc. 20-13)("Kerr Employment Contract"); Rivera Employment Contract at 1, filed August 24, 2022 (Doc. 20-13)("Rivera Employment Contract").[2] These agreements each provided that Kerr and Rivera would "aid the COMPANY in the development, servicing, and marketing of its business as an investment firm . . . ."  Kerr Employment Contract at 1; Rivera Employment Contract at 9.  Each contract contained a provision for submission of disputes to arbitration.  See Kerr Employment Contract at 1; Rivera Employment Contract at 9.  The provision states:

> (G)     Any dispute arising out of or relating to this Agreement or any other employment related disputes, including but not limited to claims of wrongful termination, discrimination, whether it is based on age, gender race, national origin or any other form of discrimination or sexual harassment, shall at the request of any part, be resolve in arbitration unless prohibited by law.
>
> (1)     Arbitration will be the sole and exclusive means of resolving the dispute. Arbitration will be by one arbitrator and will proceed in accordance with the New Mexico Uniform Arbitration Act ("Act").  If the parties are unable to agree upon the selection of an arbitrator, then pursuant to the Act, the First Judicial District Court in Santa Fe, NM shall appoint the arbitrator upon a motion by the applicable party.

---

[2]The document that the Defendants file as Document 20-13 contains both Kerr and Rivera's individual employment contracts with Maestro Global.  Kerr's contract appears on pages 1 through 8 according to the PACER pagination, while Rivera's contract appears on pages 9 through 16 according to the PACER pagination; each document is paginated separately according to its own internal pagination.  For ease of reference, the Court refers individually to each document and its pagination as the Kerr Employment Contract and the Rivera Employment Contract.

. . . .

> (5) The award of the arbitrator(s) will be final and may be entered in any court having jurisdiction over the enforcement of the award.  In addition to monetary awards, the arbitrator shall have the authority to issue such other relief as the arbitrator determines necessary to adequately resolve the case.  The prevailing party in any dispute shall be entitled to the recovery of costs and fees (including court fees), reasonable attorney fees, and the fees of the arbitrator(s) from the non-prevailing party. Each party agrees to submit to the jurisdiction of any applicable court for purposes of the enforcement of the award.

Kerr Employment Contract at 6-7; Rivera Employment Contract at 6-7.  They also signed financial advisor agreements with Raymond James that provided that Kerr and Rivera would serve as Registered Representatives to conduct securities activities on behalf on Raymond James and would be retained as employees by Waked and Stone as owners of the Santa Fe Raymond James branch office.  See Raymond James Financial Services, Inc. FA Agreement at 1, filed September 7, 2022 (Doc. 24-2)("Kerr FA Agreement"); Raymond James Financial Services, Inc. FA Agreement at 1, filed September 7, 2022 (Doc. 24-3)("Rivera FA Agreement").  That Kerr and Rivera would stay on as employees of Waked and Stone's firm was a key piece of the negotiations, and an issue that Waked and Stone insisted on to Terry.  See Email from Theresa Stone to Jane Terry (March 19, 2019, 13:37 MST), filed September 7, 2022 (Doc. 23-9)("Stone-Terry Email").  Kerr and Rivera were aware that the restrictive covenants contained in their employment contracts with Maestro Global existed for the benefit of Waked and Stone.  See TJ Rivera Testimony at 1-5, filed September 7, 2022 (Doc. 23-10)("Rivera-Kerr Testimony").[3]

---

[3]The exhibit that Waked and Stone file as Document 23-10, is headed "TJ Rivera Testimony" but contains the testimony at the arbitration hearing both of Rivera and of Kerr.  See TJ Rivera Testimony at 1-5, filed September 7, 2022 (Doc. 23-10)(Rivera testimony); id. at 5 (Kerr testimony).

Things soured thereafter.  Waked and Stone learned that the firm was not as strong as Terry represented it to them; for example, advisors there had engaged in practices that required submitting the firm to an audit.  See Statement of Claim at 9, filed August 11, 2022 (Doc. 1-5)("Statement of Claim").  Moreover, Kerr and Rivera had incorporated a financial services company, Kerr Rivera, Inc., around the same time that Waked and Stone's negotiations began with Terry.  See Statement of Claim at 10.  Kerr and Rivera disclosed confidential and proprietary client and business information that Global Maestro owned to their own firm, and in turn to Securities America, Inc. ("Securities America"), a competitor of Raymond James.  See Statement of Claim at 11-12, 19.  After the parties executed the Practice Sale Agreement, Kerr, Rivera, and Terry began impugning Waked's and Stone's reputations in an effort to divert customers from the firm to the new firm that Kerr and Rivera founded -- Kerr Rivera, Inc., now called Stonemark Investment Group and associated with Securities America.  See Complaint ¶ 13, at 3-4.  In her communications, Terry indicated she had impugned Waked and Stone's management and directed clients to Kerr and Stone's new firm.  See Email from Jane Terry (October 12, 2019, 17:24 MST), filed September 7, 2022 (Doc. 23-2); Email from Jane Terry to Kathleen Kerr (June 13, 2020, 13:08 MST), filed September 7, 2022 (Doc. 24-1).  Communications between clients indicate that Terry had cast doubt on Waked and Stone's management.  See Text Message Communication (November 12, 2019, 14:33 MST), filed September 7, 2022 (Doc. 23-4).  Both Kerr and Rivera were aware that their actions were prohibited by their FA agreements with Raymond James because the activities constituted improper business solicitation.  See Kathleen Kerry [sic] Testimony at 1-5, filed September 7, 2022 (Doc. 23-7).[4]  These actions caused the

---

[4]The exhibit that Waked and Stone file as Document 23-7, is headed "Kathleen Kerry Testimony" but contains the testimony at the arbitration hearing both of Kerr and of Rivera.  See

value of the business that Waked and Stone purchased from Terry to decline dramatically: customers fled, reducing by eighty percent the firm's assets under management.  See Complaint ¶ 13, at 3.  The present litigation then arose, first in State court before submission to arbitration.

       **2.**         <u>**Proceedings in State Court.**</u>

      Waked and Stone first sued Terry alone in New Mexico State court in Santa Fe; they did not name as defendants Kerr, Rivera, and Securities America.  <u>See</u> Complaint ¶ 18, at 4.  It was Terry who initially sought to arbitrate the dispute, arguing that FINRA regulations require that the dispute over the Practice Sale Agreement is subject to mandatory arbitration before a FINRA arbitration panel.  <u>See</u> Motion to Dismiss and to Compel Arbitration and Statement of Supporting Points and Authorities at 4-5, filed August 11, 2022 (Doc. 1-2)("State Court Motion to Compel"); Defendant's Reply in Support of Motion to Dismiss and to Compel Arbitration and Statement of Supporting Points and Authorities at 6, filed August 11, 2022 (Doc. 1-3)("State Court Reply").  Terry noted that she, Waked, and Stone all were individuals licensed to sell securities on behalf of the public as registered representatives of brokerage firms that are member firms of FINRA; as part of each person's licensure process, he or she executed a "Form U4" registration document that committed  him or her to resolve by submission to arbitration any dispute related to securities-business-related matters.  State Court Motion to Compel at 4-5.  <u>See</u> State Court Reply at 6-7.  Registered representative status requires any disputes, not just day-to-day securities sales related issues, arising out of a brokerage-related business to be submitted for arbitration.  <u>See</u> State Court Motion to Compel at 11 ("FINRA's jurisdiction over intra-industry disputes is not limited to

---

Kathleen Kerry [sic] Testimony at 1-3, filed September 7, 2022 (Doc. 23-7)(Kerr testimony); <u>id.</u> at 3-5 (Rivera testimony).

matters involving registered representatives' day-to-day activity conducting securities sales.");
State Court Reply at 6-7.  Waked and Stone argued that Terry could not compel them to arbitrate,
because she had retired and no longer actively was involved in the securities industry, so the
mandatory arbitration requirement did not apply.  See State Court Reply at 6.  The State court
rejected Waked and Stone's effort to avoid arbitration, agreeing with Terry that the dispute is
subject to mandatory arbitration and submitting the dispute to arbitration before a FINRA
arbitration panel.  See Order on Defendant's Motion to Dismiss Proceedings and Compel
Arbitration at 1, filed August 11, 2022 (Doc. 1-4).

      **3.**     **Arbitration Proceedings Before the FINRA Arbitration Panel.**

On January 14, 2021, Waked and Stone, as well as Maestro Global, filed a claim before
the FINRA arbitration panel against Terry, Kerr, Rivera, and Securities America.  See Statement
of Claim at 1.  The Statement of Claim asserted the above-described factual background: Terry
induced Waked and Stone to purchase Summit Investment from her through misrepresentations,
and then she helped Kerr and Rivera to siphon off clients from the business that Terry had just sold
to Waked and Stone to a new business that Kerr and Rivera incorporated -- Kerr Rivera, Inc.  See
Statement of Claim at 10.  Waked, Stone, and Maestro Global asserted the following claims:
(i) fraud and/or fraudulent inducement against Terry, Kerr, and Rivera;  (ii) negligent
misrepresentation against Terry, Kerr, and Rivera; (iii) breach of contract against Terry as to both
the contract's purchase provision and the contract's consulting provision; (iv) breach of contract
against Kerr and Rivera for breach of their employment agreements with Maestro Global;
(v) breach of contract against Terry, Kerr, and Rivera on Global Maestro's behalf as third-party
beneficiary to Practice Sale Agreement; (vi) breach of covenant of good faith and fair dealing
against Terry, Kerr, and Rivera; (vii) breach of duty of loyalty against Terry, Kerr, and Rivera;

(viii) solicitation of clients against Terry, Kerr, and Rivera, in violation of contractual duties; (ix) misappropriation of trade secrets against Terry, Kerr, Rivera, and Securities America, as to misappropriated client information; (x) interference with contractual relationships against Terry, Kerr, Rivera, and Securities America, as to interference with Summit Investment's relationships with its clients after its sale to Waked and Stone; (xi) quantum meruit and unjust enrichment against Terry, Kerr, Rivera, and Securities America; (xii) civil conspiracy against Terry, Kerr, Rivera, and Securities America; (xiii) joint and several liability against Terry, Kerr, Rivera, and Securities America; and (xiv) punitive damages. See Statement of Claim at 13-22. Waked, Kerr, and Maestro Global all sought injunctive relief, the return of confidential business information, compensatory damages, contractual damages, punitive damages, and attorney's fees. See Statement of Claim at 23.

Terry, Kerr, and Rivera responded to Waked, Stone and Maestro Global's claims against them. See Respondents Terry, Terry and Rivera's Joint Amended Answering Statement, Counterclaim, and Third-Party Statement of Claim, filed August 24, 2022 (Doc. 20-2)("Answering Statement"). The Answering Statement asserts that the FINRA panel lacks jurisdiction as to Maestro Global's claims against them. See Answering Statement ¶ 13, at 2 ("Respondents further deny that Maestro Global LLC is a proper party to this action because it is not a FINRA Member firm, and refuse to arbitrate Maestro's claims against them."); id. ¶ 14, at 2; id. ¶ 15, at 3; id. ¶ 64, at 4. Securities America also filed an answer, and similarly maintains that, because Maestro Global is not "a registered broker-dealer or FINRA member firm, respondent [Securities America] has no obligation to arbitrate the purported claim of Maestro against it." FINRA ARBITRATION Submission Agreement at 4, filed August 24, 2022 (Doc. 20-4)("Securities America Filings"). Securities America also asserts that Waked and Stone have no

claims against it, because Waked and Stone's dispute was at its "core" one only against Terry. Securities America Filings at 4.  Securities America stresses also that any involvement of Kerr and Rivera with it post-dated by two months their disassociation from Waked, Stone, and Summit Investment, such that Securities America had no involvement in an "orchestrated move" by Kerr and Rivera to profit from disruption to Waked and Stone's business.  Securities America Filings at 5.  Securities America also notes that it is standard industry practice, among itself and competitors like Raymond James, to permit independent associated broker-dealers like Kerr and Rivera to take private client information when they migrate firms so that a client's "advisor can continue to service [the client's] account."  Securities America Filings at 7 (quoting Raymond James, Privacy, Security & Account Protection, www.raymondjames.com/privacy-security-and-account-protection (last visited April 2, 2024)).

Initially, on March 9, 2021, Terry, Kerr, and Rivera submitted submission agreements as to the arbitration that explicitly indicated their refusal to arbitrate Maestro Global's claims against them.  See FINRA ARBITRATION Submission Agreement, filed August 24, 2022 (Doc. 20-3)("March 9 Submission Agreement").  In that document, the defendants note that they "exclude[d] from this agreement" to arbitrate under FINRA a "commitment to arbitrate the claim of Claimant Maestro Global, LLC against Respondents.  No consent of Respondents to arbitrate with Maestro Global, LLC is made or provided herein."  March 9 Submission Agreement at 1. They did not also object to the FINRA arbitration panel's jurisdiction over Waked and Stone, and those individuals' claims against them.  Securities America provides a similar FINRA arbitration submission agreement that "excluded . . . [Securities America's] commitment to arbitrate the claim of Claimant Maestro Global, LLC against Securities America, Inc."    FINRA

ARBITRATION Submission Agreement at 1, filed August 24, 2022 (Doc. 20-4)("Securities America Filings").

On March 23, 2021, FINRA arbitration staff corresponded by email with the Defendants, and informed them that the submission agreements that they provided were deficient, because of the "modification[] or changes" that the Defendants had introduced to the standardized submission agreement form that FINRA uses, i.e., those modifications being the language expressly stating that Terry, Kerr, and Rivera, and also Securities America, did not consent to arbitrate with Maestro Global.  Securities America Filings at 8.  FINRA staff advises that, "[i]f all deficiencies are not corrected within 30 days [of] . . . notice of the deficiency, the panel will proceed with the arbitration as though the deficient document had not been filed."  Securities America Filings at 8. Terry, Kerr, and Rivera responded to FINRA staff, asserting that the language they had interpolated was justified, because FINRA regulation do not require them to submit to arbitration any claims Maestro Global had against them.  See Email from Annamarie E. Braga, Matasar Jacobs, to Lauren Guerena, FINRA Dispute Resolution Services at 1-3 (Doc. 20-5)("Braga-Guerena Email").  Discussing the FINRA Code of Arbitration Procedure for Industry Disputes,[5] Terry, Kerr, and Rivera assert their right to withhold consent to arbitrate with Maestro Global, because it is neither a Member nor an Associated Person under FINRA's regulations.  See Braga-Guerena Email at 2.  The Defendants maintain that to require them to submit a submission

---

[5]FINRA's arbitration code is available online.  See 13000. Code of Arbitration Procedure for Industry Disputes, FINRA, https://www.finra.org/rules-guidance/rulebooks/finra-rules/13000 (last visited April 5, 2024); 12000. Code of Arbitration Procedure for Customer Disputes, FINRA, https://www.finra.org/rules-guidance/rulebooks/finra-rules/12000 (last visited April 5, 2024). Throughout this Memorandum Opinion and Amended Order, the Court refers to the arbitration provisions thus: "FINRA Code 13200," "FINRA Code 12200," etc.  When referring to the FINRA Code as a whole, the Court may also call it, e.g., "FINRA's Code" or the "FINRA Arbitration Code."

agreement that does not exclude consent as to arbitration with Maestro Global would require they "waiv[e] their rights" by requiring they "submit[] to arbitration against a non-FINRA affiliated company."   Braga-Guerena Email at 3.   FINRA staff reiterated that it will not permit the Defendants to submit a submission agreement that contains any alterations such as the ones they interpolate withholding consent to arbitrate against Maestro Global.   Braga-Guerena Email at 4. FINRA asserts that "any added language constitutes an alteration" and that "[m]odifications to the Submission Agreement may cause confusion, lead to ancillary litigation, and undermine the enforceability of arbitration awards."  Braga-Guerena Email at 4.  The Defendants again reiterate their opposition to having to submit submission agreements that do not expressly withhold consent as to arbitration with Maestro Global.  See Braga-Guerena Email at 5.  A FINRA arbitration panel held a hearing on June 7, 2021, and ordered the Defendants to submit unmodified submission agreements.  See Order at 1-2, filed August 24, 2022 (Doc. 20-7); Order at 1-2, filed September 7, 2022 (Doc. 23-14)("Order to File Submission Agreements").

Ultimately, Terry, Kerr, and Rivera each filed unamended notices indicating their agreement to submit for FINRA arbitration their dispute with Waked and Stone.  See FINRA ARBITRATION Submission Agreement at 1, filed August 11, 2022 (Doc. 1-6)("Terry Submission Agreement"); FINRA ARBITRATION Submission Agreement at 1, filed August 11, 2022  (Doc. 1-7)("Kerr   Submission   Agreement");   FINRA   ARBITRATION   Submission Agreement at 1, filed August 11, 2022 (Doc. 1-8)("Rivera Submission Agreement").  Waked, Stone, and Maestro Global submitted their own consent to the FINRA arbitration.  See FINRA Arbitration Submission Agreement at 1, filed August 11, 2022 (Doc. 1-9)("Plaintiffs Submission Agreement").

In their briefing to the FINRA arbitration panel, however, the Defendants continued to contest FINRA jurisdiction to arbitrate Maestro Global's claims against them.  See Respondents and Counterclaimants Kathleen Kerr and Timothy Rivera and Respondent, Counterclaimant, and Third-Party Claimant Jane Terry's Prehearing Brief at 2-5 (Doc. 20-8)("Prehearing Brief").  They adduce caselaw for the proposition that they need not "arbitrate claims brought by a non-FINRA member."  Prehearing Brief at 6 (citing In re Brean Capital LLC v. NewOak Capital LLC, 2014 NY Slip Op 51838(U), ¶1, 9 N.Y.S.3d 592 (N.Y. Sup. Ct. 2014)).  Kerr and Rivera's dispute is only with Maestro Global, and, based on their employment contract with it, Maestro Global could compel them only to arbitration by a one-arbitrator panel according to the New Mexico Uniform Arbitration Act.  See Prehearing Brief at 7.  This "customized [arbitration] provision" in their employment contract displaces any potential mandatory FINRA arbitration forum.  Prehearing Brief at 7.  The Defendants also assert that Maestro Global cannot maintain a third-party beneficiary claim to the contract as a matter of law.  Prehearing Brief at 7.  These arguments do not contest the arbitrability or FINRA jurisdiction as to Waked and Stone's claims against the defendants; these arguments only go to Maestro Global's position in the arbitration and litigation.  Their counterclaim seeks, among other sources of relief, attorneys' fees.  See Respondent Terry, Kerr, and Rivera's Joint Amended Answering Statement, Counterclaim, and Third-Party Statement of Claim at 4, filed September 7, 2022 (Doc. 23-11).

Securities America offered briefing before the arbitration that advanced similar arguments.  See Prehearing Brief of Respondent Securities America, Inc. at 2-3, filed August 24, 2022 (Doc. 20-9)("Securities America Prehearing Brief").  It too argues that because it has no contract with Maestro Global that called for arbitration of disputes, and because Maestro Global is not a

FINRA member or associated person, Maestro Global cannot compel Securities America to arbitrate with it before a FINRA panel.  See Securities America Prehearing Brief at 3-4.

### 4.   **The Arbitration Hearing**.

During the arbitration hearing, Kerr and Rivera objected on multiple occasions to having to arbitrate with Maestro Global, because they asserted that Maestro Global is not subject to FINRA.  See Declaration of Scott C. Matasar, Esq. ¶ 4, at 1-2, filed August 24, 2022 (Doc. 20-1)("Matasar Declaration").  Kerr and Rivera assert that, because their relationship with Maestro Global is solely based on their employment obligations in their contract with it, and because their contract contains a clause calling for arbitration of any contractual disputes in a non-FINRA forum, that therefore they could not be compelled to arbitrate.  See Matasar Decl. ¶¶ 6-8 at 2-3.  The FINRA panel denied this objection, however, after holding oral argument on the subject before the beginning of the arbitration.  See Matasar Decl. ¶ 9, at 2-3.  After the initial, pre-arbitration argument, the FINRA panel demanded that Terry, Kerr and Rivera provide submission agreements "or face default and regulatory suspensions."  Matasar Decl. ¶ 9, at 2.  Kerr and Rivera submitted these submission agreements to the arbitration but reserved their objection; oral argument was then heard on the subject at the close of Waked and Stone's case in chief, and the arbitration panel again denied the objection as to the lack of jurisdiction.  Matasar Decl. ¶ 15-16, at 3; id. ¶ 20, at 4.

During the hearing, there was argument from Terry, Kerr, and Rivera that they had not waived their objection to FINRA's jurisdiction over the dispute simply by participating in the case, and that the panel should dismiss the arbitration for lack of jurisdiction.  See FINRA Dispute Resolution at 3, 8:5-9:8 (Krotinger, Ch., Matasar), filed August 24, 2022 (Doc. 20-16)("Undated

Tr.").[6]  They advised the chairman of the panel that their submission of uniform submission agreements, without the language the Defendants tried to interpolate about refusing consent to arbitrate with Maestro Global, "doesn't effectuate a waiver because we had no choice but to do so, or face a default."  Undated Tr. at 3, 9:7-8 (Matasar).  The panel questioned the Defendants why they could not opt for that route, accept default, and then litigate the default in court as opposed to in arbitration.  See Undated Tr. at 3, 9:9-17 (Krotinger, Ch.).  The panel also advised that the Defendants' gamesmanship was concerning in fighting the arbitration, having previously moved to compel the arbitration and dismiss the state court action:  "I am very concerned at the idea that, first of all, Respondents moved to dismiss the previous court action in favor of arbitration." Undated Tr. at 3, 9:19-21 (Krotinger, Ch.).

Further argument was entertained whether the Defendants' submission to the arbitration constituted waiver of their objection.  See Undated Tr. at 7-8, 5:16-6:15 (Matasar).  The Defendants argued that a case from the United States Court of Appeals for the Second Circuit, Safra Securities, LLC v. Gonzalez, 764 F. App'x 125 (2d Cir. 2019), is distinguishable.  See Undated Tr. at 8, 6:7-18 (Matasar).  That case, the Defendants noted, held that submission to arbitration effectuated waiver of a party's jurisdictional objections, but Terry, Kerr, and Rivera argued that Safra Securities, LLC v. Gonzalez stands for the proposition that such an objection, made only to a FINRA case administrator, and not to a full FINRA panel, works a waiver.  See

---

[6]The exhibit that Terry, Kerr, and Rivera attach as Doc. 20-16 is a series of transcripts of the arbitration hearing.  None of the transcripts are dated, and some appear to have occurred on the same day.  The document contains four separate transcripts that are separately paginated; the transcript pages appear in minimized typeface, so that four pages of the transcript are arrayed side by side on a single page of the document.  The Court will cite to this text first by page number according to CM/ECF, and then by page and line number internal to the transcript, .e.g., Undated Tr. at 2, 4:19-5:3 (Matasar).

Undated Tr. at 8, 6:7-15 (Matasar).  The Defendants noted that unlike the <u>Safra</u> objecting party, they fought the issue not only to the FINRA case administrator but also to a full FINRA panel before submitting uniform submission agreements:

> [W]hen we were ordered to [file a uniform submission agreement], my clients refused to do so and . . . [argued that] we were not obligated to arbitrate with Maestro, and we were not going to withdraw our qualified uniform submission agreement.  At which point in time, the case administrator punted it to the panel to consider, and there was oral arguments there.  And there was an order issued by this panel directing us to file a clean uniform submission agreement.

Undated Tr. at 8, 6:7-15 (Matasar).  Terry, Kerr, and Rivera noted moreover that the Federal Arbitration Act, 9 U.S.C. §§ 1-16 ("FAA"), permits immediate appeal only "when somebody is entitled to arbitration and doesn't get it," and not in such situations as theirs for being "wrongful forc[ed] into arbitration."  Undated Tr. at 8, 7:12-16 (Wells).

The panel noted that the Defendants might have sought to enjoin the allegedly improper arbitration proceeding in New Mexico State court.  <u>See</u> Undated Tr. at 9, 10:8-11:10 (Krotinger, Ch., Matasar).  New Mexico law allows for such challenges to stay an arbitration, under N.M.S.A. § 44-7A-8, Waked and Stone noted,  <u>see</u> Undated Tr. at 9, 12:19-21 (Pratt), while the Defendants maintained that their only available option was to object and then appeal, so that their failure to invoke State court power to enjoin or stay the arbitration does not effectuate a waiver.  <u>See</u> Undated Tr. at 10, 16:16-23 (Wells).  Securities America maintained that a FINRA rule prevents them from engaging in such injunctions and from staying actions against the arbitration:

> Under [FINRA Code 13209], it provides, and I'll quote it, "During an arbitration, no party may bring any suit, legal action or proceeding against any other party that concerns or would resolve any of the matters raised in the arbitration."  So, even the FINRA rules prohibits Securities America from separately initiating some sort of action in order to stop this arbitration.  As I said, the New Mexico rules contemplate that a party wrongfully ordered to arbitration, appeal does not arise until the final award is entered by a civil court.

Undated Tr. at 10, 17:6-13 (Wells).  Waked and Stone interpreted the FINRA rule only to apply to "substantive matters [in a dispute], not the arbitrability itself," noting that "[t]here are just a plethora of cases out there where FINRA firms go to court to stay arbitration when there's no agreement to arbitrate," Undated Tr. at 12, 22:10-16 (Pratt), and the panel expressed concern about allowing the "the FINRA rule [to] preempt[] the New Mexico State Arbitration Act" by blocking the stay-of-proceedings action available under N.M.S.A. 44-7A-8, Undated Tr. at 12, 24:12-15 (Krotinger, Ch.).

Terry, Kerr, and Rivera maintained that they submitted unqualified uniform submission agreements under duress from FINRA, but Waked and Stone responded that to submit to arbitration pursuant to FINRA's requirement that members and associated persons agree to arbitrate does not constitute duress.  See Undated Tr. at 12-13, 25:20-26:1 (Curley).  The Defendants asserted that they feared simply not showing up for the arbitration because they faced "the Hobbesian choice of arbitrating per the order of this panel, or taking a default against them," noting that "if an award is issued against a FINRA associative person or a member firm, and that award fails to get paid, their license is first suspended and then they are eventually, after about 90 or 180 days, barred from any district. So, that's the compulsion."  Undated Tr. at 13, 28:25-29:7 (Matasar).  This fear explains, in the Defendants' view, their submission of unqualified submission agreements after a panel, prior to the start of arbitration, ordered them to submit unqualified submission agreements, and the fact that they have proceeded with the arbitration proceedings for a year subsequently.  Terry, Kerr, and Rivera noted moreover, that "[t]here's never been an explanation as to why [Waked and Stone] didn't follow the arbitration clause in these contracts . . . . They drafted it with their counsel, to specifically say Santa Fe, sole arbitrator." Undated Tr. at 14, 30:17-31:5 (Matasar).

One exchange between the Panel and Securities America concerned the appropriate analogy for the effect of the parties' continued participation in the arbitration after they objected to the arbitration but did not seek recourse to State court to enjoin the proceeding:

> Securities America:   [J]ust as a lawyer who would like to contest the jurisdiction over him or her in a disciplinary proceeding -- perhaps if I have inadvertently appeared in a jurisdiction.  You have two choices, because as a lawyer, you submit to the jurisdiction of the regulatory body over which you have been alleged even to have practiced.  And your choices at that point are, you can agree, or you can decide not to participate, in which case you face, you know, sanctions, licensure suspension, licensure revocation.  Or you can maintain your objection and, you know, proceed subject to our objection as to what happened here.
>
> Panel:  I hear you. But I don't think it's gotten to that point yet.  It might have, but it did not.  I'm thinking, the more analogous case might be the case where there's a motion to dismiss for lack of jurisdiction in the court and one, at least when I was practicing, it's been about 120 years, is one has to be very careful to cut at every point in the proceeding, and the papers have to say repeatedly, "Appearing specially and only for the purpose of contesting jurisdiction."  If one does not, it's a waiver.  You appear, you proceed and you waive.  You waive objection to jurisdiction.
>
> Securities America:    Like I said, the difference is a regulatory proceeding, where the panel, the body maintains sanction and licensure powers against the respondent.  And in that case, like I said, it was a Hobbesian choice.
>
> Panel:  But this is not a FINRA disciplinary proceeding, is it?
>
> Securities America:   It's a FINRA proceeding, and under the FINRA rules, if my client fails to participate, and an award enters against it, which I understand it can if it fails to participate, it not only faces, you know, needing to pay the award that entered essentially by default; but it also faces suspension from FINRA, that means putting it out of business.

Undated Tr. at 16, 39:19-41:3 (Wells, Krotinger, Ch.).   Ultimately, the panel exercised its discretion under FINRA Code 13413 to interpret the FINRA code's provisions and denied the Defendants' motions to dismiss, see Undated Tr. at 18, 3:23-4:6 (Krotinger, Ch.), but, again, in the arbitration summation, Kerr and Rivera emphasized that "their joinder to this case has been

- 18 -

wrongful and erroneous under applicable federal rules since the day it happened," Draft Transcript of Hearing at 2, 68:4-7 (taken June 24, 2022), filed August 24, 2022 (Doc. 20-17)(Matasar).[7]

The arbitration panel did not record, in violation of FINRA arbitration rules, all portions of the arbitration hearing.  See Matasar Decl. ¶¶ 25-27, at 4; Email from Cody Netfin, West Region FINRA Office of Dispute Resolution, to Annamarie Braga, Matasar Jacobs at 1 (dated August 15, 2022), filed August 24, 2022 (Doc. 20-10)("Netfin-Braga Correspondence"); Transcript FINRA Dispute Resolution at 1-9 (taken August 17, 2022), filed August 24, 2022 (Doc. 20-14)("August 17 Tr.").   Approximately two-and-one-half days of the ten-day arbitration hearing were not recorded.  See Netfin Correspondence at 1-2.  The Defendants maintain that this missing recording includes testimony from Waked and Stone that they structured Maestro Global so that Kerr and Rivera's obligations were only toward Maestro Global and not toward Waked and Stone.  See Matasar Decl. ¶ 28-29, at 6-7; cf. August 17 Tr. at 1-9.  Waked, in the hearing's unrecorded portions, also confirmed that Maestro Global is not a broker-dealer and that any persons associated with Maestro Global, i.e., Kerr and Rivera, would have to associate with a broker-dealer to deal in securities.  See Matasar Decl. ¶ 30, at 7.  The lack of recordings was due to a technical problem with the recording device used.  See Email from Cody Neftin, West Region FINRA Office of Dispute Resolution, to Reagan Pratt, Pratt & Flack LLP at 1 (dated August 30, 2022), filed September 7, 2022 (Doc. 23-13)("Neftin-Pratt Correspondence").

---

[7]The exhibit that Terry, Kerr, and Rivera attach as Doc. 20-17 is a series of transcripts of the arbitration hearing.  The transcript is dated; the transcript pages appear in minimized typeface, so that four pages of the transcript are arrayed side by side on a single page of the document.  The Court will cite to this text first by page number according to CM/ECF, and then by page and line number internal to the transcript, e.g., Undated Tr. at 2, 4:19-5:3 (Matasar).

At the hearing, Waked and Stone argued that the FINRA panel had jurisdiction over the dispute with Kerr and Rivera, despite their employment relationship with Maestro Global.  See FINRA Dispute Resolution at 2, 18:3-21:21 (Pratt), filed August 24, 2022 (Doc. 20-15)("June 25 Tr.").  Waked and Stone argued that it was third-party-beneficiary rules in contract law that gave the result: "It is basic third party beneficiary law that third party beneficiary law that third party beneficiaries such as Shawn and Theresa are of the employment agreement [between Maestro Global and Kerr and Rivera], can sue to enforce that agreement."  June 25 Tr. at 2, 20:4-7 (Pratt).  The FINRA panel, they urged, could avoid Kerr and Rivera's "shenanigans" in this way: "[W]e can avoid . . . these FINRA members going to court and saying we don't have to abide by the submission agreements that we signed, simply by awarding all the damages to [Waked] and [Stone] individually.  Or [to Waked, Stone, and Maestro Global] joined in separately."  June 25 Tr. at 2, 20:10-14 (Pratt).  During the arbitration proceedings, Terry did not take the stand to testify in her own defense, although Kerr and Rivera did.  See Plaintiffs' Response at 6.

**5.**   **The Arbitration Award.**

The panel issued the Award on July 25, 2022.  See Award at 1; Email from Cody Netfin, FINRA Dispute Resolution Services, to Gregory M. Curley, filed August 24, 2022 (Doc. 20-11).  The Award made the following determinations: Terry is severally liable to Waked and Stone for $1,589,570.00 in compensatory damages; (ii) Kerr, Rivera, and Terry are jointly and severally liable to Waked and Stone for $2,872,473.00 in compensatory damages; (iii) Terry is severally liable for interest on the first award of $1,589,570.00 to Waked and Stone; (iv) Kerr, Rivera, and Terry are jointly and severally liable for interest on the $2,872,473.00 damages; (v) Securities America is liable to Waked and Stone in compensatory damages of $100,000.00; (vi) Securities America is liable on interest on the $100,000.00; (vii) Terry is liable to Waked and Stone for

$1,000,000.00 in punitive damages; (viii) Kerry, Rivera, and Terry are jointly and severally liable to Waked and Stone for $723,558.90 in attorneys' fees; (ix) Kerr and Terry are jointly and severally liable to Waked for emotional distress damages equaling $250,000.00; (x) Kerr and Terry are jointly and severally liable to Stone for emotional distress damages equaling $250,000.00; (xi) Defendants are jointly and severally liable for $600.00 in non-refundable FINRA arbitration fees; (xii) the panel ordered Defendants to return all documents and files containing confidential or proprietary business information within fourteen days; (xiii) Kerr, Rivera, and Terry's counterclaims were denied; and (xiv) all claims not specifically addressed in the Award were denied.  See Award at 6-7.  The FINRA panel, aside from some citations to judicial decisions in the punitive damages award provision conclusion and the attorneys' fees conclusion, did not provide an explanation in the Award for the decisions it reached.  See Award at 1-10.  The Award also does not describe what factual findings the panel made during the arbitration.  See Award at 1-10.  Notably, as Waked and Stone had urged, see June 25 Tr. at 2 (suggesting that the panel "award[] all the damages to [Waked] and [Stone] individually"), the panel did not award damages to Maestro Global, and awarded damages only to Waked and Stone.

## PROCEDURAL BACKGROUND

Waked and Stone seek relief in federal court to enforce the arbitration award.  On August 11, 2022, they filed their Motion to Confirm.  Their Motion to Confirm is not styled as a complaint, but it contains statements of the Court's jurisdiction and a prayer for relief similar to a complaint. Terry, Kerr, and Rivera filed their Motion to Vacate, wherein they seek to have the Court vacate the arbitration award.  The Plaintiffs responded to the Motion to Vacate and replied in support of their own Motion to Confirm.  See Plaintiffs' Response to Defendants' Motion to Vacate Arbitration Award (Doc. #20), and Reply in Support of Plaintiffs' Motion to Confirm Arbitration

Award (Doc. #1), filed September 7, 2022 (Doc. 23)("Plaintiffs' Response").   The Defendants

then filed a reply.  See Defendants Jane Terry, Kathleen Kerr, and Timothy Rivera's Reply Brief

in Support of Cross Motion to Vacate Arbitration Award (Oral Argument Requested), filed

October 11, 2022 (Doc. 29)("Defendants' Reply").

The Court held a hearing on January 10, 2023.  See Transcript of Hearing at 1:1 (taken

January 10, 2023), filed June 5, 2023 (Doc. 57)("January 10 Tr.").  After the hearing, the Court

entered an Order granting the Motion to Confirm, denying the Motion to Vacate, and confirming

the Award.  See Order, filed March 6, 2023 (Doc. 51)("Order").  In a footnote, the Court stated:

> This Order disposes of the Plaintiffs' Motion to Confirm Arbitration Award
> and Enter Judgment Thereon, filed August 11, 2022 (Doc. 1), and the Defendants
> Jane Terry, Kathleen Kerr, and Timothy Rivera's Opposition to Plaintiffs' Motion
> to Confirm Arbitration Award and Cross Motion to Vacate Arbitration Award, filed
> August 24, 2022 (Doc. 20). The Court will issue a Memorandum Opinion at a later
> date fully detailing its rationale for its decision.

Order at 1 n.1.  After the Court entered its Order, Terry, Kerr, and Rivera filed an appeal to the

United States Court of Appeals for the Tenth Circuit.  See Notice of Appeal, filed March 20, 2023

(Doc. 52).  The Tenth Circuit abated the appeal until the Court issues a Memorandum Opinion that

the Order promised.  See Order at 1 n.1 ("The Court will issue a Memorandum Opinion at a later

date fully detailing its rationale for its decision.").

### 1.    **Waked and Stone's Motion to Confirm.**

On August 11, 2022, Waked and Stone commenced this litigation to affirm their arbitration

award.  They have not submitted a litigation document entitled a "complaint" or a "petition" as

rule 8 of the Federal Rules of Civil Procedure provides; instead, the document commencing

litigation is their Motion to Confirm.  See Motion to Confirm at 1.[8]  The Motion to Confirm, however, does make a statement of the Court's jurisdiction, founded upon the parties' diverse citizenship.  See Motion to Confirm at 1.

Invoking FAA § 9, they argue that the Court "'must' grant an order confirming [the] arbitration award unless the award is vacated, modified, or corrected" according to §§ 10 and 11 of the FAA.  Motion to Confirm ¶ 25, at 7 (quoting 9 U.S.C. § 9).  They note that similar mandatory language appears in New Mexico's arbitration statute.  See Motion to Confirm ¶ 25, at 7.  They cite caselaw for the proposition that "the confirmation of an arbitration award 'is a summary proceeding that merely makes what is already a final arbitration award a judgment of the court," and that "'the standard of review of arbitral awards is among the narrowest known to law."  Motion to Confirm ¶26, at 7 (quoting Florasynth, Inc. v. Pikholz, 750 F.2d 171, 176 (2d Cir. 1984), then quoting Sheldon v. Vermonty, 269 F.3d 1202, 1206 (10th Cir. 2001)).  They assert that, because the Award in their arbitration issued following extensive evidence and argument, the Court should confirm the Award.  See Motion to Confirm ¶ 27, at 7.  They also seek attorneys' fees on the ground that New Mexico law permits recovery of costs and attorneys' fees associated with confirming an arbitration award.  See Motion to Confirm ¶ 28, at 8 (citing N.M.S.A. § 44-7A-26(b) to -26(c)).

---

[8]Although the Plaintiffs did not offer a complaint or petition, rule 8(e) of the Federal Rules of Civil Procedure requires that "[p]leadings . . . be construed so as to do justice."  See Fed. R. Civ. P. 8(e).  Accordingly, the Court will treat the Motion to Confirm as a petition to confirm the Award under the FAA.  See 9 U.S.C. § 9 ("[A]t any time within one year after [an arbitration] award is made any party to the arbitration may apply to the court so specified for an order confirming the award.").

2.      **Terry, Kerr, and Rivera's Motion to Vacate**.

The Defendants urge the Court to vacate the Award.  They maintain that their case presents a "textbook example" of the need for the protections that the FAA and the New Mexico Uniform Arbitration Act, N.M.S.A. § 44-7a-1 to 44-7a-32 ("NMUAA"), provide.  Motion to Vacate at 1. They assert, as they had during the arbitration proceedings, that the panel improperly "forc[ed] Defendants Kathleen Kerr and Timothy River to arbitrate . . . in a FINRA forum to which they never agreed against a Respondent, Maestro Global[,] . . . which was never even subject to FINRA jurisdiction."  Motion to Vacate at 1.

Looking to FAA § 10, providing grounds for vacating arbitration awards, and to NMUAA §§ 10(a), 24(a), they assert that the arbitrators usurped their power.  See Motion to Vacate at 10-11 (citing 9 U.S.C. § 10(a)(1)-(4); N.M.S.A. §§ 44-7A-24(a), -10(a); ARW Exploration Corp. v. Aguirre, 45 F.3d 1455, 1462 (10th Cir. 1995)).  Specifically, they emphasize one of the grounds for vacatur that the FAA provides, under subsection (a)(4) of 9 U.S.C. § 10: vacatur of an arbitration award is appropriate "where the arbitrators exceeded their powers, or so imperfectly executed," that no "mutual, final, and definite" award was reached.  Motion to Vacate at 11 (quoting 9 U.S.C. § 10(a)(4)).  A prominent doctrine supports their position, the Defendants assert, namely the rule that arbitrators "exceed[] their powers" and "imperfectly execute[] them" when the arbitrators exhibit "manifest disregard of the law."  Motion to Vacate at 11 (quoting 9 U.S.C. § 10(a)(4), then Stolt-Nielsen SA v. AnimalFeeds Int'l Corp., 548 F.3d 85, 94-95 (2d Cir. 2008)). Terry, Kerr, and Rivera fault the panel for having  "'disregarded or modified unambiguous contract provision, . . . [and for] bas[ing the] award on his own personal notions of right and wrong.'" Motion to Vacate at 12 (quoting Raymond James Fin. Servs. v. Bishop., 596 F.3d 183, 189 (4th Cir. 2010)).  In their view "the Panel's Award demonstrates a complete disregard for unambiguous

contracts and applicable governing law in favor of manufacturing its desired, but illegitimate, outcome."  Motion to Vacate at 13.

According to Terry, Kerr, and Rivera, the panel wrongfully disregarded its knowledge that the only claims against Kerr and Rivera are Maestro Global's, and that Waked and Stone were not parties to the employment contracts into which Rivera and Kerr entered with Maestro Global.  See Motion to Vacate at 13.  They highlight the fact that all of the claims in Waked and Stone's arbitration Statement of Claim concern contractual disputes from this contract.  See Motion to Vacate at 13-14 (citing Statement of Claim at 16, 18, 20).  By bestowing the Award on only the principals, Waked and Stone, the panel made "an end run around the reality that Maestro was never a proper party" to the arbitration and wrongfully "impute[s] a contract which does not exist" between the defendants Kerr and Rivera and the plaintiffs Waked and Stone.  Motion to Vacate at 14.

Terry, Kerr and Rivera emphasize to the Court arguments they made to the panel about Maestro Global's improper posture as a party to the FINRA forum.  They note that FINRA's code provides panel jurisdiction that is "clearly and narrowly defined" and provides only for jurisdiction over disputes between FINRA members or FINRA associate persons.  Motion to Vacate at 14 (citing FINRA Code 13200).  The Defendants assert that some judicial decisions have vacated FINRA arbitration awards because a party to the arbitration was not a member or associated person, and so had no standing.  See Motion to Vacate (citing Wells Fargo Advisors, LLC v. Quantum Fin. Partners LLC, 2015 U.S. Dist. Lexis 113038, at *6 (D. Kan. August 25, 2015)(Robinson, J.); In re Brean Capital LLC v. NewOak Capital LLC, 2014 NY Slip Op 51838(U), ¶1, 9 N.Y.S.3d 592 (N.Y. Sup. Ct. 2014)).  They fault the panel for ignoring the specially crafted arbitration provision in their contract with Global Maestro -- providing for a

single arbitrator under the NMUAA -- and for adopting the Plaintiffs' proposed remedy instruction -- to award damages to Waked and Stone.  See Motion to Vacate at 15.

Terry, Kerr, and Rivera accuse the Panel of "intentionally ignoring the legal entity of Maestro so that Waked and Stone could personally benefit. . . ."  Motion to Vacate at 16. Moreover, they reject the proposition that Waked and Stone are intended third-party beneficiaries of their contract with Maestro Global, who, occupying such third-party beneficiary status, are empowered to sue for a breach of Kerr and Rivera's Maestro Global contract.  See Motion to Vacate at 16 n.2 (citing Fleet Morg. Corp. v. Schuster, 1991-NMSC-046, ¶ 4, 112 N.M. 48, 49-50, 811 P.2d 81, 82-83).  Terry, Kerr, and Rivera assert that the Award's imposition of joint and several liability is inappropriate because they together did not visit a single indivisible harm on the plaintiffs.  See Motion to Vacate at 16.  The Defendants argue that instead, they are not liable for the "same harm" to the "same person" because Kerr and Rivera's relationships with Waked and Stone differ from that of Terry with Waked and Kerr.  Motion to Vacate at 16 (quoting Black's Law Dictionary p.1627).  On the same basis, they fault the panel for awarding attorneys' fees to Waked and Stone, and not to Maestro Global.

Terry, Kerr, and Rivera complain at length that the failure of the panel to record portions of the arbitration hearing, and to retain copies thereof, is malfeasance supplying grounds for vacatur.  See Motion to Vacate at 17-21.  They note that FINRA Code 13606 requires recording proceedings.  See Motion to Vacate at 17-18.  During this extended discussion, they cite one case in which "merely [unrecorded] *one* day of a week-long arbitration hearing" supplied grounds to vacate an arbitration award, because it "prejudiced [the petitioner] by her inability to show that the arbitrator had exhibited bias during the unrecorded session."  Motion to Vacate at 20 (citing Millman v. UBS Fin. Servs. Inc., Case No. CPF 18-516349, Superior Court of California, County

of San Francisco (December 19, 2018)(Amended Order Granting Petition to Vacate Arbitration Award))(emphasis in original).  They assert that the failure to record the proceedings "plainly and seriously prejudice" their ability to demonstrate that the panel knew of the applicable law that would, they maintain, prevent Maestro Global's participation in the arbitration, but that the panel disregarded that known limitation.  Motion to Vacate at 20.  For these reasons then, they urge the Court to vacate the allegedly illegal award.

   3.   **Waked and Stone's Response**.

   In their Response, Waked and Stone urge the Court to reject the Motion to Vacate and instead to grant their Motion to Confirm.  They begin by noting that, although the Motion to Vacate purports to argue on behalf of all three Defendants, it contains no argument why Terry should escape her liability under the Award.  See Plaintiffs' Response at 3-4.  On this ground, Waked and Stone urge the Court to confirm the Award's provision for $1,589,570.00 in compensatory damages awarded against her and no other respondent, and $1,000,000.00 in punitive damages awarded against her and no other respondent.  See Plaintiffs' Response at 3-4 (citing Award at 6-7).

   As to Kerr and Rivera's liability, Waked and Stone assert that the Motion to Vacate fails to confront their tort claims.  See Plaintiffs' Response at 4-6.  "[B]ecause Waked and Stone also asserted multiple tort claims against Kerr and Rivera and [because], pursuant to FINRA practice, the Award does not state which claims it is based on[,] . . .  the Award could be based on Waked and Stone's contract claims, on their tort claims, or both."  Plaintiffs' Response at 4.  Waked and Stone argue thus that, even assuming it is true that they could not recover or sue as third-party beneficiaries on the Maestro Global contract, they offered bases for liability independent of Kerr and Rivera's contractual liability to Maestro Global, and the Court should reject Kerr and Rivera's

"bald[] declaration that . . . the panel 'knew' that (i) only Maestro Global, LLC asserted any claims against Kerr and Rivera, and (ii) the claims against them were based solely on their contracts with Maestro."  Plaintiffs' Response at 6 (no source given for quotation).  For this reason, Waked and Stone maintain, the Defendants do not dispute adequately that the arbitration panel manifestly disregarded the tort law governing their personal claims against Terry, Kerr, and Rivera.  See Plaintiffs' Response at 6.

Waked and Stone assert that the FINRA arbitration panel acted within its jurisdiction in deciding the claims.  See Plaintiffs' Response at 6-7.  They note that the Kerr and Rivera's Form U4s, not a narrow contract provision, authorize the arbitration:

> This was not an arbitration under a contract with a narrow arbitration clause that authorized the arbitrator to only interpret, apply, or determine compliance with the provisions of the contract, such as might be found in a typical collective bargaining agreement.  See, e.g., Champion Intern. Corp. v. United Paperworks Intern. Union, AFL-CIO, 168 F.3d 725, 729 (4th Cir. 1999).  This was a FINRA arbitration, in which the arbitrators initially drew their authority from Kerr and Rivera's agreements to be "Associated Persons" of a FINRA broker-dealer.  Those agreements bound them to the FINRA Rule requiring them to arbitrate all aspects of any dispute with any other "Associated Persons" of a FINRA firm, if the dispute arose out of their business activities.  Kerr and Rivera further confirmed the panel's authority when they signed their unqualified post-dispute Submission Agreements in which they agreed to submit the entire controversy to arbitration, "as set forth in the attached statement of claim." Doc. #2-7, 2-8. While Defendants claim that the panel "forced" them to sign submission agreements as to Maestro, they have never denied that they voluntarily signed Submission Agreements as to Waked and Stone (Doc. #20-3) or that they were bound by those agreements and by the related FINRA Rules to arbitrate every claim asserted by Waked and Stone.  See Doc. #20, p. 5-6 and n.1.

Plaintiffs' Response at 6-7.

Waked and Stone note that Kerr and Rivera did not only sign contracts with Maestro Global, but also signed contracts with Waked and with Raymond James -- a fact that Kerr and Rivera did not deny during the arbitration hearings.  See Plaintiffs' Response at 7-8.  Moreover,

they argue, they are intended third-party beneficiaries of the Maestro Global contracts, so they are empowered to bring claims on that contract.  <u>See</u> Plaintiffs' Response at 8.  They point out that it was a sticking point in negotiations of the Purchase Sale Agreement among Terry, Waked, and Stone that Kerr and Rivera stay on as the firm's employees, and they point to Kerr and Rivera's testimony at the arbitration hearing that admitted they knew their employment contracts served that purpose; thus, Waked and Stone argue, the employment contracts that Kerr and Rivera signed with Maestro Global evidently were for the benefit of Waked and Stone for their overall ownership of the services firm.  <u>See</u> Plaintiffs' Response at 11.  Waked and Stone note last that even if the arbitrators committed a legal error in allowing the third-party claim on the contract, the situation does not represent an extraordinary enough circumstance to justify vacating the arbitration award. <u>See</u> Plaintiffs' Response at 9 (citing <u>ARW Exploration Corp. v. Aguirre</u>, 45 F.3d 1455, 1463 (10th Cir. 1995); <u>THI of New Mexico at Vida Encantada, LLC v. Lovato</u>, 864 F.3d 1080, 1084 (10th Cir. 2017)).  The Plaintiffs assert, moreover, that the issue of third-party beneficiary law was not argued at the arbitration hearing, and for that reason, the arbitrators "could not have 'manifestly disregarded' a legal argument that they never heard."  Plaintiffs' Response at 12 (no citation given for quoted material).

They urge the Court not to adopt the whole "manifest disregard" framework, because they note that, although appellate courts had introduced a "manifest disregard" doctrine as a ground for vacatur in addition to the four statutorily provided grounds in 9 U.S.C. § 10, more recent Supreme Court of the United States precedent has made unavailable that rule.  They note that in the 2008 case, <u>Hall Street Assocs., L.L.C. v. Mattel, Inc.</u>, the Supreme Court held that "the FAA confines its expedited judicial review to the grounds listed in 9 U.S.C. §§ 10 [(vacatur)] and 11 [(correction)]," and "expanding the detailed categories would rub too much against the grain of

the § 9 language, where provision for judicial confirmation carries no hint of flexibility."
Plaintiffs' Response at 13 (quoting Hall Street Assocs., L.L.C. v. Mattel, Inc, 552 U.S. at 587,
592).  They assert that appellate courts since that case have held that "manifest disregard of the
law," as a judicially created vacatur ground, is no longer available.  See Plaintiffs' Response at 13
(citing Abbott v. Law Office of Patrick J. Mulligan, 440 F. App'x 612, 618-19 (10th Cir. 2011);
THI of New Mexico at Vida Encantada, LLC v. Lovato, 864 F.3d at 1085 n.1).  New Mexico's
NMUAA similarly lacks such a doctrine for vacating arbitration awards.  See Plaintiffs' Response
at 13

Waked and Stone urge the Court to reject the contention that the award is invalid because
of the panel's lack of jurisdiction to adjudicate Maestro Global's claims.  See Plaintiffs' Response
at 13-15.  They assert first that Terry, Kerr, and Rivera waived their objection to FINRA's
jurisdiction both by submitting unqualified submission agreements, and because the Defendants
failed to seek an injunction against the allegedly improper arbitration proceeding either in State
court or in federal court.  See Plaintiffs' Response at 14.  They note that courts regularly enjoin
allegedly improper proceedings.  See Plaintiffs' Response at 14 (citing CIG Asset Mgmt. v.
Bircoll, No. CIV 13-13213, 2013 WL 4084763, at *2 (E.D. Mich. August 13, 2013)(Drain, J.);
Brean Capital, LLC v. NewOak Capital LLC, 46 Misc. 3d 1203(A), 9 N.Y.S.3d 592 (N.Y. Sup.
Ct. 2014)).  In Safra Securities, LLC v. Gonzalez, 764 F. App'x 125 (2d Cir. 2019), they note, the
Second Circuit "rejected a complaint indistinguishable from Defendants'."  Plaintiffs' Response
at 14.  Waked and Stone conclude that argument by maintaining that the FINRA administrators
did not compel under duress Terry, Kerr, and Rivera to sign and submit the unqualified uniform
submission agreements that they ultimately signed.  See Plaintiffs' Response at 15 (citing Barwin
v. Reidy, 1957-NMSC-016, ¶ 49, 62 N.M. 183, 197, 307 P.2d 175, 185).

Waked and Stone's Response maintains that both the Maestro Global contracts and the uniform submission agreements empowered the panel to award attorneys' fees.  See Plaintiffs' Response at 15 (citing Hollern v. Wachovia Sec., Inc., 458 F.3d 1169, 1174 (10th Cir. 2006)).  In an extended discussion, Waked and Stone also contend that the failure to record portions of the arbitration proceedings does not supply grounds for vacatur.  See Plaintiffs' Response at 16.  They note that Terry, Kerr, and Rivera must show that the "failure to record reflected **misconduct** by the panel that **prejudiced** the proceedings of prevented judicial review."  Plaintiffs' Response at 16 (citing Lessin v. Merrill Lynch, Pierce, Fenner & Smith Inc., Civ. A. 5-171, 2006 WL 1096623, *8 (D.D.C. March 31, 2006)(Collyer, J.))(emphasis in original).  Plaintiffs also maintain that the failure to record does not reflect misconduct nor does it prejudice the Defendants.  See Plaintiffs' Response at 16-17 (citing Groves v. Merrill Lynch, Pierce, Fenner & Smith, Inc., No. MER-L-1471-04, 2006 WL 2059514 (N.J. Super. Ct. App. Div. July 26, 2006); Card v. Stratton Oakmont, Inc., 933 F. Supp. 806, 814-15 (D. Minn. 1996)(Davis, J.)).  To this issue, the Plaintiffs point out that the testimony given but unrecorded "would not have justified vacatur," because the testimony allegedly concerned only arguments about the impropriety of Maestro Global as a party.  See Plaintiffs' Response at 18.  Waked and Stone note that Terry, Kerr, and Rivera do not in their Motion to Vacate challenge the sufficiency of the evidence supporting the arbitration Award.  See Plaintiffs' Response at 18.  Moreover, they cite cases to the effect that, where, as here, the party challenging the award fails to provide the reviewing court with only a portion of the hearing transcript and with none of the exhibits filed in the arbitration, there is a presumption that unprovided evidence supports the award, see Plaintiffs' Response at 19 (citing Groves v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 2006 WL 2059514, at *7, In re Chestnut Energy Partners, Inc., 300 S.W.3d 386, 401 (Tex. Ct. App. 2009)), and they note that the one case which the

Defendants cite regarding their missing tapes argument, <u>Millman v UBS Financial Services, Inc.</u>, is unavailable on Westlaw or Lexis and unprovided to the Court.  For all these reasons, they urge the Court to deny the Motion to Vacate and instead to grant the Motion to Confirm.

### 4.      <u>Terry, Kerr, and Rivera's Reply</u>.

The Defendants' Reply urges the Court to reject the arguments in the Response, because of a failure of a fundamental requirement of arbitration: their consent to arbitrate, specifically with Maestro Global.  <u>See</u> Defendants' Reply at 1.  Terry, Kerr, and Rivera accuse the Plaintiffs of both using Maestro Global's corporate form as a shield and as a sword; Terry, Kerr, and Rivera maintain that they did not consent to arbitrate with Maestro Global, and that the FINRA panel could not bypass their consent by awarding damages to Waked and Stone, Maestro Global's principals.  <u>See</u> Defendants' Reply at 3 (citing <u>Alford v. Frontier Enterprises, Inc.</u>, 599 F.2d 483, 484 (1st Cir. 1979)).

The Defendants maintain that if Waked and Stone are to enforce personally, as third-party beneficiaries, the contract's terms and seek its benefits, then the contract's constraints also bind Waked and Stone, including the non-FINRA forum arbitration issue.  <u>See</u> Defendants' Reply at 4-5 (citing  <u>Trans-Bay Engineers & Builders v. Hills</u>, 551 F.2d 370, 378 (D.C. Cir. 1976); <u>Parker v. Ctr. for Creative Leadership</u>, 15 P.2d 297, 298 (Colo. App. 2000); <u>Lee v. Grandcor Med. Systems</u>, 702 F. Supp. 252, 255 (D. Colo. 1998)(Carrigan, J.)).  Terry, Kerr, and Rivera maintain that "[b]y pursuing claims to 'enforce the restrictive covenants in Kerr and Rivera's employment agreements with Maestro' (Resp. at p. 3), Plaintiffs necessarily assumed the burden under those Agreements to arbitrate '[a]ny dispute arising from or relating to [the Employment Agreements] or any other employment related disputes' in a non-FINRA forum."  Defendants' Reply at 5 (quoting Plaintiffs' Response at 3, then Employment Contracts at 6, 14).  In response to Waked and Stone's argument

that, even if Waked and Stone were required to arbitrate contract breach claims in a non-FINRA

forum, that Waked and Stone were free to pursue their tort claims in a FINRA forum, Terry, Kerr,

and Rivera assert that the arbitration provision's broad language -- "[a]ny dispute arising out of or

relating to this Agreement or any other employment related disputes . . . shall . . . be resolved in

arbitration . . . by one arbitrator . . . in accordance with the New Mexico Uniform Arbitration Act,"

Employment Contracts at 6, 14 -- requires both contract breach and tort claims to be resolved in

the non-FINRA forum.  See Defendants' Reply at 5-6 (citing Cummings v. FedEx Ground Package

System, Inc., 404 F.3d 1258, 1261 (10th Cir. 2005); Roby v. Corporation of Lloyds, 996 F.2d

1353, 1361 (2d Cir. 1983); Raymond James Fin. Servs. v. Bishop, 596 F.3d 183, 192 (4th Cir.

2010)).  On similar grounds, the Defendants resist the Plaintiffs' contention that the Defendants

offered no argument why the FINRA panel lacks jurisdiction over the dispute with Terry; because

of the employment contracts' broad language for arbitration, Terry too could insist on the non-

FINRA forum arbitration, because she was alleged to have conspired with Kerr and Rivera who,

the Defendants assert, undoubtedly could insist on the non-FINRA forum.  See Defendants' Reply

at 7 (citing Arnold v. Arnold Corp.- Printed Communications for Business, 920 F.2d 1269, 1281

(6th Cir. 1990); Lawit v. Maney & Gordon, PA, No. CIV 13-0835, 2014 WL 11512612, at *6

(D.N.M. 2014)(Vidmar, M.J.)).  Terry, the Defendants assert, "objected to the Panel hearing such

claims and as such properly asserts the right to vacatur of the Award on the same grounds as

Defendants Kerr and Rivera."  Defendants' Reply at 8.

　　　They argue that the employment contracts' agreement to arbitrate in a non-FINRA forum

supersedes any pre-existing agreement to arbitrate in a FINRA forum.  They cite caselaw for the

proposition that "'a contract between the parties can supersede the default obligation to arbitrate

under the FINRA Rules.'"  Defendants' Reply at 8 (quoting Goldman Sachs & Co v. City of Reno,

747 F.3d 733, 741 (9th Cir. 2014), and citing Credit Suisse Securities (USA), LLC v. Tracy, 812

F.3d 249, 254 (2nd Cir. 2016); Raymond James Fin. Servs. v. Bishop, 596 F.3d at 189). "The

Employment Agreements met the 'sufficiently specific requirement' and displaced Plaintiffs'

default right to compel Defendants to arbitrate the subject disputes in a FINRA forum."

Defendants' Reply at 9 (quoting UBS Financial Services Inc. v. Carilion Clinic, 706 F.3d 319, 328

(4th Cir. 2010)).

Terry, Kerr, and Rivera maintain that throughout the arbitration they objected to the

compelled arbitration based on the jurisdictional issue regarding Maestro Global.  They assert that

they submitted unqualified uniform submission agreements only upon fear of disciplinary action

against them by a fully empowered arbitration panel and that they did not seek injunctive relief in

State court because FINRA's rules prevent seeking judicial relief before imposition of the Award,

see Defendants' Reply at 10 (citing FINRA Code 13212; FINRA Code 13209);[9] these

circumstances, they assert, differentiate their situation from the United States Court of Appeals for

the Second Circuit's case, Safra Securities, LLC v. Gonzalez, 764 F. App'x 125, which found

waiver based on an objection to FINRA jurisdiction lodged before only a FINRA case

administrator and not subsequently lodged before a full FINRA panel, see Defendants' Reply at

10.  The Defendants argue that, so long as they maintained vigorously their opposition to FINRA

jurisdiction throughout the proceedings, no waiver of their opposition to the panel's jurisdiction

---

[9]FINRA's arbitration code is available online.  See 13000. Code of Arbitration Procedure for Industry Disputes, FINRA, https://www.finra.org/rules-guidance/rulebooks/finra-rules/13000 (last visited April 5, 2024); 12000. Code of Arbitration Procedure for Customer Disputes, FINRA, https://www.finra.org/rules-guidance/rulebooks/finra-rules/12000 (last visited April 5, 2024). Throughout this Memorandum Opinion and Amended Order, the Court refers to the arbitration provisions thus: "FINRA Code 13200," "FINRA Code 12200," etc.  When referring to the FINRA Code as a whole, the Court may also call it, e.g., "FINRA's Code" or the "FINRA Arbitration Code."

lies in their commencement of arbitration; the proposition that they "were required to initiate a judicial proceeding to enjoin enforcement of the FINRA Panel's Order compelling Defendants to adjudicate claims involving Defendants Kerr and Rivera's employment and the Employment Agreements finds no support" either in caselaw or in statutory law.  Defendants' Reply at 11-12 (citing CIG Asset Mgmt. v. Bircoll, 2013 WL 4084763, at *2-3; Brean Capital, LLC v. NewOak Capital, LLC, 9 NY.S.3d 592, at *1-5, Lewis v. Circuit City Stores, Inc., 500 F.3d 1140, 1149-1150 (10th Cir. 2007); 9 U.S.C. § 10; N.M.S.A. § 44-7A-24(4)).  According to the Defendants, these objections to the panel's jurisdiction apply equally to Waked and Stone, if the Court treats Waked and Stone as having stepped into the shoes of Maestro Global as third-party beneficiaries. See Defendants' Reply at 12-13 (citing Flying Phoenix Corp. v. Creative Packaging Machinery, Inc., 681 F.3d 1198, 1201 (10th Cir. 2012)).

The Defendants argue that the contracts which Kerr and Rivera executed with Raymond James do not obligate them to arbitrate in a FINRA forum.  Because, they note, the Raymond James contracts providing that Kerr and Rivera will serve as financial advisors on its behalf make clear that Kerr and Rivera "'[are] being retained by Shawn Waked . . . an associate of [Raymond James],'" then this contract does not provide an independent basis for FINRA arbitration jurisdiction, Defendants' Reply at 13 (quoting Raymond James Financial Services, Inc. FA Agreement at 1 (dated April 8, 2019), filed September 7, 2022 (Doc. 24-2)("Kerr RJ FA Agreement"); Raymond James Financial Services, Inc. FA Agreement at 1 (dated April 8, 2019), filed September 7, 2022 (Doc. 24-3)("Rivera RJ FA Agreement")); this result follows from the fact that "Waked employed Defendants Kerr and Rivera through Maestro . . . [and] Mr. Waked, through Maestro, agreed to arbitrate '[a]ny dispute arising from or relating to'" the employment contracts in a non-FINRA forum, Defendants' Reply at 13-14 (quoting Employment Contracts at

6, 14).   Reiterating their claim that the unavailability of the multiple days of recording of the arbitration hearing prejudices their claim because the missing portions "show the nature and extent of Defendants' objections" based on lack of FINRA arbitrability, see Defendants' Reply at 15, they urge the Court to vacate the award.   To supplement their Reply, the Defendants Kerr and Rivera filed a motion seeking a page extension.   See Defendants' Motion for Extension of Page Limit, filed October 7, 2022 (Doc. 28)("Motion for Page Extension").

### 5. **Waked and Stone's Sur-Reply.**

Waked and Stone filed a motion to permit a sur-reply and attached as an exhibit the sur-reply they would file if the Court would consider it.   See Plaintiffs' Motion for Leave to File Sur-Reply, filed October 14, 2022 (Doc. 30)("Motion for Sur-Reply"); Plaintiffs' Sur-Reply to Defendants' Reply Brief (Doc. #29) Regarding Defendants' Motion to Vacate Arbitration Award (Doc. #20) and Plaintiffs' Motion to Confirm Arbitration Award (Doc. #1), filed October 14, 2022 (Doc. 30-1)("Sur-Reply").   The Motion for Sur-Reply argues that the Court's consideration of the Sur-Reply is proper, because Terry, Kerr, and Rivera's Reply "argues, for the first time in this or any other proceeding, that Defendants Kerr and Rivera were not obliged to arbitrate Plaintiffs Waked and Stone's claims in a FINRA arbitration."   Motion for Sur-Reply at 1.   Because the Defendants' briefing offers new arguments, the Court should permit them to file a sur-reply, Waked and Stone argue.   See Motion for Sur-Reply at 1.

The Sur-Reply that Waked and Stone attach, in case the Court grants their Motion for Sur-Reply, argues against the Reply's thesis that "the arbitration clause of their employment agreements with Maestro Global LLC 'superseded' their prior agreements and the FINRA Rule requiring a FINRA arbitration."   Sur-Reply at 1.   Waked and Stone note that Terry, Kerr, and Rivera, throughout the arbitration, protested only their having to arbitrate with Maestro Global,

and that they did not protest having to arbitrate Waked and Stone's claims against them.  See Sur-Reply at 1-2 (citing Answering Statement ¶ 13, at 2; id. ¶ 64, at 4; Prehearing Brief at 3-4).

Waked and Stone argue that the Defendants' reliance on the United States Court of Appeals for the Second Circuit's caselaw, regarding arbitration, is misplaced.  See Sur-Reply at 3-4.  The Plaintiffs note that the Tenth Circuit has not adopted the Second Circuit's decision holding that "FINRA members and associated persons can privately agree to not be bound by FINRA Rule 13200."  Sur-Reply at 3 (citing Credit Suisse Securities (USA) LLC v. Tracy, 812 F.3d 249, 256 (2nd Cir. 2016)).  Waked and Stone note, moreover, that FINRA has issued a notice explicitly disagreeing with the reasoning and result of Suisse Securities (USA) LLC v. Tracy, 812 F.3d 249; FINRA there states that "FINRA has made clear to member firms and associated persons that they have the mandatory and nonwaivable duty to arbitrate disputes, and (with certain exceptions) to arbitrate them before FINRA."  Sur-Reply at 3-4 (quoting Regulatory Notice 16-25: Forum Selection Provisions Involving Customers, Associated Persons and Member Firms, FINRA (July 22, 2016), https://www.finra.org/rules-guidance/notices/16-25 ("Reg. Notice 16-25").  It is for this reason, Waked and Stone argue, that, for example, the United States Court of Appeals for the Third Circuit in has declined to follow the Second Circuit, instead holding that a private arrangement -- such as the Maestro Global contracts here -- cannot narrow the mandatory arbitration FINRA requires.  See Sur-Reply at 4 (citing Reading Health Sys. v. Bear Stearns & Co., 900 F.3d 87 (3d Cir. 2018)).  They point out, moreover, that Terry herself, in her initial motion to compel arbitration filed in State court, relied on Regulatory Notice 16-25 to compel Waked and Stone to arbitrate.  See Sur-Reply at 4.

Waked and Stone argue, moreover, again, that Terry, Kerr, and Rivera should have sought an injunction in State court to halt the arbitration proceedings before the FINRA panel.  See Sur-

Reply at 5-6.  They note that FINRA Code 13209 does not prohibit such a court challenge to the jurisdictional issue of the agreement to arbitrate, but rather only prohibits court litigation as to the underlying substantive dispute.  See Sur-Reply at 5.  According to the Plaintiffs, Terry, Kerr, and Rivera should have sought a State court injunction, and now have waived their ability to challenge the panel's jurisdiction and to vacate the award on that basis.  See Sur-Reply at 5-6 (citing Suisse Securities (USA) LLC v. Tracy, 812 F.3d at 251; Goldman Sachs & Co. v. City of Reno, 747 F.3d 733, 741 (9th Cir. 2014)).

Waked and Stone's Sur-Reply concludes by asserting that the Defendants' briefing continues to offer no argument why the Award is invalid as to Terry.  See Sur-Reply at 6.  In Waked and Stone's view, the Defendants' briefing offers argument only as to why the Award is invalid as to Kerr and Rivera, but makes no argument why the Award is invalid as to Terry.  See Sur-Reply at 6.  On all these bases, therefore, the Plaintiffs argue that the Court should reject the arguments that the Reply offers, if the Court is to grant the Motion for Sur-Reply and to consider the Sur-Reply's arguments.

6.      **The January 10, 2023, Hearing.**

On January 10, 2023, the parties argued before the Court the Motion to Confirm, Motion to Vacate, and related motions, as well as the Motion for Sur-reply and the Motion for Page Extension.  The Court began by indicating it was inclined to grant the Motion for Sur-reply and the Motion for Page Extension.  See January 10 Tr. at 3:5-22 (Court).  The parties did not oppose approving both motions, so the Court at the hearing granted the Motion for Sur-reply and the Motion for Page Extension.  See January 10 Tr. at 4:11-14 (Court).

As to the Motion to Confirm and the Motion to Vacate, the Court indicated it was inclined to grant the Motion to Confirm and inclined to deny the Motion to Vacate, because "on these

motions to confirm arbitration awards, the strike zone is fairly large[,] . . . so it's got to be pretty bad for a court not to confirm it[, and] my impression . . . is that we're in the strike zone." January 10 Tr. at 4:18-21 (Court).  As to confirming the Award as to Terry, the Court suggested that the issue is straightforward, because any theory of liability the FINRA panel considered could be the basis of the award and so "any [justification] . . . is going to be acceptable unless it's just so far out of bounds." January 10 Tr. at 5:5-6 (Court).  As to Kerr and Rivera, however, the issue was more complicated, the Court indicated, because the issue concerned those Defendants' consent to arbitrate.  See January 10 Tr. at 5:10-17 (Court).

The Plaintiffs Waked and Stone voiced their agreement that the case was simple as to Terry, and that the bulk of the arbitration Award liability was Terry's, and "was plainly not derived from the Maestro Global contract. . . ." January 10 Tr. at 6:7-12 (Pratt).  This Award includes the "1.6 million of the award [which] was against Jane Terry only, and [y]ou have a million dollars in punitive against Jane Terry only.  There is $500,000 in emotional distress damages. Those aren't derived from a contract." January 10 Tr. at 6:12-17 (Pratt).

As to Kerr and Rivera's liability, Waked and Stone argue that awarding them under the award does not require the existence of the Maestro Global contract but could have been based solely on tort claims against Kerr and Rivera.  See January 10 Tr. at 6:20-7:11 (Pratt).  According to Waked and Stone, the Award does not require liability predicated on the Maestro Global contract:

> The other $2.9 was awarded, could also have been awarded even if there had never been a Maestro contract with anybody. It could have been based entirely upon Ms. Kerr and Mr. Rivera tortiously interfering with the contract between Mr. Waked and Ms. Stone on one hand and Jane Terry on the other hand, or the fact that they conspired with Jane Terry to defraud Mr. Waked and Ms. Stone. Even if there had never been any Maestro contract at all, they would have been obligated to arbitrate those claims in a FINRA forum under Rule 13.200 of the

FINRA rules, which says: Associated persons, if they bring a claim against other associated persons, based out of their business activities, those must go to a FINRA forum.

January 10 Tr. at 6:22-7:11 (Pratt).

Waked and Stone argued that the uniform submission agreements that Terry, Kerr, and Rivera submitted constitute their consent to arbitrate the claims against them. Waked and Stone highlight that although Kerr and Rivera's qualified submission agreements explicitly stated that Terry, Kerr, and Rivera refused consent to arbitrate with Maestro Global, "[t]hey did not globally say: Well, anything having anything remotely to do with the Maestro Global contracts. They did not say: Oh, we object to anything that could have been arbitrated under the Maestro Global contracts." January 10 Tr. at 8:2-8 (Pratt). The Defendants' argument is unavailing, Waked and Stone maintain, that Terry, Kerr, and Rivera could not be compelled to arbitrate in a FINRA arbitration forum, because of their contracts calling for a non-FINRA arbitration forum, given that FINRA rules do not permit "superseding FINRA['s] requirement to arbitrate between associated persons, which is what all five of these people were." January 10 Tr. at 9:3-6 (Pratt).

Terry, Kerr, and Rivera reiterate their argument that they did not consent to the arbitration at issue here. They argue that, "at least with regard to Ms. Kerr and Mr. Rivera[,] . . . they did not agree to play the game. They did not agree . . . to even step up to bat." January 10 Tr. at 10:5-7 (Saucedo). In response to the Court's questioning that their signatures on the unqualified submission agreement constitute consent to arbitrate, even under pressure from FINRA arbitrators, the Defendants asserted that their continued objections to the arbitration with Maestro Global preserved their ability to contest the arbitration's validity overall. See January 10 Tr. at 10:17-11:10 (Court, Saucedo). They looked to the caselaw from the Supreme Court and the Tenth Circuit to support the proposition that their continual objection to the arbitration preserved their objection,

although they continued to go through with the arbitration; the Supreme Court's <u>First Options of Chicago, Inc. v. Kaplan</u>, 514 U.S. 938 (1995)("<u>First Options</u>"), and the Tenth Circuit's <u>Lewis v. Cir. City Stores, Inc.</u>, 500 F.3d 1140, 1149 (10th Cir. 2007)("<u>Lewis</u>"), both anticipate the situation that Kerr and Rivera faced, wherein the arbitrators threatened them: "[I]f you don't comply with these FINRA regulations, your licensing could be at issue; and this is still going to go to arbitration, you're just not going to be able to present a case.  So we're going forward without you."  January 10 Tr. at 11:12-19 (Saucedo).

Maintaining that they were not required to seek an injunction before the arbitration started, the Defendants argued that the determination is a court's prerogative both whether parties have an agreement to arbitrate and whether a particular claim is subject to arbitration.  <u>See</u> January 10 Tr. at 13:8-21 (Saucedo, Court).  Instead, the Defendants maintain, there are three options when faced with an arbitration to which they object:

> The first is . . . to come to court, file an injunction.  [T]hat is a possibility.  It's not, however, required.

> The second would be simply not show up.  [T]he <u>First Options</u> case talks about that. . . .

> But the third option, as explained in <u>Lewis</u>, as explained in <u>First Options</u>[,] is to make your objection.  If they're denied, you go through with your arbitration. . . [B]y going through the arbitration, once the objection is made, it is not waiving ability to challenge whether, in fact, that issue or the parties were properly before the arbitration panel or properly submitted to arbitration.

January 10 Tr. at 13:24-14:20 (Saucedo).  They characterize their position thus: "participation is not waiver."  January 10 Tr. at 17:4 (Saucedo).  Case law, they argue, also supports the proposition that such agreements as Kerr and Rivera's Maestro Global employment contracts that contain more specific, tailored agreements to arbitrate, then "you don't fall under just the general FINRA

standard arbitration policies and rules.  If you agree to something more specific, and it is very clear[,] . . . then that's the process that is to be followed." January 10 Tr. at 17: 9-13 (Saucedo).

The Court expressed concern that the Defendants' argument relies on the ability to contract away, through more specific arbitration provisions in contracts, the broad arbitration regulations of FINRA; the availability of superseding FINRA's arbitration requirements through contract, the Court cautioned, may be unique only to an unpublished opinion from the United States Court of Appeals for the Second Circuit, and the other Courts of Appeals or in New Mexico State courts may not share that view.  See January 10 Tr. at 19:23-20:22 (Court, Saucedo).

In the view of Terry, Kerr, and Rivera, all of the claims against Kerr and Rivera arise out of their employment relationships with Maestro Global, regardless whether those claims are characterized as contract breach claims or as tort claims.  See January 10 Tr. at 22:7-16 (Saucedo)("The claims that were brought against Kerr and Rivera absolutely come from their relationship with Maestro, their employment relationship with Maestro. . . . [I]n fact, that was the only argument.  That was the only relationship that created a duty: In contract, in tort, whatever, it was that relationship.").  The Defendants disagreed with the Court's suggestion that it constitutes a substantive decision committed to the FINRA arbitrators' discretion whether Waked and Kerr could bring as third-party beneficiaries claims arising from the Maestro Global contracts, see January 10 Tr. at 23:16-24:10 (Court, Saucedo); Kerr and Rivera instead suggested that the legal question pointed to the jurisdictional problem, namely, that if Waked and Stone would bring their claim as third parties to the Maestro Global contracts, then they should keep to the employment contracts' arbitration provision and decide "issues with regard to Maestro and the employment agreements in the appropriate arbitration forum," January 10 Tr. at 24:14-16 (Saucedo).  They concluded that the arbitration panel's decision on the scope of its powers does not bind the Court:

"Deference is not given to the panel on questions that do not go to the merits."  January 10 Tr. at 25:3-4 (Saucedo).

As to Waked and Stone's interpretation of the cases upon which Terry, Kerr, and Rivera rely, specifically, First Options, 514 U.S. 938, they agreed that one party's continued objection to the arbitration panel's authority, even once they have gone through the arbitration, means that they have not waived their ability to object to the panel's authority.  See January 10 Tr. at 26:9-19 (Court, Pratt)("If you vigorously object, if you preserve your objection and you go ahead and go through the arbitration, you get to raise it at this point that the arbitrators didn't have jurisdiction over you.  Isn't that a sound interpretation of Lewis?  It is a sound interpretation in the sense of that the Court gets to decide whether or not the arbitration clause itself allowed the arbitrators to determine their own jurisdiction.").  As to whether the arbitrators receive deference on the decision as to their jurisdiction, Waked and Stone argue that the arbitrators receive deference if the Court decides that the parties' agreement empowered the arbitrators to make that decision as to the scope of their authority -- i.e., if the parties agreed that the arbitrators should have the power to determine their own authority.  See January 10 Tr. at 27:4-15 (Court, Pratt).

Waked and Stone also resist as a "fundamental flaw in the argument of the respondents" the proposition that "there was only one arbitration agreement for Ms. Kerr and Mr. Rivera with Maestro Global."  January 10 Tr. at 29:12-14 (Pratt).  Waked and Stone emphasize instead that there was an independent, overlapping agreement to arbitrate over the same set of subjects: according to Waked and Stone, Kerr and Rivera "agreed to FINRA arbitration, encompassing anything to do with the business agreement, when they signed their U4s, becoming associated persons of Raymond James."  January 10 Tr. at 29:15-18 (Saucedo).

The Court expressed concern that, merely because Maestro Global is not a FINRA member, such associated persons as Kerr and Rivera could not be compelled, pursuant to their FINRA registration status and Form U4 agreements, to arbitrate in FINRA arbitration with Maestro Global. The Court, Terry, Kerr, and Rivera engaged in the following discussion:

> MR. SAUCEDO:     FINRA would not have jurisdiction over an employment contract with a nonmember. . . .
>
> THE COURT:     If Kerr and Rivera sign a document as a licensed, regulated people, that we're going to arbitrate all our claims, why does the existence of a third party or another entity have any relevance to narrowing or giving them a veto over the arbitration agreement they've agreed to? . . . [Kerr and Rivera] signed an agreement with FINRA, . . . in these U4s, saying: We will arbitrate any disputes we have with FINRA members.
>
> MR. SAUCEDO:     With FINRA members, correct, and within the FINRA jurisdiction. What we're arguing is that Maestro is not a FINRA member. . . .
>
> THE COURT:     Just because Maestro is not, [it] doesn't seem to me to narrow the language of Kerr and Rivera's agreement under FINRA to arbitrate.
>
> MR. SAUCEDO:     To arbitrate claims covered by FINRA, FINRA jurisdiction.
> Maestro, again, it's an investment advisory group. This was an employment agreement. It had nothing to do with, essentially, this broker/dealer arrangement, which is what FINRA covers. So this was outside of FINRA.
> For example, of course, let's say Ms. Kerr was in a car accident, the plaintiff could not say: Well, you've agreed to FINRA, I'm going to make you go to FINRA arbitration on this personal injury claim. A little bit of an extreme example there, but it again shows that FINRA must stay within the agreement within its jurisdiction.

January 10 Tr. at 32:8-33:24 (Saucedo, Court). The Court noted that all parties in the federal litigation before it -- i.e., Waked, Stone, Terry, Kerr, and Rivera -- all are FINRA members and this fact would not seem to raise the problem of FINRA's jurisdiction over them, and that the one pertinent, non-FINRA member, Maestro Global, is not a party in the present case. Terry, Kerr, and Rivera identified this issue as a fundamental problem with the arbitration: the whole arbitration

proceeded with Maestro Global as a party, and when the arbitration concluded, in the Defendants'

view, the panel realized that it lacked power over Maestro Global, so it awarded damages solely

to Waked and Stone.  See January 10 Tr. at 34:17-25 (Saucedo).  The Defendants conceded,

however, that the denial of any award to Maestro Global in the arbitration could be interpreted as

the panel having denied all of Maestro Global's claims, so that the panel's award of no damages

to Maestro Global is not an indication that the FINRA panel recognized an allegedly fatal flaw in

its jurisdiction over the case.  Tr. at 35:10-36:10 (Court, Saucedo).

 In concluding the hearing, the Court indicated that it was inclined to grant the Motion to

Confirm and inclined to deny the Motion to Vacate.  In the Court's view,

> the FINRA regulations and agreement cover these claims and required them to be
> arbitrated.  So even if the defendants properly . . . preserve[d] their
> objections[,] . . . their objections do not have merit.  And that's the reason that the
> panel went ahead and decided the issues.  And I think they fall within the scope of
> deference that should be given.  And even if I have to independently determine the
> panel's jurisdiction and scope, I think that the panel got it right, so it's a de novo
> review.

January 10 Tr. at 9-21 (Court).

 **7.**   **Procedural History After the January 10, 2023, Hearing on the Motion to Confirm and the Motion to Vacate, Including Rivera's Settlement with Waked and Stone.**

 After the January 10, 2023, hearing, the Court issued its Order, in which it granted the

Motion to Confirm, denied the Motion to Vacate, and confirmed the Award.  See Order at 1.

Thereafter, Terry, Kerr, and Rivera appealed the Court's Order to the Tenth Circuit.  See Notice

of Appeal at 1, filed March 20, 2023 (Doc. 53)("Notice of Appeal").  In response to the Notice of

Appeal, the Clerk of Court of the Tenth Circuit entered an Order, filed April 5, 2023

(Doc. 58)("Tenth Circuit Order"), in which the Tenth Circuit abated the Defendants' appeal

pending the issuance of the Court's full Memorandum Opinion detailing the rationale for its

issuance of the Order granting the Motion to Confirm, denying the Motion to Vacate, and confirming the Award.  See Tenth Circuit Order at 1-2.  Rivera notifies the Court that he has settled his dispute with Waked and Stone.  See Defendant Rivera's Notice of Withdrawal of Motion to Vacate, filed October 13, 2023 (Doc. 68).

## LAW REGARDING ARBITRATION AGREEMENTS AND THE FAA

"The FAA reflects the fundamental principle that arbitration is a matter of contract." Rent-A-Center, West, Inc. v. Jackson, 561 U.S. 63, 67 (2010).  "[T]he basic purpose of the Federal Arbitration Act is to overcome courts' refusals to enforce agreements to arbitrate."  Allied-Bruce Terminix Cos., Inc. v. Dobson, 513 U.S. 265, 270 (1995).  "The FAA thereby places arbitration agreements on an equal footing with other contracts, and requires courts to enforce them according to their terms."  Rent-A-Center, West, Inc. v. Jackson, 561 U.S. at 270 (citing Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ., 489 U.S. 468, 478 (1989); Buckeye Check Cashing, Inc. v. Cardegna, 546 U.S. 440, 443 (2006)).

Under FAA § 4, a party "aggrieved" by the failure of another party "to arbitrate under a written agreement for arbitration" may petition a federal court "for an order directing that such arbitration proceed in the manner provided for in such agreement."  9 U.S.C. § 4.  If a party is aggrieved by the refusal of another to arbitrate under a written agreement, the district court, upon petition, "shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement."  9 U.S.C. § 4. Section 2, the "primary substantive provision of the Act," Moses H. Cone Memorial Hospital v. Mercury Constr. Corp., 460 U.S. 1, 24 (1983), provides: "A written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter

arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. "If a party challenges the validity under § 2 of the precise agreement to arbitrate at issue, the federal court must consider the challenge before ordering compliance with that agreement under § 4." Rent-A-Center, West, Inc. v. Jackson, 561 U.S. at 71.

### 1.    Public Policy Favoring Enforcement of Arbitration Agreement.

"There is a strong federal policy encouraging the expeditious and inexpensive resolution of disputes through arbitration." Metz v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 39 F.3d 1482, 1488-89 (10th Cir. 1994). See Southland Corp. v. Keating, 465 U.S. 1, 10 (1984)("Congress declared a national policy favoring arbitration."); Hill v. Ricoh Americas Corp., 603 F.3d 766, 771 (10th Cir. 2010)("[T]he FAA is a 'congressional declaration of a liberal federal policy favoring arbitration agreements.'")(quoting Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp., 460 U.S. at 24). Congress enacted the FAA with the express purpose of granting arbitration agreements the same enforceability as any other contract provision. See Volt Info. Sciences, Inc. v. Bd. of Trs., 489 U.S. 468, 474 (1989)(stating that Congress designed the FAA to "overrule the judiciary's longstanding refusal to enforce agreements to arbitrate and place such agreements upon the same footing as other contracts"). When the applicability of arbitration is in dispute, "as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 626 (1985)(quoting Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. at 24-25). New Mexico state courts also view arbitration as a "highly favored" method of resolving disputes, "in part because 'it promotes both judicial efficiency and conservation of resources by all parties.'" Piano v. Premier Distrib. Co., 2005-NMCA-018, ¶ 5, 137 N.M. 57, 59, 107 P.3d 11, 13 (quoting

Santa Fe Techs., Inc. v. Argus Networks, Inc., 2002-NMCA-030, ¶ 51, 131 N.M. 772, 788, 42 P.3d 1221, 1237).

    2.    **Existence of a Valid Arbitration Agreement.**

    Arbitration is simply a matter of contract between parties; it is a way to resolve those disputes -- but only those disputes -- that the parties have agreed to submit to arbitration." First Options of Chi., Inc. v. Kaplan, 514 U.S. 938, 943 (1995)(internal citations omitted). Courts must interpret arbitration clauses liberally, and all doubts must be resolved in arbitration's favor. See Hicks v. Cadle, Co., 355 F. App'x 186, 192 (10th Cir. 2009)("We resolve any doubts in favor of arbitrability.")(citing Litton Fin. Printing Div. v. NLRB, 501 U.S. 190, 209 (1991)); Armijo v. Prudential Ins. Co., 72 F.3d 793, 797-98 (10th Cir. 1995)(stating that "questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration," and that "arbitration clauses must be interpreted liberally, and any doubts should be resolved in favor of arbitration," and holding that the plaintiffs had "failed to rebut the presumption of arbitrability").

    While "the presumption in favor of arbitration is properly applied in interpreting the scope of an arbitration agreement, . . . this presumption disappears when the parties dispute the existence of a valid arbitration agreement." Dumais v. Am. Golf Corp., 299 F.3d 1216, 1220 (10th Cir. 2002). See Riley Mfg. Co., Inc. v. Anchor Glass Container Corp., 157 F.3d 775, 779 (10th Cir. 1998)("When the dispute is whether there is a valid and enforceable arbitration agreement in the first place, the presumption of arbitrability falls away."). In the Tenth Circuit, and in the courts of New Mexico, the "existence of an agreement to arbitrate is a threshold matter which must be established before the FAA can be invoked." Avedon Eng'g Inc. v. Seatex, 126 F.3d 1279, 1287 (10th Cir. 1997). See K.L. House Constr. Co. v. City of Albuquerque, 1978-NMSC-025, ¶ 4, 91 N.M. 492, 494, 576 P.2d 752, 754 ("[T]he courts only decide the threshold

question of whether there is an agreement to arbitrate.  If so, the court should order arbitration.").
"Like other contracts . . . [arbitration agreements] may be invalidated by 'generally applicable
contract defenses, such as fraud, duress, or unconscionability.'"  Rent-A-Center, West, Inc. v.
Jackson, 2010 U.S. LEXIS 4981, at *8 (quoting Doctor's Assocs., Inc. v. Casarotto, 517 U.S. 681,
687 (1996).  In K.L. House Construction Co. v. City of Albuquerque, the Supreme Court of New
Mexico held that a valid arbitration clause existed and found that the parties were compelled to
arbitrate all disputes when the "subject matter of the dispute has a reasonable relationship to the
subject matter of the contract."  K.L. House Construction Co. v. City of Albuquerque, 1978-
NMSC-025, ¶ 8, 91 N.M. at 494, 576 P.2d at 754.

> When a broad and general arbitration clause is used . . . the court should be
> very reluctant to interpose itself between the parties and the arbitration which they
> have agreed upon.  When the parties agree to arbitrate any potential claims or
> disputes arising out of their relationships by contract or otherwise, the arbitration
> agreement will be given broad interpretation unless the parties themselves limit
> arbitration to specific areas or matters.  Barring such limiting language, the courts
> only decide the threshold question of whether there is an agreement to arbitrate.

K.L. House Construction Co. v. City of Albuquerque, 1978-NMSC-025, ¶ 8, 91 N.M. at 494, 576
P.2d at 754.

### 3.   Consideration and Illusory Arbitration Agreements.

"To determine whether the agreement to arbitrate is valid, courts look to general state
contract law, with the caveat that state laws that are specifically hostile to arbitration agreements
are preempted by the FAA."  Salazar v. Citadel Commc'ns Corp., 2004-NMSC-013, ¶  135 N.M.
447, 450, 90 P.3d 466, 469 (2004)(citing Perry v. Thomas, 482 U.S. 483, 492 n.9 (1987); Doctor's
Assocs., Inc. v. Casarotto, 517 U.S. 681, 687 (1996)).  "It is for the trial court, and not the arbitrator,
to decide whether a valid agreement to arbitrate exists."  Sisneros v. Citadel Broad. Co., 140 N.M.
at 270-71, 142 P.3d at 39.  It is a fundamental tenet of contract law "that each party to a contract

has a duty to read and familiarize himself with the contents of the contract, each party generally is presumed to know the terms of the agreement, and each is ordinarily bound thereby." Ballard v. Chavez, 1994-NMSC-007, ¶ 8, 117 N.M. 1, 3, 868 P.2d 646, 648. Under New Mexico law, "'to be legally enforceable, a contract must be factually supported by an offer, an acceptance, consideration, and mutual assent.'" Garcia v. Middle Rio Grande Conservancy Dist., 1996-NMSC-029, ¶ 9, 121 N.M. 728, 731, 918 P.2d 7, 10 (quoting Hartbarger v. Frank Paxton Co., 115 N.M. 665, 669, 857 P.2d 776, 780 (1993)). "Under general New Mexico contract law, an agreement that is subject to unilateral modification or revocation is illusory and unenforceable." Salazar v. Citadel Commc'ns Corp., 135 N.M. at 450, 90 P.3d at 469. "This principle applies equally to agreements to arbitrate." 135 N.M. at 450, 90 P.3d at 469. The Supreme Court of New Mexico has found that, if a party "reserves the right to change the agreement unilaterally, and at any time," the party "has not really promised anything at all and should not be permitted to bind the other party." Salazar v. Citadel Commc'ns Corp., 135 N.M. at 450, 90 P.3d at 469.

In Dumais v. American Golf Corp., 150 F. Supp. 2d 1182 (D.N.M. 2001)(Vazquez, J.), the Honorable Martha Vazquez, United States District Judge for the United States District Court for the District of New Mexico was asked to determine if an arbitration provision in an employment handbook was enforceable, and precluded an employee from bringing a claim for sexual harassment and constructive discharge under Title VII of the Civil Rights Act of 1964 against her employer. Judge Vazquez found that the arbitration agreement embodied in a dispute-resolution program was illusory, because it was executed over two months after the employee began her employment. See 150 F. Supp. 2d at 1193. The agreement also modified the terms of employment -- it divested the employee's right to have disputes heard in an Article III court -- without consideration in return for that divestiture. See 150 F. Supp. 2d at 1193.

Judge Vazquez noted that inconsistent provisions in the employment agreement made it unclear whether the arbitration agreement was binding on the employer, and therefore the potentially unilateral character of the promise to arbitrate made it illusory.  See 150 F. Supp. 2d at 1194.  The Tenth Circuit affirmed Judge Vazquez' holding in a de novo review on appeal.  See Dumais v. American Golf Corp., 299 F.3d 1216 (10th Cir. 2002).  In so doing, the Tenth Circuit stated: "We join other circuits in holding that an arbitration agreement allowing one party the unfettered right to alter the arbitration agreement's existence or its scope is illusory."  299 F.3d at 1219.  See Cordova v. World Fin. Corp. of NM, 2009-NMSC-021, ¶¶ 12-16, 146 N.M. 256, 261, 208 P.3d 901, 906 (discussing New Mexico illusory arbitration agreement cases).

In Lumuenemo v. Citigroup, Inc., No. CIV 08-0830, 2009 U.S. Dist. LEXIS 15654 (D. Colo. February 12, 2009), the Honorable Wiley Y. Daniel, Chief United States District Judge for the District of Colorado, distinguished the facts in the New Mexico Court of Appeals case Piano v. Premier Distributing Co. from the facts in Lumuenemo v. Citigroup, Inc., stating:

> Plaintiff cites Piano v. Premier Distributing Co., 137 N.M. 57, 60, 107 P.3d 11 (N.M. Ct. App. 2004), as support for her argument.  However, the holding in Piano turned on the fact that the plaintiff was an at-will employee prior to signing the arbitration agreement, and therefore, the implied promise of continued at-will employment did not constitute consideration.  Id. at 60.  Piano is distinguishable from the facts before this Court.  Here, Defendant's initial hiring of Plaintiff was conditioned on her consent to the terms of the Arbitration Agreement; thus, there was consideration in the form of employment.  Further, Defendant does need Plaintiff's approval -- Plaintiff had up to 30 days to contest any changes to the Arbitration Agreement and/or to decide whether to continue employment based on such changes. Moreover, the holding in Piano is not binding on this court.

2009 U.S. Dist. LEXIS 15654, at *14.

In Salazar v. Citadel Communications Corp., the Supreme Court of New Mexico held that, because Citadel Communications reserved the right to modify any provision of its employee

handbook at any time, including the arbitration agreement contained therein, the agreement to arbitrate was "an unenforceable illusory promise." 2004-NMSC-013, ¶¶ 14-16, 135 N.M. 447, 452, 90 P.3d 466, 471.  Similarly, in Hardin v. First Cash Fin. Servs., Inc., 465 F.3d 470 (10th Cir. 2006), the arbitration agreement required the employer to provide ten-days notice to its current employees before amending or terminating the arbitration agreement, and provided that the employer could not amend the agreement if it had actual notice of a potential dispute or claim, nor could it terminate the agreement as to any claims which arose prior to the date of termination. See 465 F.3d at 478.  The Tenth Circuit, applying Oklahoma contract law, found that "[t]he[] limitations [were] sufficient to avoid rendering the parties' Agreement to arbitrate illusory."  465 F.3d at 478.  See Pennington v. Northrop Grumman & Mission Sys. Corp., 269 F. App'x 812, 820 (10th Cir. 2008)("[T]he reciprocal obligation to arbitrate provides the requisite consideration.").

## LAW REGARDING DIVERSITY JURISDICTION AND ARBITRATION

"Subject-matter jurisdiction under 28 U.S.C. § 1332(a)(1) requires: (i) complete diversity among the parties; and (ii) that 'the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.'"  Thompson v. Intel Corp., No. CIV 12-0620, 2012 WL 3860748, at *12 (D.N.M. August 27, 2012)(Browning, J.)(citing 28 U.S.C. § 1332(a)).  As the Court has explained, "[t]he Supreme Court of the United States has described this statutory diversity requirement as 'complete diversity,' and it is present only when no party on one side of a dispute shares citizenship with any party on the other side of a dispute."  McEntire v. Kmart Corp., No. CIV 09-0567, 2010 WL 553443, at *3 (D.N.M. February 9, 2010)(Browning, J.)(no citation given for quoted material, but citing Strawbridge v. Curtiss, 7 U.S. (3 Cranch) 267, 267-68 (1806); McPhail v. Deere & Co., 529 F.3d 947, 951 (10th Cir. 2008)).  The amount-in-controversy requirement is an "estimate of the amount that will be put at issue in the course of the litigation."

Valdez v. Metro. Prop. & Cas. Ins., No. CIV 11-0507, 2012 WL 1132374, at *15 (D.N.M. March 19, 2012)(Browning, J.)(citing McPhail v. Deere & Co., 529 F.3d at 956).  See De La Rosa v. Reliable, Inc., 113 F. Supp. 3d 1135, 1150 (D.N.M. 2015)(Browning, J.); Ullman v. Safeway Ins. Co., 995 F. Supp. 2d 1196, 1213-14 (D.N.M. 2013)(Browning, J.).  The Court will discuss the two requirements in turn.

### 1.    Diversity of Citizenship.

For diversity jurisdiction purposes, a person's domicile determines citizenship.  See Crowley v. Glaze, 710 F.2d 676, 678 (10th Cir. 1983).  "A person's domicile is defined as the place in which the party has a residence in fact and an intent to remain indefinitely, as of the time of the filing of the lawsuit."  McEntire v. Kmart Corp., 2010 WL 553443, at *3 (citing Crowley v. Glaze, 710 F.2d at 678).  See Freeport-McMoRan, Inc. v. KN Energy, Inc., 498 U.S. 426, 428 (1991)("We have consistently held that if jurisdiction exists at the time an action is commenced, such jurisdiction may not be divested by subsequent events.").  If neither a person's residence nor the location where the person has an intent to remain can be established, the person's domicile is that of his or her parents at the time of the person's birth.  See Gates v. Comm'r of Internal Revenue, 199 F.2d 291, 294 (10th Cir. 1952)("[T]he law assigns to every child at its birth a domicile of origin.  The domicile of origin which the law attributes to an individual is the domicile of his parents.  It continues until another domicile is lawfully acquired.").  Additionally, "while residence and citizenship are not the same, a person's place of residence is prima facie evidence of his or her citizenship."  McEntire v. Kmart Corp., 2010 WL 553443, at *3 (citing State Farm Mut. Auto. Ins. v. Dyer, 19 F.3d 514, 520 (10th Cir. 1994)).  A corporation, on the other hand, is "deemed to be a citizen of any State by which it has been incorporated and of the State where it has its principal place of business."  Gadlin v. Sybron Int'l Corp., 222 F.3d 797, 799 (10th Cir.

2000)(quoting 28 U.S.C. § 1332(c)(1)).  See De La Rosa v. Reliable, Inc., 113 F. Supp. 3d at 1151;

Ullman v. Safeway Ins. Co., 995 F. Supp. 2d at 1214.

> 2.    **Amount in Controversy.**

The statutory amount-in-controversy requirement, which presently stands at $75,000.00,

must be satisfied as between a single plaintiff and a single defendant for a federal district court to

have original jurisdiction over the dispute; "a plaintiff cannot aggregate independent claims against

multiple defendants to satisfy the amount-in-controversy requirement," nor can multiple plaintiffs

aggregate their claims against a single defendant to exceed the threshold.  Martinez v. Martinez,

No. CIV 09-0281, 2010 WL 1608884, at *18 (D.N.M. March 30, 2010)(Browning, J.).  If multiple

defendants are jointly liable, or jointly and severally liable, on some of the claims, however, the

amounts of those claims may be aggregated to satisfy the amount-in-controversy requirement as

to all defendants jointly liable for the claims.  See Alberty v. W. Sur. Co., 249 F.2d 537, 538 (10th

Cir. 1957); Martinez v. Martinez, 2010 WL 1608884, at *18.  Similarly, multiple plaintiffs may

aggregate the amounts of their claims against a single defendant if the claims are not "separate and

distinct."  Martin v. Franklin Capital Corp., 251 F.3d 1284, 1292 (10th Cir. 2001).  Multiple claims

by the same plaintiff against the same defendant may be aggregated, even if the claims are entirely

unrelated.  See 14A Charles A. Wright, et al., Federal Practice and Procedure, Jurisdiction § 3704,

at 566-95 (4th ed. 2011).  While the rules on aggregation sound complicated, they are not in

practice: if a single plaintiff -- regardless whether he or she is the only plaintiff who will share in

the recovery -- can recover over $75,000.00 from a single defendant -- regardless whether the

defendant has jointly liable co-defendants -- then the court has original jurisdiction over the dispute

between that plaintiff and that defendant.  The court can then exercise supplemental jurisdiction

over other claims and parties that "form part of the same case or controversy under Article III,"

28 U.S.C. § 1367(a), meaning that they "derive from a common nucleus or operative fact," United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 725 (1966).

Satisfaction of the amount-in-controversy requirement must be established by a preponderance of the evidence.  See McPhail v. Deere & Co., 529 F.3d at 953.  In the context of establishing an amount-in-controversy, the defendant seeking removal could appear to be bound by the plaintiff's chosen amount of damages in the complaint, which would seem to allow a plaintiff to avoid federal jurisdiction "merely by declining to allege the jurisdictional amount [in controversy]." McPhail v. Deere & Co., 529 F.3d at 955.  The Tenth Circuit's decision in McPhail v. Deere & Co. has foreclosed such an option from a plaintiff who wishes to remain in state court. McPhail v. Deere & Co. holds that a defendant's burden in establishing jurisdictional facts is met if the defendant proves "jurisdictional facts that make it possible that $75,000 is in play." 529 F.3d at 955.

The Supreme Court recently clarified that a defendant seeking removal to federal court need only include in the notice of removal a plausible allegation that the amount in controversy exceeds the jurisdictional threshold.  See Dart Cherokee Basin Operating Co. v. Owen, 574 U.S. 81, 88-89 (2014).  The district court should consider outside evidence, and find by a preponderance of the evidence whether the amount in controversy is satisfied "only when the plaintiff contests, or the court questions, the defendant's allegation."  Dart Cherokee Basin Operating Co. v. Owen, 574 U.S. at 89.  See De La Rosa v. Reliable, Inc., 113 F. Supp. 3d at 1152.

**3.**     **Diversity of Citizenship in Motions to Compel Arbitration.**

In the context of FAA motions to compel arbitration, parties often invoke a federal court's diversity jurisdiction, because the FAA does not by itself create federal-question jurisdiction. "[T]he Act does nothing, being 'something of an anomaly in the field of federal-court jurisdiction'

- 55 -

in bestowing no federal jurisdiction but rather requiring an independent jurisdictional basis." Hall St. Assocs., L.L.C. v. Mattel, Inc., 552 U.S. 576, 581-82 (2008)(quoting Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 at 25 n.32. The Supreme Court has held that "a federal court may 'look through' an [FAA motion to compel arbitration] to determine whether it is predicated on an action that 'arises under' federal law." Vaden v. Discover Bank, 556 U.S. 49, 62 (2009)("Vaden"). Importantly, this ruling applies only to federal-question jurisdiction, and not diversity. See Vaden, 556 U.S. at 62. Although the Tenth Circuit has not ruled on this issue, the United States Court of Appeals for the Eighth Circuit has held that "diversity of citizenship is determined in these cases by the citizenship of the parties named in the proceedings before the district court, plus any indispensable parties who must be joined pursuant to Rule 19." Northport Health Servs. of Ark. LLC v. Rutherford, 605 F.3d 483, 491 (8th Cir. 2010)("Rutherford"). In Rutherford, the Eighth Circuit noted that "the pre-Vaden circuit decisions were unanimous in looking only to the citizenship of the parties to the federal action." 605 F.3d at 489. The Eighth Circuit explained that Vaden did not change the rule of refusing to "look through" to all of the underlying state action's parties because such a procedure

> ignores the underlying facts and the Supreme Court's decision in [Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1]. In that case, the Supreme Court stated that the independent basis of federal jurisdiction was diversity of citizenship. But it did not discuss that threshold issue, despite noting the presence of a non-diverse party who made the parallel state court action non-removable. 460 U.S. at 7 & n.4 . . . .
>
> Even if no party challenged diversity jurisdiction, that the Supreme Court did not even discuss the issue is telling because in other cases it has noted that federal courts are obligated to consider lack of subject matter jurisdiction sua sponte.

Rutherford, 605 F.3d at 489-90 (footnote and internal citations omitted). Indeed, "[t]he Supreme Court 'does not normally overturn, or so dramatically limit, earlier authority sub silentio.'"

Rutherford, 605 F.3d at 490 (quoting Shalala v. Ill. Council on Long Term Care, Inc., 529 U.S. 1, 18 (2000)). The Court thus concludes, that in a situation where not all of the parties to a State court action are present in a federal court FAA action to compel arbitration of the state lawsuit, "diversity of citizenship is determined in these cases by the citizenship of the parties named in the proceedings before the district court, plus any indispensable parties who must be joined pursuant to Rule 19." Rutherford, 605 F.3d at 491. In other words, the Court will not "look through" to the state court action in diversity cases.

The Court also notes that multiple judges within the District of New Mexico have ruled that a court should not "look through" to the parties in the state court action in a diversity case. "The Eighth Circuit held that non-diverse nursing home administrators who were named as defendants in the underlying state tort action were not necessary and indispensable parties in the nursing home's federal court action to compel arbitration, and thus their citizenship did not destroy diversity jurisdiction." THI of N.M. at Hobbs Ctr, LLC v. Patton, 851 F. Supp. 2d 1281, 1286 (D.N.M. 2011)(Hansen, J.)("THI")(citing Rutherford, 605 F.3d at 491). Judge Hansen followed the Eighth Circuit's ruling, which "determined that *Vaden* did not implicitly overrule the pre-*Vaden* circuit decisions that were unanimous in looking only to the citizenship of the named parties in the federal action." THI, 851 F. Supp. 2d at 1287 (citing Rutherford, 605 F.3d at 489). See THI of N.M. at Vida Encantada, LLC v. Lovato, 848 F. Supp. 2d 1309, 1317 (D.N.M 2012)(Vázquez, J.)("*Vaden . . .* is inapplicable here, where jurisdiction is founded on diversity of citizenship between the parties, rather than on the presence of a federal question.").

   **4.      Amount in Controversy in Motions to Compel Arbitration.**

Unlike determining the citizenship of the parties, a court may "look through" to a possible arbitration award when evaluating the amount in controversy. The Tenth Circuit has held that

"[t]his court . . . finds persuasive the holding of other circuits that 'look through to the possible award resulting from the desired arbitration' to determine the amount in controversy." Woodmen of the World Life Ins. Soc'y v. Manganaro, 342 F.3d 1213, 1217 (10th Cir. 2003)(quoting Doctor's Assocs., Inc. v. Hamilton, 150 F.3d 157, 160 (2d Cir. 1998)).  "Accordingly, the requisite jurisdictional amount will be satisfied in a suit to compel arbitration unless it is legally certain that the stakes of the arbitration are $75,000 or less."  Woodmen of the World Life Ins. Soc'y v. Manganaro, 342 F.3d at 1217.  See THI of N.M. at Las Cruces, LLC v. Fox, 727 F. Supp. 2d 1195, 1211 n.6 (D.N.M. 2010)(Browning, J.).

## LAW REGARDING WAIVER OF ARBITRATION AGREEMENTS

The Tenth Circuit has established a six-factor test to determine if the right to arbitrate has been waived.  See Healey v. Cox Commc'ns (In re Cox Enterprises, Inc.), 790 F.3d 1112, 1116 (10th Cir. 2015).  The Court must consider:

> (1) whether the party's actions are inconsistent with the right to arbitrate; (2) whether the litigation machinery has been substantially invoked and the parties were well into preparation of a lawsuit before the party notified the opposing party of an intent to arbitrate; (3) whether a party either requested arbitration enforcement close to the trial date or delayed for a long period before seeking a stay; (4) whether a defendant seeking arbitration filed a counterclaim without asking for a stay of the proceedings; (5) whether important intervening steps [e.g., taking advantage of judicial discovery procedures not available in arbitration] had taken place; and (6) whether the delay affected, misled, or prejudiced the opposing party.

Healey v. Cox Commc'ns (In re Cox Enterprises, Inc.), 790 F.3d at 1116 (alteration in original).  When applying the factors, the test is not mechanical: "Rather, these factors reflect certain principles that should guide courts in determining whether it is appropriate to deem that a party has waived its right to demand arbitration."  Healey v. Cox Commc'ns (In re Cox Enterprises, Inc.), 790 F.3d at 1116.  The Court's analysis is focused on the notion that a party "'may not play

fast and loose with the judicial machinery and deceive the courts,'" and "'[a]n important consideration in assessing waiver is whether the party now seeking arbitration is improperly manipulating the judicial process.'"   Healey v. Cox Commc'ns (In re Cox Enterprises, Inc.), 790 F.3d at 1116 (quoting Basso v. Utah Power & Light Co., 495 F.2d 906, 909 (10th Cir. 1974), then Hill v. Ricoh Americas Corp., 603 F.3d 766, 773 (10th Cir. 2010)).

Often a party will waive arbitration where it moves for arbitration in tandem with other motions, even though the party had been aware for some time of its right to compel arbitration:

> [R]ather than requesting that its motion for summary judgment be stayed until its motion to compel was decided, Cox moved to compel arbitration on the same day it moved for summary judgment, even though it was aware that arbitration could have been raised earlier. Cf.  Hurley v. Deutsche Bank Trust Co. Ams., 610 F.3d 334, 339 (6th Cir. 2010)(noting that defendants waive their "right to arbitrate by failing to assert that right in a timely fashion and instead participating in litigation-related activities," in particular motions for summary judgment); St. Mary's Med. Ctr. of Evansville, Inc. v. Disco Aluminum Prods. Co., 969 F.2d 585, 589 (7th Cir. 1992)("A party may not normally submit a claim for resolution in one forum and then, when it is disappointed with the result in that forum, seek another forum."). This was only one of Cox's many attempts, detailed by the district court, to "[c]learly . . . play heads I win, tails you lose" by manipulating the litigation machinery and omitting known material facts about the absent class members from its briefing. Cox II, 2014 WL 3567629, at *3 (quotation omitted).

Healey v. Cox Commc'ns (In re Cox Enterprises, Inc.), 790 F.3d at 1117.   Cf. Hurley v. Deutsche Bank Trust Co. Ams., 610 F.3d 334, 339 (6th Cir. 2010)(noting that defendants waive their "right to arbitrate by failing to assert that right in a timely fashion and instead participating in litigation-related activities," in particular motions for summary judgment); St. Mary's Med. Ctr. of Evansville, Inc. v. Disco Aluminum Prods. Co., 969 F.2d 585, 589 (7th Cir. 1992)("A party may not normally submit a claim for resolution in one forum and then, when it is disappointed with the result in that forum, seek another forum.").

Another important factor for the court's analysis is how significantly a party has invoked the machinery of litigation. See Healey v. Cox Commc'ns (In re Cox Enterprises, Inc.), 790 F.3d at 1117. In some cases, a waiver may be found where a "Court has read literally thousands of pages of briefs, conducted several hearings, including a class certification hearing, and issued dozens of Orders." Healey v. Cox Commc'ns (In re Cox Enterprises, Inc.), 790 F.3d at 1117. In accordance with the factors, making ample use of discovery alone will also support a finding of waiver. See Healey v. Cox Commc'ns (In re Cox Enterprises, Inc.), 790 F.3d at 1118. The prejudice borne by a party that has been subjected to the machinery and costs of litigation, only to have it taken away at the last minute, is as important to the analysis as the consideration of the integrity of the judicial process. See Healey v. Cox Commc'ns (In re Cox Enterprises, Inc.), 790 F.3d at 1118. See also United States v. Youngbear, No. CR 07-1560, 2008 WL 6045499, at *4 (D.N.M., October 21, 2008)(Browning, J.)("The Supreme Court of the United States has stated: 'A party may waive any provision, either of a contract or of a statute, intended for his benefit.'" (quoting United States v. Mezzanatto, 513 U.S. 196, 201 (1995)); Lucero v. Martinez, No. CIV 03-1128, 2006 WL 1304945, at *2 (D.N.M. March 11, 2006)(Browning, J.).

### NEW MEXICO LAW REGARDING CONTRACT INTERPRETATION

In contract cases, "the role of the court is to give effect to the intention of the contracting parties." Bogle Farms, Inc. v. Baca, 1996-NMSC-051, ¶ 22, 122 N.M. 422, 428, 925 P.2d 1184, 1190. "'The primary objective in construing a contract is not to label it with specific definitions or to look at form above substance, but to ascertain and enforce the intent of the parties as shown by the contents of the instrument.'" Bogle Farms, Inc. v. Baca, 1996-NMSC-051, ¶ 22, 122 N.M. at 428, 925 P.2d at 1184 (quoting Shaeffer v. Kelton, 1980-NMSC-117, ¶ 8, 95 N.M. 182, 185, 619 P.2d 1226, 1229). New Mexico has "adopted the contextual approach to contract

interpretation, in recognition of 'the difficulty of ascribing meaning and content to terms and expressions in the absence of contextual understanding.'" Mark V, Inc. v. Mellekas, 1993-NMSC-001, ¶ 10, 114 N.M. 778, 781, 845 P.2d 1232, 1235 (quoting C.R. Anthony Co. v. Loretto Mall Partners, 1991-NMSC-070, ¶ 14, 112 N.M. 504, 508, 817 P.2d 238, 242). See Pedroza v. Lomas Auto Mall, Inc., No. CIV 07-0594, 2013 WL 4446770, at *18 (D.N.M. August 2, 2013)(Browning, J.).

     "The question whether an agreement contains an ambiguity is a matter of law." Hartnett v. Papa John's Pizza USA, Inc., 912 F. Supp. 2d 1066, 1092 (D.N.M. 2012)(Browning, J.). When the "evidence presented is so plain that no reasonable person could hold any way but one, then the court may interpret the meaning as a matter of law." Mark V, Inc. v. Mellekas, 1993-NMSC-001, ¶ 10, 114 N.M. at 781, 845 P.2d at 1235. A contract "is not rendered ambiguous merely because a term is not defined; rather, the term must be interpreted in its usual, ordinary, and popular sense . . . and may be ascertained from a dictionary." Battishill v. Farmers Alliance Ins. Co., 2006-NMSC-004, ¶ 8, 139 N.M. 24, 26, 127 P.3d 1111, 1113 (quoting Battishill v. Farmers All. Ins. Co., 2004-NMCA-109, ¶ 11, 136 N.M. 288, 291, 97 P.3d 620, 623). "A contract is deemed ambiguous only if it is reasonably and fairly susceptible of different constructions. The mere fact that the parties are in disagreement on the construction to be given does not necessarily establish ambiguity." Vickers v. N. Am. Land Dev., Inc., 1980-NMSC-021, 607 P.2d 603, 606 (citation omitted).

     "An ambiguity exists in an agreement when the parties' expressions of mutual assent lack clarity." Mark V, Inc. v. Mellekas, 1993-NMSC-001, ¶ 12, 114 N.M. at 781, 845 P.2d at 1235 (citation omitted). If the court finds that the contract is "reasonably and fairly susceptible of different constructions, an ambiguity exists." Mark V, Inc. v. Mellekas, 1993-NMSC-001, ¶ 12,

114 N.M. at 781, 845 P.2d at 1235 (citing Vickers v. N. Am. Land Dev., Inc., 1980-NMSC-021,

¶ 9, 94 N.M. at 68, 607 P.2d at 606 (1980)).

> [I]n determining whether a term or expression to which the parties have agreed is unclear, a court may hear evidence of the circumstances surrounding the making of the contract and of any relevant usage of trade, course of dealing, and course of performance. . . .  It is important to bear in mind that the meaning the court seeks to determine is the meaning one party (or both parties, as the circumstances may require) attached to a particular term or expression at the time the parties agreed to those provisions.
>
> . . . .
>
> It may be that the evidence presented is so clear that no reasonable person would determine the issue before the court in any way but one.  In that case, to the extent the court decides the issue, the question then may be described as one of law.

C.R. Anthony Co. v. Loretto Mall Partners, 1991-NMSC-070, ¶¶ 15, 17, 112 N.M. at 510, 817

P.2d at 242-44 (affirming the trial court because it "considered all evidence adduced in response

to the motion for summary judgment, including collateral or extrinsic evidence of the

circumstances surrounding the execution of the lease amendment, and quite properly found no

ambiguity")(citing Eskimo Pie Corp. v. Whitelawn Dairies, 284 F. Supp. 987, 995

(S.D.N.Y.1968)(Mansfield, J.)).  In addition, in determining whether an ambiguity exists,

> [a] court may employ the many rules of contract interpretation that do not depend on evidence extrinsic to the contract.  See, e.g., Smith v. Tinley, 100 N.M. 663, 665, 674 P.2d 1123, 1125 (1984)(reasonable interpretation of contract is favored); Schultz & Lindsay Constr. Co. v. State, 83 N.M. 534, 536, 494 P.2d 612, 614 (1972)(uncertainties construed strictly against drafter); Id. at 535, 494 P.2d at 613 (each part of contract is to be given significance according to its place in the contract so as to give effect to the intentions of the parties).

C.R. Anthony Co. v. Loretto Mall Partners, 1991-NMSC-070, ¶ 17 n.5, 112 N.M. at 510 n.5, 817

P.2d at 244 n.5.  Once the Court finds that an ambiguity exists, the resolution of that ambiguity

becomes a question of fact.  See Mark V, Inc. v. Mellekas, 1993-NMSC-001, ¶ 13, 114 N.M. at

781, 845 P.2d at 1235.  To decide the meaning of any ambiguous terms, "the fact finder may

consider extrinsic evidence of the language and conduct of the parties and the circumstances surrounding the agreement, as well as oral evidence of the parties' intent." Mark V, Inc. v. Mellekas, 1993-NMSC-001, ¶ 13, 114 N.M. at 781, 845 P.2d at 1236. "[I]f the court finds ambiguity, the jury (or court as the fact finder in the absence of a jury) resolves the ambiguity as an issue of ultimate fact before deciding breach and damages." C.R. Anthony Co. v. Loretto Mall Partners, 1991-NMSC-070, ¶ 11, 112 N.M. at 508, 817 P.2d at 241.

### ANALYSIS

The Court holds that the Award is valid as to Terry, because there is an existing agreement to engage in FINRA arbitration and no reason presents itself to vacate the Award as to her. The Court holds, however, that the Award is invalid as to Kerr, because her Maestro Global employment contract's non-FINRA arbitration provision supersedes her FINRA arbitration agreement, and because that provision binds Waked and Stone as intended third-party beneficiaries to the Maestro Global contract. The Court emphasizes that Rivera settled with Waked and Stone, so the Court does not discuss the Award's validity as to him. In reaching these conclusions, the Court's analysis proceeds thus.

First, the Court addresses three preliminary issues pertinent to both Terry and Kerr: (i) Terry and Kerr's challenges to the Award raise arbitrability issues, and do not raise merits-related issues that, once decided by an arbitrator, are presumptively correct and largely immune from judicial review; (ii) the parties did not delegate to the FINRA arbitrators the ability to decide arbitrability, in such a way that would shield from judicial review a decision about arbitrability; and (iii) Terry and Kerr did not waive by participating in the arbitration their ability to raise their challenges, because they raised their objections with sufficient consistency. The disposition in

- 63 -

Waked and Stone's favor of any three issues effectively would end the discussion, rendering the Award presumptively valid; the Court decides in Terry and Kerr's favor on these matters, however.

Second, the Court addresses Terry's liability alone under the Award and determines the Award is valid as to her, first determining that the Award in isolation would be valid and then addressing two counterarguments thereto, that Maestro Global's participation and the existence of Kerr's employment contract rendered the Award invalid: (i) the Award in isolation would be valid as to Terry, if the arbitration only involved Terry, Waked and Stone, and did not involve Maestro Global or Kerr; (ii) Maestro Global's participation in the arbitration does not render invalid Terry's Award liability; and (iii) Kerr's employment contract's non-FINRA arbitration provision does not render Terry's Award liability invalid, because the non-FINRA provision does not bind Terry, who is a non-signatory to Kerr's employment contract.  Accordingly, the Court determines that the Award is valid as to Terry.

Third, the Court determines that the Award is invalid as to Kerr, because the FINRA arbitrators exceeded their powers by imposing liability on her.  The Court reaches the following subsidiary conclusions: (i) the non-FINRA arbitration provision in Kerr's contract binds Waked and Stone, because, although non-signatories, they are the contract's intended third-party beneficiaries; and (ii) the non-FINRA arbitration provision in Kerr's contract displaces the FINRA arbitration provision, because FINRA's arbitration rules can be contracted around.  Because the contractual, non-FINRA provision displaces Kerr's background agreement to arbitrate before FINRA as a regulated professional, there existed as to her no agreement to arbitrate before FINRA, so the FINRA panel exceeded its powers by imposing liability on her.  Accordingly, the Court vacates Kerr's liability under the Award.

I.   **TERRY AND KERR'S CHALLENGES TO THE AWARD RAISE ARBITRABILITY ISSUES, THE PARTIES DID NOT DELEGATE TO THE FINRA ARBITRATORS THE ABILITY TO DECIDE ARBITRABILITY, AND TERRY AND KERR DID NOT WAIVE THEIR ARBITRABILITY CHALLENGE.**

At the outset, the Court settles three threshold questions, which, if decided against Terry and Kerr, effectively would end the analysis, because Terry and Kerr's liability under the Award presumptively then would be valid.  First, the Court concludes that Terry and Kerr's arguments against the Award raise arbitrability issues and not merits issues, where arbitrators' merits decisions are largely shielded from judicial review; the presumption in favor of arbitrability, moreover, does not apply, because Terry and Kerr's specific contentions concern the existence of an agreement to arbitrate, not the scope of an agreement to arbitrate.  Second, the parties did not agree to delegate to the FINRA arbitrators the ability to determine their own jurisdiction, because FINRA Code 13413, which allows FINRA arbitrators to interpret the FINRA Code, does not effect a delegation of the ability to determine arbitrability.  Third, Terry and Kerr did not waive their ability to raise their arbitrability challenge by participating in the arbitration, because they raised with sufficient vigor and consistency their jurisdictional challenge.

A.   **TERRY AND KERR'S CHALLENGES TO THE AWARD RAISE ARBITRABILITY-RELATED ISSUES INSTEAD OF MERITS-RELATED ISSUES.**

The Court determines that Terry and Kerr's arguments against the Award raise arbitrability related disputes, not merits-related ones that the FAA commits to arbitrators' decision-making authority and largely shields from judicial review.  The presumption in favor of arbitrability, moreover, is inapplicable, because Terry and Kerr do not dispute whether a particular issue falls within the scope of an agreement to arbitrate.  Instead, Terry and Kerr dispute whether there exists at all an agreement to arbitrate before FINRA.

1.      **The Dispute Here Is Not a Merits Issue, But Instead a Threshold Arbitrability Issue.**

The Court first must determine whether the parties' dispute here concerns a merits-related issue -- one which the FAA assigns to the arbitrators and shields almost wholly from judicial review -- or whether it concerns the threshold arbitrability issue, and one that the FAA does not insulate from the Court's review, unless the parties intentionally agreed that the arbitrators would decide that very issue of arbitrability.  To use the baseball metaphor employed at the hearing, the matter for decision now is whether the dispute is a merits-related one that enjoys the wide "strike zone," January 10 Tr. at 4:18-21 (Court), afforded to arbitrators to render substantive decisions on the parties' dispute, or whether the issue concerns the parties' "agree[ment] to play the game[, and] . . . to even step up to bat," January 10 Tr. at 10:5-7 (Saucedo).  Although there is a presumption in favor of arbitration, that presumption concerns only the scope of a particular agreement to arbitrate, and that presumption drops away when the legal question is whether there existed, in the first place, an agreement to arbitrate.  See Presbyterian Healthcare Servs. v. Goldman, Sachs & Co., 122 F. Supp. 3d 1157, 1206 (D.N.M. 2015)(Browning, J.)("Presbyterian Healthcare")("[The] presumption towards arbitration . . . applies only when the parties dispute only the *scope* of an arbitration clause, [and] 'disappears when the parties dispute the *existence* of a valid arbitration agreement.'" (quoting Dumais v. Am. Golf Corp., 299 F.3d 1216, 1220 (10th Cir. 2002)(emphasis in Presbyterian Healthcare, not in Dumais v. Am. Golf Corp.)).

Terry and Kerr argue to the Court that they did not agree to the FINRA arbitration which produced the Award here, which constitutes an arbitrability or existence-of-agreement-to-arbitrate argument and not a merits one insulated from the Court's review.  Terry and Kerr argue that they did not agree to arbitrate with the Plaintiffs before FINRA, that they did not agree to FINRA

arbitration with Maestro Global, that they instead agreed to arbitrate with it in a non-FINRA forum, and that Waked and Stone too should have been bound to that non-FINRA forum arbitration agreement. See Motion to Vacate at 1 ("[The panel] forc[ed] Defendants Kathleen Kerr and Timothy River to arbitrate . . . in a FINRA forum to which they never agreed against a Respondent, Maestro Global[,] . . . which was never even subject to FINRA jurisdiction."). This contention is not a merits claim, e.g., as would be one that the panel got the substantive law wrong. It is such a claim that enjoys the wide "strike zone," January 10 Tr. at 4:18-21 (Court), under the FAA provision for motions for vacatur in 9 U.S.C. § 10(a). See Oxford Health Plans LLC v. Sutter, 569 U.S. 564, 569 (2013)("A party seeking relief under [the 'exceeding powers' provision, 9 U.S.C. § 10(a)(4)] bears a heavy burden."); Stolt-Nielsen S.A. v. AnimalFeeds International Corp., 559 U.S. at 671 ("It is not enough . . . to show that the [arbitrator] committed an error -- or even a serious error."); Eastern Associated Coal Corp. v. Mine Workers, 531 U.S. 57, 62 (2000)(holding that because the parties "'bargained for' the 'arbitrator's construction' of their agreement," an arbitral decision "'even arguably construing or applying the contract'" must stand, regardless of a court's opinion that it lacks merit (quoting Steelworkers v. Enterprise Wheel & Car Corp., 363 U.S. 593, 599 (1960), then Paperworkers v. Misco, Inc., 484 U.S. 29, 38 (1987))). This claim is not one, therefore, that the FAA shields almost wholly from judicial review. Instead, it is an arbitrability issue, or an agreement-to-arbitrate issue, that presumptively is subject to the Court's plenary review.

       **2.**      **The Presumption in Favor of Arbitrability Is Inapplicable Here, Because Terry and Kerr Challenge the Existence of an Agreement to Arbitrate, and Not the Scope of an Agreement to Arbitrate.**

The presumption in favor of arbitrability does not apply to the present situation. Although there exists a presumption in favor of arbitrability, that rule restates the preference that the FAA

embodies, offering a rebuke to the history of judicial hospitality to arbitration agreements. <u>See</u>

<u>Volt Info. Sciences, Inc. v. Bd. of Trs.</u>, 489 U.S. 468, 474 (1989)(stating that Congress designed

the FAA to "overrule the judiciary's longstanding refusal to enforce agreements to arbitrate and

place such agreements upon the same footing as other contracts"); <u>Mitsubishi Motors Corp. v.</u>

<u>Soler Chrysler-Plymouth, Inc.</u>, 473 U.S. 614, 626 ("[A]s a matter of federal law, any doubts

concerning the scope of arbitrable issues should be resolved in favor of arbitration." (quoting

<u>Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.</u>, 460 U.S. at 24-25)). That presumption,

however, is inapplicable where, as here, the issue is not whether a particular question falls within

the scope of an extant agreement to arbitrate. <u>See</u> <u>Dumais v. Am. Golf Corp.</u>, 299 F.3d 1216, 1220

(10th Cir. 2002)("[While] the presumption in favor of arbitration is properly applied in interpreting

the scope of an arbitration agreement, . . . this presumption disappears when the parties dispute the

existence of a valid arbitration agreement."); <u>Riley Mfg. Co., Inc. v. Anchor Glass Container</u>

<u>Corp.</u>, 157 F.3d 775, 779 (10th Cir. 1998)("When the dispute is whether there is a valid and

enforceable arbitration agreement in the first place, the presumption of arbitrability falls away.").

The presumption in favor of arbitrability applies, for example, in a situation where an employee's

employment contract explicitly states that all disputes "arising out of employment" will be

arbitrated, and the question is whether the employee's slip-and-fall in the parking lot leaving a

shift comes within that provision; in such a situation, the presumption favoring arbitration of

disputes demands that the arbitration clause be read to cover such a situation. <u>Cf.</u>, <u>e.g.</u>, <u>Wells</u>

<u>Fargo Advisors, LLC v. Quantum Fin. Partners LLC</u>, No. CIV 15-9145, 2015 WL 5053631, at *3

(D. Kan. August 26, 2015)(Robinson, J.)("Jacobs signed two contracts that contained arbitration

clauses[, which] . . . contain the language 'arising out of' which the Tenth Circuit interprets

broadly. . . . The broadness of the MOU's arbitration clause . . . make it clear that Wells Fargo's

contributory copyright claim arises out of or in connection with Jacobs's employment." (no citation given for quoted material)).

Terry and Kerr do not maintain that a particular dispute does not come within the scope of a field charged to the arbitrator; rather, they argue that there is no agreement to arbitrate, at least not before FINRA and not with Maestro Global, in the first place.  See Motion to Vacate at 1 ("[The panel] forc[ed] Defendants Kathleen Kerr and Timothy River to arbitrate . . . in a FINRA forum to which they never agreed against a Respondent, Maestro Global[,] . . . which was never even subject to FINRA jurisdiction.").  Because this is an existence and not a scope challenge, the presumption in favor of arbitrability does not apply here.

## B. THE PARTIES DID NOT DELEGATE TO THE FINRA ARBITRATORS THE ABILITY TO DETERMINE ARBITRABILITY.

The parties have not delegated the decision as to arbitrability to the FINRA arbitrators, so no deference is owed to the arbitrators' decision that Terry and Kerr's dispute with Maestro Global is arbitrable.  There is a presumption that courts determine arbitrability.  See Henry Schein, Inc. v. Archer & White Sales, Inc., 139 S. Ct. 524, 531 (2019)("Henry Schein")("Under our cases, courts 'should not assume that the parties agreed to arbitrate arbitrability unless there is clear and unmistakable evidence that they did so.'" (quoting First Options, 514 U.S. at 944)).  Because arbitration is a matter of contract, however, parties to an arbitration agreement may agree amongst themselves that the arbitrator will decide matters of arbitrability, i.e., parties can agree that the arbitrator of their dispute will decide its own jurisdiction.  See Rent-A-Ctr., W., Inc. v. Jackson, 561 U.S. 63, 68-70 (2010)("The delegation provision is an agreement to arbitrate threshold issues. . . . [P]arties can agree to arbitrate 'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy[,

which] merely reflects the principle that arbitration is a matter of contract." (citing <u>Howsam v. Dean Witter Reynolds, Inc.</u>, 537 U.S. 79, 83-85 (2002); <u>Green Tree Financial Corp. v. Bazzle</u>, 539 U.S. 444, 452 (2003); <u>First Options</u>, 514 U.S. at 943)).  A reviewing court should view cautiously, however, such delegation provisions, lest the court imbue the arbitrator with substantially greater powers than the parties intended.  <u>See</u> <u>supra</u> <u>Domke on Arbitration</u> § 15.11  ("[T]he willingness of parties to enter into arbitration agreements would be drastically reduced if an arbiter had the power to determine his or her own jurisdiction.").  Accordingly, the Supreme Court has required that parties "clear[ly] and unmistakeabl[y]" signal their intent to delegate to the arbitrator the power to determine arbitrability.  <u>Henry Schein</u>, 139 S. Ct. at 531 (quoting <u>First Options</u>, 514 U.S. at 944).  Thus, whether the parties here delegated to the FINRA panel the power to determine its own jurisdiction depends on whether they agreed "clear[ly] and unmistakeabl[y]" to delegate that authority to the panel.  <u>Henry Schein</u>, 139 S. Ct. at 531 (quoting <u>First Options</u>, 514 U.S. at 944).

The parties here did not delegate to the FINRA panel the power to determine arbitrability, because the agreement between them, construed according to New Mexico contract law, does not contain such a delegation.  If there was such a delegation, it would have to lie on construing FINRA's Code of Arbitration -- specifically FINRA Code 13413.  Indeed, the FINRA panel relied on that provision to determine that the panel possessed the authority to determine its own jurisdiction:

> [W]hat may be my favorite FINRA rule . . . is Industry Code Section 13413, the same as in the Customer Code 12409, which says, in its entirely, "[T]he panel has the authority to interpret and determine the applicability of all provisions under the Code. Such interpretations are final and binding upon the parties."

Undated Tr. at 12, 24:16-23 (Ch. Krotinger)(quoting FINRA Code 13413).

1.     **Contracting Parties Can, by Means of Incorporation-by-Reference, Agree to Arbitrate and Can Delegate to Arbitrators the Power to Determine Arbitrability.**

Agreements to arbitrate are determined according to standard State contract law.  See Hardin v. First Cash Fin. Servs., Inc., 465 F.3d 470, 475 (10th Cir. 2006)("Generally, courts 'should apply ordinary state-law principles that govern the formation of contracts' to determine whether a party has agreed to arbitrate a dispute." (quoting First Options, 514 U.S. at 944)). Contracting parties may incorporate by reference into their contract the provisions that another writing makes.  See Summit Elec. Supply Co. v. Int'l Bus. Machines Corp., No. CIV 07-0431, 2009 WL 9087259, at *8–9 (D.N.M. September 30, 2009)(Armijo, J.)("'Where the language of an agreement clearly and unambiguously expresses the intent of the parties' to incorporate a document by reference, the 'court must give effect to the parties' agreed upon intent.'" (quoting Trujillo v. CS Cattle Co., 1990-NMSC-037, ¶14, 109 N.M. 705, 709, 790 P.2d 502, 506)).  One contract may incorporate by reference an organization's bylaws or code.  See Cuenco v. Clubcorp USA, Inc., No. CIV 20-0774, 2021 WL 2453279, at *2 (S.D. Cal. June 16, 2021)(Sabraw, C.J.)(holding that a membership contract incorporated by reference an organization's bylaws, including its arbitration rules, when "the membership applications at issue in this case clearly and repeatedly called out the Club Bylaws, and specifically made reference to 'arbitration of disputes'" (no citation given for quoted material)).  Parties' contracts may incorporate by reference the arbitration rules of FINRA or other arbitration organizations like the AAA.  See supra Domke on Arbitration § 10.14 ("Whether bylaws of organizations expressly refer to arbitration rules or not, the parties are generally presumed to have intended to make use of arbitration when they are both members of an organization whose rules or bylaws require that members arbitrate their disputes.");

id. § 15:11.50 ("Parties may delegate [the arbitrability determination] . . . by incorporating by reference a set of arbitration rules that include such delegation.").

Here, Terry, Kerr, Waked, and Stone had an agreement to arbitrate with one another based on the contract each individual made with FINRA, as their Form U4's express.  The contract containing the outstanding FINRA arbitration agreement technically was not a contract they signed with each other; rather, each person individually executed a Form U4 agreement in which the individual contracted with FINRA, by which he or she agreed to be bound by FINRA's arbitration rules, see Form U4 § 15A, ¶ 5, at 15 ("I agree to arbitrate any dispute, claim or controversy that may arise between me and my firm, or a customer, or any other person, that is required to be arbitrated under the rules, constitutions, or by-laws of the SROs indicated in Section 4 . . . .").  The Form U4 provision containing the agreement to be bound by the FINRA Code effects an incorporation by reference into each individual's contract, so that each individual's Form U4 brings the FINRA Code to bear upon the individual broker-dealer.  See Kidder, Peabody & Co. v. Zinsmeyer Trusts P'ship, 41 F.3d 861, 864 (2d Cir. 1994)("It is well established that an agreement to arbitrate may be incorporated by reference into a second contract." (citing Progressive Casualty Ins. Co. v. C.A. Reaseguradora Nacional De Venezuela, 991 F.2d 42, 48 (2d Cir. 1993))).  As the Court has discussed, it is upon this incorporation-by-reference basis that, as a matter of New Mexico contract law, Terry, Kerr, Waked and Stone each individually have an agreement to arbitrate their disputes with each other.  See Citigroup Global Markets Inc. v. Abbar, 761 F3d 268, 274 (2d Cir. 2014)("'The arbitration rules of an industry self-regulatory organization such as FINRA are interpreted like contract terms; the organization's arbitration provision should thus be interpreted to give effect to the parties' intent as expressed by the plain language of the provision.'" (quoting Wachovia Bank, N.A. v. VCG Special Opportunities Master Fund, Ltd., 661 F3d 164,

171 (2d Cir. 2011))).  Supra Domke on Arbitration § 10.14 ("[P]arties are generally presumed to have intended to make use of arbitration when they are both members of an organization whose rules or bylaws require that members arbitrate their disputes.").

Although each natural person's contract is between her and FINRA, every other pertinent party stands as an intended third-party beneficiary to that individual-FINRA contract, insofar as each individual's Form U4 contract incorporates the FINRA arbitration code, which in turn mandates arbitration of disputes between FINRA registered persons.  Cf. UBS Fin. Servs., Inc. v. W. Virginia Univ. Hosps., Inc., 660 F.3d 643, 649–50 (2d Cir. 2011)("'[A] broker's membership obligation confers upon the customer an option to arbitrate as the exchange rules provide.' A customer under the exchange's rules is entitled to invoke the arbitration provision 'as an intended third-party beneficiary' in a dispute with a member." (quoting Kidder, Peabody & Co. v. Zinsmeyer Trusts P'ship, 41 F.3d 861, 864 (2d Cir. 1994))).  See also Valentine v. Health & Wellness Lifestyle Clubs, LLC, No. 20-4341, 2022 WL 2903444, at *4 (6th Cir. July 22, 2022)("The relevant 'agreement' to arbitrate is between Valentine and FINRA, not Valentine and HWLC.  Valentine . . . agreed, by virtue of the FINRA Code, to arbitrate . . . with customers pursuant to FINRA Rule 12200.").

As discussed, it is on this basis -- via third-party beneficiary invocation of FINRA Code 13200, via the FINRA's code's incorporation by reference into the Form U4s -- that there exists an outstanding agreement to arbitrate between Terry, Kerr, Waked and Stone.  For example, thus, Terry stands as a third-party beneficiary of Waked's Form U4 contract with FINRA, under FINRA Code 13200, as the FINRA Code is incorporated by reference into Waked's Form U4 agreement. It is on this legal basis that each natural person in this litigation has agreed to arbitrate before FINRA with every other natural person.  It is on this same basis too, that, because Maestro Global

is not a FINRA member, not a FINRA associated person, and not a FINRA customer, no natural person agreed to arbitrate with Maestro Global via the natural person's Form U4 agreement with FINRA.  Because Maestro Global falls into none of the applicable FINRA status categories, it cannot invoke as a third-party beneficiary each natural person's FINRA arbitration commitment. Thus, in the same legal breath that each natural person agreed to arbitrate with each other, no natural person agreed to FINRA arbitration with Maestro Global, as the Court holds above.

## 2.  Terry and Kerr Did Not, By Incorporating FINRA Code 13413 by Reference, Delegate to the FINRA Panel the Power to Determine Arbitrability.

The Court now must determine whether, via this same, incorporation-by-reference vehicle, the parties delegated to the FINRA arbitrators the power to determine arbitrability, i.e., the scope of their own jurisdiction.  Specifically, the issue is whether FINRA Code 13413, incorporated into each person's Form U4 agreement, represents an agreement by each that the FINRA arbitration panel would determine what disputes are arbitrable.  The Court joins several other decisions in holding that FINRA Code 13413 does not effect a "clear and unmistakable" delegation.  Henry Schein, 139 S. Ct. at 531 ("Under our cases, courts 'should not assume that the parties agreed to arbitrate arbitrability unless there is clear and unmistakable evidence that they did so.'" (quoting First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944 (1995)).

As noted, courts have recognized that parties can, via incorporation by reference, delegate to arbitrators the ability to determine arbitrability.  See Domke on Arbitration supra § 15:11.50 ("Parties may delegate [the arbitrability determination] . . . by incorporating by reference a set of arbitration rules that include such delegation.").  For example, incorporating into a contract the AAA's arbitration code effectuates such a delegation to arbitrators of the ability to determine arbitrability.  See Goldgroup Res., Inc. v. DynaResource de Mexico, S.A. de C.V., 994 F.3d 1181,

1191 (10th Cir. 2021)("[W]e have repeatedly held that contracting parties' incorporation of the

AAA Rules into their arbitration agreement constitutes 'clear and unmistakable evidence of an

agreement to arbitrate arbitrability.'" (quoting Dish Network L.L.C. v. Ray, 900 F.3d 1240, 1246

(10th Cir. 2018) and citing Belnap v. Iasis Healthcare, 844 F.3d 1272, 1281 (10th Cir. 2017))).

Courts considering whether incorporation of FINRA's Code effects the same result,

however, have held the opposite, that the FINRA Code does not on its own effect a delegation of

the arbitrability determination.  As the Honorable Ronnie Abrams, United States District Judge for

the United States District Court for the Southern District of New York, explains:

> Unlike the AAA rules, which provide that "'[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement,'" *Contec Corp.*, 398 F.3d at 208 (quoting AAA Rule R-7(a)), the FINRA Code "does not clearly and unmistakably provide for all issues of arbitrability to be arbitrated," *Alliance Bernstein*, 445 F.3d at 126 (evaluating NASD Rule 10324, now FINRA Rule 13413). The relevant FINRA rule is more circumscribed than its AAA counterpart, stating only that "[t]he [arbitration] panel has the authority to interpret and determine the applicability of all provisions *under the Code.*" FINRA Rule 13413 (emphasis added). Accordingly, the *Alliance Bernstein* court found that the parties had delegated arbitrability in that instance on the basis that the particular arbitrability dispute -- whether the Code's provision mentioning "employment discrimination . . . in violation of a statute" encompassed a claim under Sarbanes-Oxley -- hinged on interpretation of the FINRA Code.  445 F.3d at 126.
>
> Here, by contrast, the underlying dispute as to whether NY CPLR § 7515 applies to the Agreements does not implicate the FINRA Code. FINRA Rule 13413 therefore does not apply. No other FINRA rule delegates to its arbitration panel determinations about the general scope or validity of an arbitration agreement. As a result, the Agreements' incorporation of the Code does not clearly evince the parties' intent to delegate the arbitrability question at issue here.

Rollag v. Cowen Inc., No. CIV 20-5138, 2021 WL 807210, at *5 (S.D.N.Y. March 3,

2021)(Abrams, J.).  Other cases that have considered the issue generally hold that the FINRA Code

does not effect a delegation.  See Stagliano v. O.N. Equity Sales Co., No. CIV 20-1760, 2020 WL

3172891, at *4 (E.D. Pa. June 15, 2020)(Kearney, J.)("The Investors' claim is based on the

language in the FINRA rules and the Uniform Submission Agreement. Neither includes language

"clearly and unmistakably" expressing the parties' intent to have arbitrators instead of the court

decide the question of arbitrability. . . . [T]he agreement here does not delegate arbitrability."

(citing Chesapeake Appalachia, LLC v. Scout Petroleum, LLC, 809 F.3d 746, 761 (3d Cir. 2016)));

Retina Consultants P.C. Defined Benefit Pension Plan v. Benjamin, No. CIV 19-0037, 2020 WL

1491756, at *5 (S.D. Ga. March 19, 2020)(Hall, C.J.)("[I]ncorporating the FINRA Rules into an

arbitration agreement is insufficient on its own to evidence the parties' clear intent for the arbitral

panel to determine arbitrability." (discussing Merrill Lynch, Pierce, Fenner & Smith, Inc. v.

Cohen, 62 F.3d 381, 384 (11th Cir. 1995))). But see Katalyst Sec., LLC v. Marker Therapeutics,

Inc., No. 21-CV-08005, 2022 WL 704427, at *3 (S.D.N.Y. March 9, 2022)(Swain, C.J.)(holding

that a contract effected a delegation by providing that "'[t]he parties . . . agree to submit all

controversies to the exclusive jurisdiction of FINRA arbitration . . . and all controversies which

may arise . . . shall be determined by arbitration pursuant to the rules then pertaining to FINRA.'"

(quoting parties' agreement)).  Moreover, similar to the Court's conclusion that participation alone

in FINRA arbitration does not waive the right to contest a valid underlying agreement's existence,

see infra Section II.A.3, federal courts have held that participation alone in FINRA arbitration does

not effect a delegation of the arbitrability determination.  See Stagliano v. O.N. Equity Sales Co.,

2020 WL 3172891, at *4 ("[T]he Investors' filings in the FINRA proceedings are not sufficiently

clear and unmistakable evidence of the Investors' intent to delegate the gateway question of

arbitrability to the arbitrator.").  Where a court has found there was a valid delegation to a FINRA

panel, the conclusion rests on not on FINRA Code 13413 or any other FINRA Code provision, but

on an explicit delegation provision contained in the parties' specific contract.  Cf. Pepe v. N.Y.

Life Ins. Co., No. CIV 22-4005, 2023 WL 1814879, at *4 (E.D. La. February 7, 2023)(Vance,

J.)("The Partner's Agreement plainly provides that 'any dispute as to whether [plaintiff's] Claim is arbitrable . . . shall be resolved by a final and binding arbitration proceeding.' . . . There is clear and unmistakable evidence that the parties intended to arbitrate the issue of arbitrability." (quoting parties' agreement)(first ellipses in Pepe v. N.Y. Life Ins. Co., second ellipses is the Court's)).

The Court joins those district courts that have considered the question in concluding that FINRA Code 13413 does not constitute a "clear and unmistakable" delegation to FINRA'S arbitrators of the power to determine arbitrability. Henry Schein, 139 S. Ct. at 531 (quoting First Options, 514 U.S. at 944). Unlike the AAA delegation provision, which explicitly provides that "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement," AAA Rule R-7(a), FINRA Code 13413 provides only that "[t]he panel has the authority to interpret and determine the applicability of all provisions under the Code," FINRA Code 13413. Unlike the incorporation by reference of AAA's rules, which effects a delegation of arbitrability determinations, see Goldgroup Res., Inc. v. DynaResource de Mexico, S.A. de C.V., 994 F.3d at 1191 ("[W]e have repeatedly held that contracting parties' incorporation of the AAA Rules into their arbitration agreement constitutes 'clear and unmistakable evidence of an agreement to arbitrate arbitrability.'" (quoting Dish Network L.L.C. v. Ray, 900 F.3d at 1246, and citing Belnap v. Iasis Healthcare, 844 F.3d at 1281)), the same incorporation-by-reference vehicle does not, in the FINRA and Form U4 context, effect such a delegation. The Court instead understands Code 13413 to provide primarily that FINRA arbitrators may interpret the substance, i.e., regarding merits related determinations, and procedure of the FINRA code, but not the outstanding existence of an agreement to arbitrate.

- 77 -

Accordingly, the FINRA arbitrators here were wrong to look to Code 13413 as a basis to say that they possessed the power to determine their own jurisdiction.  See Undated Tr. at 12, 24:16-23 (Ch. Krotinger)("[W]hat may be my favorite FINRA rule . . . is Industry Code Section 13413, the same as in the Customer Code 12409, which says, in its entirely, '[T]he panel has the authority to interpret and determine the applicability of all provisions under the Code. Such interpretations are final and binding upon the parties.'" (quoting FINRA Code 13413)(first brackets are the Court's, second brackets in original)).  Insofar as Terry and Kerr did not agree, via Code 13413 incorporated by reference into their Form U4s, that the FINRA panel would have the ability to determine the arbitrability of their dispute, they thus did not delegate away the Court's ability to assess that question.  The parties offer no other basis besides FINRA Code 13413 for the conclusion that the parties delegated to the FINRA arbitrators the ability to determine arbitrability. The only basis for such a delegation thus failing, Terry and Kerr's contention is therefore not a merits dispute largely insulated from the Court's review, and is not an arbitrability dispute that the parties assigned to panel's decisional power.

### C.    TERRY AND KERR DID NOT WAIVE THEIR JURISDICTIONAL CHALLENGE TO THE FINRA ARBITRATION BY PARTICIPATING IN THE ARBITRATION OR BY EXECUTING SUBMISSION AGREEMENTS, BECAUSE TERRY AND KERR CONSISTENTLY AND VIGOROUSLY RAISED TO THE FINRA ARBITRATORS THEIR JURISDICTIONAL COMPLAINT.

Terry and Kerr did not forfeit -- on the bases either of submitting an unqualified uniform submission agreement or of participating through completion in the FINRA arbitration -- the argument they make that they did not agree to arbitrate before FINRA and with Maestro Global. The Court holds that they did not waive their ability to contest the existence of an agreement, despite the submission agreement and their participation, and that the submission agreement and

their participation do not now constitute the otherwise missing agreement to arbitrate with Maestro

Global.  The Court therefore agrees with the Defendants' reading of Supreme Court and Tenth

Circuit precedent on protesting a lack of agreement to arbitrate; the Court agrees with the

Defendants' formulation that there exists a three-tiered schema for lodging an objection to an

arbitration proceeding on the basis that there exists no agreement to arbitrate:

> The first is . . . to come to court, file an injunction.  [T]hat is a possibility.
> It's not, however, required.
>
> The second would be simply not show up.  [T]he <u>First Options</u> case talks
> about that. . . .
>
> But the third option, as explained in <u>Lewis</u>, as explained in <u>First Options</u>[,]
> is to make your objection.  If they're denied, you go through with your arbitration.
> . . [B]y going through the arbitration, once the objection is made, it is not waiving
> ability to challenge whether, in fact, that issue or the parties were properly before
> the arbitration panel or properly submitted to arbitration.

Tr. at 13:24-14:20 (Saucedo).  Although the unqualified submission agreement, on its face, appears

to constitute such an agreement to arbitrate, the Court holds that it does not constitute an agreement

to arbitrate existing independently of the underlying FINRA-status agreement.  Terry and Kerr

could have refused to sign the submission agreements and ultimately incurred FINRA regulatory

penalties.  <u>See</u> FINRA Code 9554(a) ("If a . . . person subject to FINRA's jurisdiction fails to

comply with an arbitration award . . .  [this may] result in a suspension or cancellation of

membership or a suspension from associating with any member."); Regulatory Notice 10-31,

FINRA (June 18, 2010), https://www.finra.org/rules-guidance/notices/10-31 (describing the

function and changes to FINRA rule 9554, which "allows FINRA to bring expedited actions to

address failures to comply with FINRA arbitration awards and related settlements").  Terry and

Kerr could have refused to sign the submission agreements, and subsequently either: (i) sought a

State or federal court injunction against the arbitration; or (ii) refused to arbitrate and defended against any motion to compel FINRA arbitration that Waked, Stone and Maestro Global might have brought. The Court agrees with Terry and Kerr, however, that those were not the only two options available to them. Instead, the Court holds that they properly could argue vigorously that they did not want to sign the unqualified submission agreements, sign them upon the FINRA arbitration panel's order, proceed with the FINRA arbitration during which they raised continual objections, and retain for the Court's consideration on their Motion to Vacate and on Waked and Stone's Motion to Confirm that Terry and Kerr never agreed to arbitrate with Maestro Global in the first place.

The Court first addresses these three avenues of protest available to a party faced with an arbitration in which she does not believe she agreed to participate. The Court then applies these doctrines to Terry and Kerr's situation. Although Terry and Kerr did not seek a court injunction against the alleged improper arbitration with Maestro Global, and did not refuse to submit to arbitration and face a motion to compel, they can maintain on their Motion to Vacate their argument that they did not agree to arbitrate with Maestro Global despite the fact that they submitted to arbitration and participated in the arbitration. Terry and Kerr's submission to and participation in arbitration alone, therefore, does not constitute an agreement to arbitrate.

1.    **A Party Who Believes the Party Did Not Agree to Arbitrate May Either (i) Enjoin the Arbitration, (ii) Refuse to Arbitrate and Defend Against a Motion to Compel Arbitration, or (iii) Move to Vacate the Award After Having Submitted to and Participated in the Arbitration, If the Party Continuously and Vigorously Contested the Lack of Agreement During the Arbitration Proceedings.**

Believing that they were not obligated to arbitrate with Maestro Global, Terry and Kerr had three options available to them: (i) seek an injunction; (ii) refuse to arbitrate and fight any

motion to compel arbitration that Waked, Stone and Maestro Global might have brought; or (iii) fight the Award after submitting to and participating in arbitration, while having vigorously lodged the non-consent protest.  The NMUAA and the FAA permit the first two procedural options.  As to seeking an injunction, the NMUAA permits this route.  See N.M.S.A. § 44-7A-8(b) ("On motion . . . alleging that an arbitration proceeding has been initiated or threatened but that there is no agreement to arbitrate, the court shall proceed summarily to decide the issue.  If the court finds that there is an enforceable agreement to arbitrate, it shall order the parties to arbitrate.").  The FAA does not on its own terms supply a statutory mechanism to enjoin allegedly improper arbitrations, but federal courts regularly entertain suits to enjoin FINRA arbitrations as a matter of federal preliminary injunction law.  See, e.g., N.Y. Bay Cap., LLC v. Cobalt Holdings, Inc., 456 F. Supp. 3d 564, 574 (S.D.N.Y. 2020)(Woods, J.)("Because NYBAY has demonstrated a likelihood of success on the merits and irreparable harm, it is entitled to a preliminary injunction to enjoin the FINRA Arbitration.").  These statutes also permit the second route: the NMUAA permits motions to compel arbitration, so the non-consenting party can refuse to arbitrate, force the opposing side's hand to move to compel arbitration, and then argue lack of agreement in such proceedings, see N.M.S.A. § 44-7A-8(a) ("On motion of a person showing an agreement to arbitrate and alleging another person's refusal to arbitrate pursuant to the agreement[] . . . the court shall proceed summarily to decide the issue and order the parties to arbitrate unless it finds that there is no enforceable agreement to arbitrate."); the FAA also enables motion to compel, so lack of consent can be argued in such FAA proceedings, see 9 U.S.C. § 4 ("A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court . . . for an order directing that such arbitration proceed

in the manner provided for in such agreement.").  Accordingly the arbitration statutes anticipate

the first two options.

The statutes also implicitly permit the third option -- submit to and participate in arbitration,

and argue, on a motion to vacate the resulting arbitration award, the original lack of agreement to

arbitrate -- as Supreme Court and federal appellate decisions suggest.  First Options concerns a

securities industry dispute over a series of agreements, some with arbitration clauses, that "worked

out" debts which an investment firm (MKI) and its natural person proprietors (the Kaplans) owed

to a stock-trade-clearing company (First Options):

> MKI, having signed the only workout document (out of four) that contained
> an arbitration clause, accepted arbitration. The Kaplans, however, who had not
> personally signed that document, denied that their disagreement with First Options
> was arbitrable and filed written objections to that effect with the arbitration panel.
> The arbitrators decided that they had the power to rule on the merits of the parties'
> dispute, and did so in favor of First Options.

First Options, 514 U.S. at 941.  The Supreme Court acknowledges the availability of the first two

options for protest discussed above: a party threatened with foisted-upon arbitration can "try[] to

enjoin the arbitration[] or [can] refus[e] to participate in the arbitration and then defend[] against

a court petition . . . to compel arbitration."  First Options, 514 U.S. at 946 (citing 9 U.S.C. § 4).

The Supreme Court here also suggests, however, that these are not the sole two options to protest

lack of agreement to arbitrate.  Although a party does not try either the injunction route or defense-

against-petition route, the failure to invoke these procedures does not mean that a party "intend[s]

to be bound by the arbitrators' decision," i.e., failure to invoke these procedures does not constitute

agreement to arbitrate.  514 U.S. at 946.  Thus, a party's appearance before an arbitrator to argue

that a particular issue is not subject to arbitration does not constitute consent to have the arbitrator

arbitrate the issue.   First Options, 514 U.S. at 946, ("[I]nsofar as the Kaplans were forcefully

objecting to the arbitrators deciding their dispute with First Options, one naturally would think that they did <u>not</u> want the arbitrators to have binding authority over them." (emphasis in original)).  In this way, appearance before an arbitrator to contest arbitrability is like appearance before a court for the sole purpose of contesting personal jurisdiction: mere appearance does not constitute consent to jurisdiction or, analogously, to arbitrability.  That the plaintiffs in <u>First Options</u> ultimately submitted to and went through with the arbitration does not mean that they cannot argue on a motion to vacate or against a motion to confirm that they did not agree to arbitrate.

Appellate court decisions similarly permit a party to continue to argue on a motion to vacate that the party did not consent to arbitrate, despite having proceeded with an arbitration brought to completion.  Like <u>First Options</u>, these decisions indicate that among the aggrieved party's options are to enjoin the arbitration, or to refuse to participate and fight a motion to compel; these decisions also, however, leave open a third possibility, that a party can raise consistently the lack of consent to arbitrate before the arbitrators so as to be able to continue to argue the lack of agreement to the award-confirming court.  In <u>Lewis v. Circuit City Stores, Inc.</u>, 500 F.3d 1140 (10th Cir. 2007)("<u>Lewis</u>"), the Tenth Circuit suggests this approach.  The <u>Lewis</u> plaintiff, according to a workplace arbitration agreement, "submitted an Arbitration Request Form," a form which he signed and which "stated that he agreed 'to accept the decision and award of the Arbitrator as final and binding.'"  <u>Lewis</u>, 500 F.3d at 1144 (no citation given for quoted material).  Unhappy with the result of an arbitration, Lewis argued that "his arbitration agreement . . . was unenforceable as a matter of basic contract law," but the Tenth Circuit concludes that "Lewis waived this argument by proceeding with arbitration without placing any objection clearly on the record prior to or during the arbitration proceeding."  <u>Lewis</u>, 500 F.3d at 1148.  The Tenth Circuit explains:

> [O]ur usual rules regarding waiver and estoppel apply to prevent a party from complaining about the enforceability of an arbitration agreement if he already has fully participated in arbitration without any relevant objection. In particular, a rule of waiver is important to advance the goals of arbitration as an efficient method of dispute resolution for which parties may contract in advance. . . .
>
> Lewis states that he objected to arbitration, that he "never had a choice to opt out," and that he "made it clear that he did not want to arbitrate." . . . But, importantly, at oral argument, Lewis conceded that he had not expressly challenged the enforceability of the agreement during arbitration.  The record here reveals only a general complaint about having to arbitrate. . . . A party's bare statement that he does not want to arbitrate a dispute is, of course, not a legal argument or objection, but instead merely signals "buyer's remorse" that he agreed at the outset to arbitrate future disputes.  Furthermore, the evidence belies Lewis's claim that he "never voluntarily agreed" to arbitrate his employment claims, because he twice completed and signed arbitration request forms, the second time through counsel.
>
> Because Lewis never adequately objected in arbitration to the arbitrability of his claims or raised a question as to the validity of the arbitration agreement, he waived his opportunity to do so and is estopped from raising such issues now.

Lewis, 500 F.3d at 1149-50.  Notably, Lewis does not suggest that only the first two avenues for protest discussed above -- (i) seeking an injunction against the arbitration, or (ii) refusing to arbitrate and defending against a motion to compel arbitration -- were the only available avenues for the non-consenting party to argue the lack of an enforceable agreement to arbitration.  Indeed, Lewis' interpretation of First Options suggests the opposite: "[T]o the extent parties 'forcefully object[ ] to the arbitrators deciding their dispute,' they preserve their objection even if they follow through with arbitration."  Lewis, 500 F.3d at 1148 (quoting First Options, 514 U.S. at 946).

Other cases also suggest that an "express[] challenge[] . . . during arbitration," Lewis 500 F.3d at 1150, regarding the underlying arbitration agreement's existence or validity goes a ways toward preserving such a jurisdictional challenge, see Coady v. Ashcraft & Gerel, 223 F.3d 1, 9 (1st Cir. 2000)("Having examined Ashcraft & Gerel's submissions to the arbitrators and the transcripts of the arbitration hearings, we find that the firm consistently and vigorously maintained

its objection to the scope of arbitration."); China Minmetals Materials Imp. & Exp. Co. v. Chi Mei Corp., 334 F.3d 274, 291-92 (3d Cir. 2003)("China Minmetals")("Chi Mei did not waive its objection to CIETAC's jurisdiction inasmuch as it participated in the arbitration primarily to argue the forgery/jurisdiction issue and consistently objected to CIETAC's jurisdiction throughout the proceedings."). Indeed, China Minmetals explicitly rejects the proposition that seeking an injunction is the only way to raise the jurisdictional objection to the arbitration. See China Minmetals, 334 F.3d at 291 n.17 ("Our result would not be different even if Chi Mei could have initiated an action in the United States to enjoin arbitration and have obtained jurisdiction over Minmetals in that action."). These cases therefore indicate strongly the availability of three routes for protesting the validity or existence of an agreement to arbitrate.[10]

The Second Circuit opinion that Waked and Stone cite, see Safra Securities, LLC v. Gonzalez, 764 F. App'x 125 (2d Cir. 2019)("Safra Sec."), does not foreclose the proposition that a party's vigorous, continual complaint to FINRA arbitrators maintains for consideration on a motion to vacate an alleged lack of agreement to arbitrate. There, "after initially protesting

---

[10]The Court notes its view that, if the second route for jurisdictional protest is adopted -- refusing to arbitrate and defending against a motion to compel arbitration -- then the non-consenting party must argue lack of agreement. If there is litigation over the motion to compel, then the allegedly non-consenting party must argue its view that she is not required to arbitrate, because she did not so agree to arbitrate. If the allegedly non-consenting party does not take the opportunity before a judge to argue that there is no agreement, but instead offers only other arguments against the motion to compel, then she cannot later argue there was no agreement to arbitrate. The party must seize the opportunity, before the arbitration, that a hearing on a motion to compel arbitration presents to argue lack of agreement. If the allegedly non-consenting party is not presented with such an opportunity because the other side does not move to compel arbitration, the non-consenter may forego seeking an injunction and instead submit to the arbitration while continuously protesting lack of agreement. To permit otherwise, would be to reward the allegedly non-consenting party's "'buyer's remorse' that he agreed at the outset to arbitrate future disputes." Lewis, 500 F.3d at 1150.

FINRA's jurisdiction over Spinola's claims, Safra Securities signed a 'FINRA ARBITRATION Submission Agreement.'"  Safra Sec., 764 F. App'x at 126.

> The Safra Parties claimed, in their complaint before the district court, that Safra Securities did not freely assent to the Submission Agreement it signed. Their complaint alleges that the FINRA case administrator "insisted that [Safra Securities] agree to submit the matter to FINRA without reservation," and that Safra Securities filed the agreement "strictly as a result of the threats and blatant coercion of the FINRA case administrator." App. 9. But Safra Securities never explains why it could not have maintained its objections to FINRA's jurisdiction, refused to sign the Submission Agreement, and proceeded to the district court, as it later did. The Safra Parties have thus failed plausibly to plead any indicia of coercion by FINRA that could rise to the level of duress and render the Submission Agreement voidable. In short, the allegations do not undermine our conclusion that Safra Securities agreed to arbitrate Spinola's claims under the legal standards articulated above.

Safra Sec., 764 F. App'x at 126.  Although the party's unavailing protest to the arbitrator's jurisdiction may not have risen to the level of duress, the Second Circuit's holding can be limited to that ruling: the pressure that FINRA case administrators place on a party to sign a submission agreement does not suffice to invalidate on duress grounds a submission agreement.  Although such a submission agreement is not the product of duress, this holding does not, per se, undermine the proposition that a party who submits to arbitration may later argue on a motion to vacate that there existed no agreement in the first place that supplied the basis for the submission agreement. Because the party in Safra Securities did not "maintain[] its objections to FINRA's jurisdiction," Safra Sec., 764 F. App'x at 126, this protest did not constitute the full-throated "express[] challenge[] . . . during arbitration," Lewis 500 F.3d at 1150, that can preserve for review on a motion to vacate such a jurisdictional challenge.  Accordingly, the Court agrees with Terry and Kerr's reading of Safra Securities as not foreclosing the third avenue for jurisdictional protest.

Besides the above appellate decisions containing language suggesting the existence of three avenues for contesting agreement to arbitrate, the existence alone of lack-of-agreement as grounds

for award vacatur suggests that a party's submission alone to arbitration does not foreclose the ability to argue lack of agreement.  Lack of agreement to arbitrate is a recognized basis for vacatur. See N.M.S.A. 44-7A-8(a)(5) ("[T]he court shall vacate an award made in the arbitration proceeding if . . . there was no agreement to arbitrate, unless the person participated in the arbitration proceeding without raising the objection under Section 16(c) not later than the beginning of the arbitration hearing."); 4 Am. Jur. 2d Alternative Dispute Resolution § 223  ("A court must vacate an arbitration award if the dispute is not substantively arbitrable; that is, if the parties did not agree to arbitrate.  The Uniform Arbitration Act requires a reviewing court to vacate an arbitration award if the parties did not agree to submit the dispute to arbitration.").  That a party may succeed in vacating an arbitration award on the basis of lack of agreement, however, suggests that the party already has submitted and gone through with the whole arbitration, bringing it to a close.  This line of cases does not suggest, moreover, that a party may only seek to vacate the award if the party already had sought and been denied an injunction or fought a motion to compel on lack-of-agreement grounds.  This doctrine, therefore, suggests that a party's mere participation in an arbitration does not per se constitute an agreement to arbitrate and that the party cannot contest that she did not agree to arbitrate in the first place.

      **2.**      **Applying These Principles, Terry and Kerr Properly Made Their Challenge to Having to Arbitrate Before FINRA with Maestro Global with Sufficient Consistency that They Have Not Waived their Ability to Argue Lack of Agreement on their Motion to Vacate.**

Applying the above-described legal principles, the Court holds that, here, Terry and Kerr are not estopped from arguing on their Motion to Vacate that they did not agree to arbitrate before FINRA with Maestro Global because, in keeping with the third avenue of protest available to them, they made their jurisdictional challenge to the FINRA arbitrators' authority with sufficient

consistency.  As discussed above, Terry and Kerr indeed lacked an outstanding agreement to arbitrate with Maestro Global, because Maestro Global was not a FINRA member, associated person, or customer; accordingly under neither FINRA Code 13200 nor FINRA Code 12200 did Terry and Kerr agree, by way of their Form U4 contracts, to arbitrate with Maestro Global, unlike they did with Waked and Stone based on their outstanding Form U4 agreements to arbitrate under FINRA Code 13200 with other FINRA associated persons.  Terry and Kerr raised this objection with sufficient consistency throughout the arbitration that they may maintain this argument on their Motion to Vacate.

Terry and Kerr executed unqualified submission agreements expressly agreeing to arbitrate, but they made these submissions upon the FINRA arbitration panel's order; although the pressure that the FINRA arbitrators exerted on them to sign the submission agreements does not rise to the level of duress, still Terry and Kerr did not waive their ability to challenge that there was no original agreement to arbitrate that underlay submission agreements.  In sum, Terry and Kerr, by executing the submission agreements and participating in the arbitration, did not lose their ability to challenge lack of agreement because they raised their lack of agreement argument consistently and vigorously during the arbitration.

> a.   **Terry and Kerr Objected With Sufficient Consistency During the Arbitration That They Can Continue To Raise Their Challenge On The Motion To Vacate.**

From the outset of Maestro Global's participation in the FINRA arbitration, Terry and Kerr objected to Maestro Global's presence.  After Waked and Stone filed their initial lawsuit against Terry in New Mexico State court, Terry moved to compel FINRA arbitration over the dispute, see State Court Motion to Compel at 4-5, but at that time Maestro Global was not a party to the case, see Complaint ¶ 18, at 4; once Maestro Global had been joined as a plaintiff, however, Terry and

Kerr (who also was joined as a defendant at this point), objected to having to arbitrate with Maestro Global on several occasions before the beginning of arbitration.  First, Terry and Kerr raised their objections in their answer to the Plaintiffs' claim.  See Answering Statement ¶ 13, at 2.  They submitted to the FINRA arbitration administrators submission agreements in which they modified the language to make clear that they refused to arbitrate with Maestro Global.  See  March 9 Submission Agreement at 1 (including language that "exclude[d] from this agreement" to arbitrate under FINRA is a "commitment to arbitrate the claim of Claimant Maestro Global, LLC against Respondents. No consent of Respondents to arbitrate with Maestro Global, LLC is made or provided herein").  They engaged in a back and forth with FINRA communicators to assert that they did not want to arbitrate before FINRA any dispute with Maestro Global.  See Securities America Filings at 8; Braga-Guerena Email at 1-4.

When the FINRA case administrators refused to accept the modified agreements that Terry and Kerr sent them, Terry and Kerr demanded a hearing before a panel of FINRA arbitrators to adjudicate the issue whether Terry and Kerr had to arbitrate with Maestro Global; the empaneled FINRA arbitrators decided that Terry and Kerr could not file submission agreements with their proposed modifications, that they had to sign unqualified submission agreements, and that they had to arbitrate with Maestro Global.  See Order to File Submission Agreements at 2 (addressing "[q]uestions regarding Plaintiff Maestro Global LLC's standing in FINRA arbitration" and ordering that "[a]ll current named parties, Respondents and Plaintiff's, shall remain as parties in the case[ and r]espondents Terry, Kerr, and Rivera shall provide an unmodified submission agreement to the panel").  Terry and Kerr executed unqualified submission agreements to the panel, see Terry Submission Agreement at 1; Kerr Submission Agreement at 1, and the Court will discuss below, see infra Section II.B.2.b.ii, whether Terry and Kerr's execution of the submission

agreements alone waives their ability to argue lack of agreement to arbitrate.  After executing the submission agreements, the arbitration commenced, but at the closing of the arbitration, Terry and Kerr again argued, on a motion to dismiss, that they had not agreed to arbitrate with Maestro Global.  See Matasar Decl. ¶ 4, at 12; Undated Tr. at 1-16; June 25 Tr. at 1-2.  Again, the arbitration panel rejected their claim and imposed the Award, although only as to Waked and Stone, and not also to Maestro Global.  See Award at 1.  Now on their Motion to Vacate and in opposition to the Plaintiffs' Motion to Confirm, Terry and Kerr make to the Court essentially the same arguments that they have from the start: they did not agree to arbitrate with Maestro Global because it is not a FINRA member, associated person, or customer, and that the non-FINRA arbitration contractual provision governs.

The vigor and consistency with which Terry and Kerr raised their objection throughout the arbitration preserves the objection for the Court's review on their Motion to Vacate and the Plaintiffs' Motion to Confirm.  As described above, Supreme Court and appellate court precedent supports the proposition that participation through to completion in an arbitration does not waive an allegedly non-consenting party's ability to argue that the party did not agree to arbitrate in the first place.  See First Options, 514 U.S. at 946 ("[I]nsofar as the Kaplans were forcefully objecting to the arbitrators deciding their dispute with First Options, one naturally would think that they did not want the arbitrators to have binding authority over them." (emphasis in original)); Lewis, 500 F.3d at 1150 (holding that a non-consenting party's "express[] challenge[] . . . during arbitration" and "'forceful[] objection to the arbitrators deciding their dispute,' . . .  preserve[s] their objection even if they follow through with arbitration."  (quoting First Options, 514 U.S. at 946)(alterations added)); Coady v. Ashcraft & Gerel, 223 F.3d at 9 ("Having examined Ashcraft & Gerel's submissions to the arbitrators and the transcripts of the arbitration hearings, we find that the firm

consistently and vigorously maintained its objection to the scope of arbitration."); <u>China Minmetals</u>, 334 F.3d at 291-92 ("Chi Mei did not waive its objection to CIETAC's jurisdiction inasmuch as it participated in the arbitration primarily to argue the forgery/jurisdiction issue and consistently objected to CIETAC's jurisdiction throughout the proceedings.").  Although a non-consenting party can litigate the issue before the arbitration occurs -- either (i) by seeking an injunction against the wrongful arbitration, or (ii) holding out and forcing the other party's hand to bring a motion to compel arbitration, <u>see</u> <u>First Options</u>, 514 U.S. at 946 (noting that a party may "try[] to enjoin the arbitration[] or refus[e] to participate in the arbitration and then defend[] against a court petition . . . to compel arbitration" (citing 9 U.S.C. § 4)) -- the non-consenting party also can litigate the question after an award issues if they consistently protest the arbitration.

Here, Terry and Kerr could have fought the FINRA arbitration by seeking an injunction, or they could have refused to arbitrate, forcing Waked, Stone, and Maestro Global to bring a motion to compel, but Terry and Kerr were not required to take those paths.  Instead, their repeated, forceful protests that they did not agree to arbitrate with Maestro Global preserves the issue for the Court's review on their Motion to Vacate and on Waked and Stone's Motion to Confirm.  Terry and Kerr, therefore, did not waive this argument by participation alone.

> **b.      Although the Unqualified Submission Agreements Were Not Procured Under Duress, Terry and Kerr's Execution of the Agreements Still Does Not Effect Waiver of Their Ability To Argue On the Motion To Vacate That They Did Not Agree To <u>Arbitrate With Maestro Global</u>.**

Terry and Kerr did not waive their lack-of-agreement objection solely on the basis that they executed unqualified submission agreements, because executing the agreements is part-and-parcel of participating in the arbitration.  Although the Court holds that the pressure on Terry and Kerr to

sign the agreements does not rise to the level of duress, there need not have been duress, rendering unenforceable the submission agreements, to preserve Terry and Kerr's objection. Instead, their continued protest throughout their participation in the FINRA proceedings is not rendered nugatory, solely because, as part of the proceedings, they had to sign a sheet of paper, i.e., the submission agreements.

Before the Court, the parties argued the applicability of the Second Circuit's case, Safra Securities, which held that no duress existed that would render unenforceable a FINRA submission agreement because a party executed it upon FINRA administrators' demand. As discussed above, in that case, the party arguing lack of agreement lodged its protest only with the FINRA case administrators and did not demand a hearing on the subject before a panel of arbitrators. See Safra Sec., 764 F. App'x at 126 (explaining that "the FINRA case administrator 'insisted that [Safra Securities] agree to submit the matter to FINRA without reservation,' and that Safra Securities filed the agreement 'strictly as a result of the threats and blatant coercion of the FINRA case administrator.'" (quoting appellant's brief)(alterations added)). The court there found that the submission agreement was not procured by duress:

> Safra Securities never explains why it could not have maintained its objections to FINRA's jurisdiction, refused to sign the Submission Agreement, and proceeded to the district court, as it later did. The Safra Parties have thus failed plausibly to plead any indicia of coercion by FINRA that could rise to the level of duress and render the Submission Agreement voidable.

Safra Sec., 764 F. App'x at 126. Waked and Stone read Safra Securities as directly applicable and dictating the result here. Terry and Kerr, however, argue that their situation is distinguishable, because they argued their position not just, as in Safra Securities, to FINRA administrators but to a full FINRA arbitration panel; they argue, therefore, that the pressure on them was greater and rose to the level of duress to render unenforceable the submission agreement they signed.

The Court agrees that Terry and Kerr's protest was pursued to a greater degree than that described in Safra Securities.  Nonetheless, the pressure exerted on Terry and Kerr did not rise to the level of duress: duress involves the proverbial "gun to the head."  Cf. Restatement (Second) of Contracts § 175(1) ("If a party's manifestation of assent is induced by an improper threat by the other party that leaves the victim no reasonable alternative, the contract is voidable by the victim."); 28 Williston on Contracts § 71:4 (4th ed. 2023)(describing the concept of duress as "cover[ing] every case where one party to a contract or transfer was deprived of freedom of will as a result of wrongful conduct on the part of the other party" and noting that "[d]uress in contract formation involves a dual concept of external pressure and internal surrender or loss of volition in response to outside compulsion"); N.M.R.A. Civ. UJI 13-838. Duress ("The conduct claimed to cause the duress must be wrongful, although not necessarily criminal.").  The pressure that even the full-empaneled FINRA arbitrators placed on Terry and Kerr to sign the submission agreement does not rise to that level.  The pressure was not "wrongful," N.M.R.A. Civ. UJI 13-838, and Terry and Kerr were not left with "no reasonable alternative,"  Restatement (Second) of Contracts § 175(1), nor did they experience "internal surrender or loss of volition," 28 Williston on Contracts § 71:4.  The submission agreements therefore were not procured by duress.

Just because the submission agreements were not procured by duress, however, does not mean Terry and Kerr waived their lack-of-agreement argument, because the duress question is different from the waiver one here.  Although a submission agreement is a separate, enforceable agreement, see 4 Am. Jur 2d Alternative Dispute Resolution § 63 ("A submission to arbitration . . . is a contract . . . . The agreement for submission constitutes the charter for the entire ensuing arbitration proceedings."), the submission agreement properly is conceived of, in this situation, as part-and-parcel of the overall arbitration, such that Terry and Kerr's lack-of-

agreement objection to executing the submission agreements is equivalent to their lack-of-agreement objection to any other stage of the arbitration proceeding.  Federal courts have looked through FINRA submission agreements to the overall arbitration proceeding and treated the submission agreements as constituting only a stage of the overall proceeding.  As the Honorable A. Joe Fish, Senior United States District Judge for the Northern District of Texas indicates:

> Because [submission agreements] are drafted to cover every possible arbitration that comes before FINRA, they are broad and general in scope. . . . Moreover, FINRA specifically tells parties that they cannot alter the language of the Submission Agreement. . . . As First Command recognizes, "if Davey's interpretation of the Submission Agreement is accepted, *any* limitation on an arbitrator's authority contained in an arbitration clause would be eviscerated in *every* single FINRA arbitration proceeding."

Davey v. First Command Fin. Servs., Inc., No. CIV 11-1510, 2012 WL 277968, at *3-4 (N.D. Tex. January 31, 2012)(quoting party's brief).  Here, Terry and Kerr no less waived their lack-of-agreement protest by participating in a stage of the proceeding that happened to involve signing a one-page document stating that they agreed to arbitrate than they did in participating in any other part of the arbitration that indicates an agreement to arbitrate.   Indeed, although Safra Securities notes one avenue of protest to signing, under threat of regulatory penalty, the submission agreements -- seeking an injunction against the threatened arbitration -- it does not mention the other two: fighting a motion to compel or else participating under protest.  See Safra Sec., 764 F. App'x at 126 ("Safra Securities never explains why it could not have maintained its objections to FINRA's jurisdiction, refused to sign the Submission Agreement, and proceeded to the district court, as it later did.").

Moreover, notably in Lewis, the court does not suggest it is dispositive that a party to an arbitration sign a document summarily stating they agree to arbitrate and be bound by an arbitrator's decision.  There, the plaintiff executed a document similar functionally to Terry and

Kerr's submission agreements here: aside from the outstanding, background provision for arbitration in his employment contract that underlay the dispute's arbitration, Lewis signed a document stating that he "agreed 'to accept the decision and award of the Arbitrator as final and binding.'"  Lewis, 500 F.3d at 1144 (no citation given for quoted material).  Notably, the Lewis decision does not point to Lewis' signature on this document as proof-positive that he did not object to arbitration; instead, Lewis suggests that fact is one among many factors that constitute Lewis' failure consistently to maintain his objection.  See Lewis, 500 F.3d at 1150 ("Furthermore, the evidence belies Lewis's claim that he 'never voluntarily agreed' to arbitrate his employment claims, because he twice completed and signed arbitration request forms, the second time through counsel." (emphasis added)).

Analogously, Terry and Kerr's signatures on documents stating that they agreed to arbitrate alone does not waive their lack-of-agreement objection, because those documents only are creatures of the broader arbitration proceedings, proceedings to which Terry and Kerr objected consistently for the same reasons that they objected specifically to having to sign these documents.  Accordingly, though the submission agreements bearing their signatures were not procured by duress, and purport to announce an agreement to arbitrate, still Terry and Kerr are not foreclosed thereby from arguing now on their Motion to Vacate that they did not agree to the overall arbitration.

**D.    THE THREE THRESHOLD CONSIDERATIONS -- ARBITRABILITY CHALLENGE, WHETHER THE PARTIES DELEGATED, AND WHETHER THERE WAS WAIVER -- DO NOT FORECLOSE THE COURT'S PLENARY CONSIDERATION OF TERRY AND KERR'S CHALLENGES TO THE AWARD.**

In sum, the Court agrees that Terry and Kerr's contention that they did not agree to arbitrate before FINRA with Maestro Global is not a merits-based decision that the FAA largely shields from the Court's consideration. Their characterization is thus correct that their arguments concerns not whether a particular call the FINRA umpires made fell within the FAA's wide "strike zone," January 10 Tr. at 4:18-21 (Court), but rather an argument that they "did not agree to play the game[, or] . . . to even step up to bat." Tr. at 10:5-7 (Saucedo). Theirs is not a merits, but an arbitrability issue and, because the issue concerns the existence and not the scope, of an agreement to arbitrate, the presumption in favor of arbitrability does not apply. The parties, moreover, did not already, in their agreement delegate to the FINRA panel the arbitrability determination. Accordingly, the panel's determination that it had jurisdiction over the dispute is not one to which the Court owes the enormous deference that federal courts owe arbitrators on matters of substantive, merits-based decision-making. Cf. Sheldon v. Vermonty, 269 F.3d at 1206 ("'[T]he standard of review of arbitral awards is among the narrowest known to law.'" (quoting Brown v. Coleman Co., 220 F.3d 1180, 1182 (10th Cir. 2000)). Finally, Terry and Kerr did not waive their jurisdictional challenge to the Award by participating in the arbitration, given that they consistently and vigorously raised their jurisdictional complaint.

**II.    TERRY'S LIABILITY UNDER THE AWARD IS VALID, BECAUSE NEITHER OF TWO ARGUMENTS AGAINST IT -- MAESTRO GLOBAL'S PARTICIPATION IN THE ARBITRATION AND KERR'S CONTRACTUAL NON-FINRA ARBITRATION PROVISION -- ARE PERSUASIVE.**

The Court affirms the Award as to Terry.  The Court's analysis proceeds in three parts. First, viewed in isolation, Terry agreed to arbitrate with Waked and Stone before FINRA, because all three persons are FINRA associated persons.  The Court here brackets the issues about Maestro Global and Kerr, and determines there exists an enforceable agreement to arbitrate before FINRA; where there exists no hint of bias or other foul play, an arbitration award that is the product of an enforceable agreement to arbitrate is presumptively valid under the FAA.  Second, the Court addresses Maestro Global's presence in the arbitration proceedings: Terry did not agree to arbitrate before FINRA with Maestro Global, because Maestro Global has no FINRA registration status; nevertheless, Maestro Global's presence and participation in the arbitration is not fatal to Terry's liability under the Award, because the Award imposes no liability on Terry to Maestro Global. Third and finally, the Court addresses Terry's position vis-à-vis the non-FINRA arbitration agreement in Kerr's employment contract with Maestro Global and determines that provision's enforceability has no significance for Terry's liability under the Award, because Terry is a non-signatory to that contract, and no doctrine permits her to invoke its non-FINRA arbitration provision.  The Court concludes that Terry's liability under the Award is valid, because she agreed to arbitrate before FINRA with Waked and Stone and no persuasive reason exists either in Maestro Global's presence or the Kerr non-FINRA arbitration provision's enforceability to vacate Terry's liability under the Award.

None of the issues that Defendants raise as to the propriety of the FINRA proceeding -- specifically, the existence of the non-FINRA arbitration agreement in Kerr's Maestro Global employment contract, and the presence in the arbitration of Maestro Global, a non-FINRA member or associated person -- affect the Awards validity as to Terry.  As to her, the FINRA panel had jurisdiction, because there existed in her Form U4 agreement a valid, outstanding agreement

to arbitrate.  Cf. 9 U.S.C. § 9 (requiring that "the parties in their agreement . . . agree[] that a judgment of the court shall be entered upon the award made pursuant to . . . arbitration"); Avedon Eng'g Inc. v. Seatex, 126 F.3d 1279, 1287 (10th Cir. 1997)("[The] existence of an agreement to arbitrate is a threshold matter which must be established before the FAA can be invoked.").  Moreover, the panel did not otherwise run afoul of any of the grounds for vacatur that the FAA or the NMUAA enumerate.  See 9 U.S.C. § 10(a)(1)-(4); N.M.S.A. § 44-7A-24(a).  Accordingly, because none of the proffered reasons that the Award as to Terry should be vacated withstand scrutiny, the Court affirms the Award as to her.[11]  As Waked and Stone note, the bulk of the liability for the Award is Terry's.

### A.    TERRY'S LIABILITY UNDER THE AWARD, VIEWED IN ISOLATION, IS VALID, BECAUSE THERE IS AN ENFORCEABLE AGREEMENT TO ARBITRATE BEFORE FINRA AMONG TERRY, WAKED AND STONE.

The Court begins by bracketing any issues that Maestro Global or Kerr raise, and addresses, in isolation, the existence on Terry's part of an agreement to arbitrate with Waked and Stone: such an agreement exists in the Form U4 agreement she executed.  Terry, indeed, was the first party to note that FINRA arbitration was mandatory here.  See State Court Motion to Compel at 4-5; State Court Reply at 6.  Terry, Waked, and Stone all were FINRA associated persons who executed Form U4 agreements, which require that registered representatives agree to abide by all FINRA

---

[11]The Court notes that the failure to record portions of the arbitration proceedings is not a basis to vacate the Award, because there is no allegation that bias motivated what was a mere mechanical failure of the recording equipment.  Edward Mellon Tr. v. UBS Painewebber, Inc., No. CIV 06-0184, 2006 WL 3227826, at *4 (W.D. Pa. November 6, 2006)(Hardiman, J.)("[I]ncomplete transcription of the arbitration is not a ground for vacatur of the Award." (emphasis in original)); Moeller v. D.E. Frey & Co., Inc., No. 4:03 MC7-SPM, 2004 WL 1173397, at *4 (N.D. Fla. May 10, 2004)(Mickle, J.); Grosso v. Barney, No. CIV 03-0115, 2003 WL 22657305 at *7 (E.D. Pa. July 8, 2003)(Giles, J.)(declining to "infer misconduct and prejudice from the failure of the panel to record a small portion of a lengthy proceeding").

rules and regulations, including the requirement to arbitrate disputes with customers, and with FINRA members and associated persons; FINRA's mandatory arbitration covers not only day-to-day matters, but also covers such disputes as that among Terry, Waked and Stone over the sale of Terry's firm to Waked and Stone.  See State Court Motion to Compel at 4-5; State Court Reply at 6.  The parties did not provide a copy of the Form U4 agreement that Terry, Waked or Stone executed, but these documents come often in a standardized form which contains such a clause.  See Rev. Form U4 (05/2009): Uniform Application for Securities Industry Registration or Transfer ¶ 5, at 15, FINRA, https://www.finra.org/registration-exams-ce/broker-dealers/registration-forms/form-u4 (last visited April 3, 2024)(including an "agree[ment] to arbitrate any dispute . . . required to be arbitrated under the rules, constitutions, or by-laws of the" self-regulating organization to which the submitting party is registering, i.e., FINRA)("Standard Form U4"); 2263. Arbitration Disclosure to Associated Persons Signing or Acknowledging Form U4, FINRA, https://www.finra.org/rules-guidance/rulebooks/finra-rules/2263 (last visited April 3, 2024)(requiring that a FINRA member inform an associated person registering to work on the member's behalf that the associated person is bound to arbitrate all industry-related disputes).  Although Terry had retired after she sold her practice, she was still covered under FINRA's rules for two years, so the agreement to arbitrate still bound her.  See Formerly Registered Reps, FINRA, https://www.finra.org/registration-exams-ce/manage-your-career/formerly-registered-reps   (last visited Dec. 23, 2023)("When you terminate your registration with FINRA, you remain subject to FINRA's jurisdiction for at least two years.").   An organization's membership in FINRA or a person's registration with FINRA thus constitutes an agreement to arbitrate; as the United States Court of Appeals for the Eleventh Circuit explains:

Despite the absence of a direct, written agreement, an agreement to arbitrate still may be found based on Pictet Overseas's membership in FINRA. FINRA is a self-regulatory organization established under the Securities Exchange Act of 1934, 15 U.S.C. § 78o-3, with "the authority to exercise comprehensive oversight over all securities firms that do business with the public." *UBS Fin. Servs., Inc. v. W. Va. Univ. Hosps., Inc.*, 660 F.3d 643, 648 (2d Cir. 2011)(internal quotation marks omitted). When Pictet Overseas joined FINRA, it agreed, like all other FINRA members, to comply with FINRA's rules. *See id.* (citing FINRA Bylaws art. 4 § 1). These rules include FINRA Rule 12200,[] which requires a FINRA member and its associated persons to arbitrate certain disputes with customers before FINRA upon the customer's demand. *See* FINRA Rule 12200 (requiring arbitration when it is "[r]equested by the customer," "[t]he dispute is between a customer and a member or associated person of a member," and "[t]he dispute arises in connection with the business activities of the member or the associated person"). Pictet Overseas's agreement when joining FINRA thus may "itself constitute[ ] the agreement" to arbitrate. *MONY Sec. Corp. v. Bornstein*, 390 F.3d 1340, 1342 (11th Cir. 2004).

Pictet Overseas Inc. v. Helvetia Tr., 905 F.3d 1183, 1187-88 (11th Cir. 2018).  Accordingly, in the

Form U4 agreement that Terry executed which still mandates that she arbitrate under FINRA's

code, there exists a valid, enforceable agreement to arbitrate among her, Waked and Stone.  Cf.

9 U.S.C. § 9 (requiring the existence of an agreement to arbitrate); Avedon Eng'g Inc. v. Seatex,

126 F.3d at 1287 ("[The] existence of an agreement to arbitrate is a threshold matter which must

be established before the FAA can be invoked."); K.L. House Constr. Co. v. City of Albuquerque,

1978-NMSC-025, ¶ 8, 91 N.M. 492, 494, 576 P.2d 752, 754 ("[T]he courts only decide the

threshold question of whether there is an agreement to arbitrate.  If so, the court should order

arbitration.").[12]  In the absence of any other parties, the above conclusion effectively would end

---

[12]The same threshold finding, that a valid agreement to arbitrate exists under the Form U4 agreements, applies also to Kerr.  To become FINRA registered representatives, Kerr also executed Form U4's that represent valid agreements to arbitrate.  In opposition to this proposition, the Defendants argue that the Maestro Global contracts' arbitration agreement supplants the background Form U4 arbitration provision; the status of that Maestro Global contract provision vis-a-vis the Form U4 provision is different among the various Defendants, however.  As the Court will discuss later, the Maestro Global provision supplants the Kerr's Form U4 arbitration.  For now, the Court discusses next why the Maestro Global contract provision does not displace Terry's

the analysis: the Award imposed liability on Terry to Waked and Stone, and there was an enforceable agreement to arbitrate among them before FINRA.  Even if the Court determines other portions of the Award are invalid, the Court can confirm this valid portion.  See Comedy Club, Inc. v. Improv W. Assocs., 553 F.3d 1277, 1288 (9th Cir. 2009)("If an arbitrator exceeded the scope of his authority in issuing an award, and that award is divisible, we may vacate part of the award and leave the remainder in force.").  With no evidence of foul play, the Award is presumptively valid.  See Sheldon v. Vermonty, 269 F.3d at 1206 ("'[T]he standard of review of arbitral awards is among the narrowest known to law.'" (quoting Brown v. Coleman Co., 220 F.3d 1180, 1182 (10th Cir. 2000))).  The presence of other parties, however, means the Court will proceed to analyze whether their presence affects the validity of the award

### B.    MAESTRO GLOBAL'S IMPROPER PARTICIPATION IN THE FINRA ARBITRATION DOES NOT AFFECT THE AWARD'S VALIDITY AS TO TERRY.

The presence in the arbitration of Maestro Global, even if it was improper, does not defeat the validity of the Award as to Terry.  It does not change the result as to her, because, although Maestro Global, a non-member of FINRA, could not be compelled to arbitrate under that proceeding, nevertheless Maestro Global's improper presence does not defeat the overall validity of the arbitration as to Terry, because Terry's liability to Waked and Stone is premised on foundations entirely independent of Maestro Global's existence.  The Court explains these conclusions in turn.

---

Form U4 arbitration agreement.  The reason is that she is not a party to the Kerr's employment contracts, and that contract's provisions for arbitration do not otherwise bind her.

The Court approaches this analysis by bracketing certain issues of legal significance, similar to its analysis in the preceding section.  The Court now brackets the significance of the fact that Maestro Global entered into a contract containing arbitration provisions with Kerr, and addresses solely whether Maestro Global's presence as a party to the arbitration, throughout the proceedings, is grounds to vacate Terry's Award liability.  That is, in this portion of its analysis, the Court addresses whether it should vacate the Award as to Terry, solely because, present throughout the arbitration proceedings was a party with whom she did not agree to arbitrate, namely, Maestro Global.

This analysis requires first establishing that Terry did not agree to arbitrate with Maestro Global, which is neither a FINRA registered representative nor a FINRA member.  In considering this issue, the Court concludes that Terry did not agree to arbitrate with Maestro Global.  As the Court holds above, Terry objected with sufficient consistency that the Court holds that she is not foreclosed, solely on the basis of her continued participation, from arguing that she did not consent to arbitrate with Maestro Global.  The Court, therefore, does not agree with the proposition that the Defendants agreed to arbitrate with Maestro Global solely because they participated in the arbitration proceeding.  Similarly, the Court does not hold that an agreement to arbitrate with Maestro Global lies on the submission of the unqualified uniform submission agreement, because Terry's steadfast objections to arbitrating with Maestro Global are sufficient, although the Court does not hold that the uniform submission agreements were signed under duress.  Accordingly, Terry did not agree to arbitrate under FINRA with Maestro Global.[13]

---

[13]The conclusion the Court reaches here -- that there was no agreement to arbitrate before FINRA with Maestro Global -- also applies to Kerr.  The Court holds below, however, that Kerr's contractual agreement for non-FINRA arbitration with Maestro Global, which also binds Waked and Stone, takes precedence over any FINRA arbitration to which Kerr may be bound.

The Court holds, however, that Maestro Global's participation in the arbitration is not fatal to the Award as to Terry, because the Award provided no award to Maestro Global, and all the award was given to Waked and Stone, parties with whom Terry did agree to arbitrate.  In the absence of any showing of prejudice to her, she lacks standing to complain about the lack of jurisdiction over arbitration participants.  Accordingly, Maestro Global's participation during the proceeding, even though Terry did not agree to arbitrate with it, does not make vacatur appropriate of the Award as to Terry.

> **1.  That Terry Executed a Form U4 Agreement Does Not Signify That She Agreed to Arbitrate with Maestro Global.**

Terry did not agree to arbitrate her dispute with Maestro Global, although she did agree to arbitrate with Maestro Global's natural principals, Waked and Stone.  The distinction vis-à-vis the agreement to arbitrate between the natural versus artificial persons is that Waked and Stone are registered representatives with FINRA, which means that arbitration between them and Terry is mandatory; because, however, Maestro Global has no FINRA status, Terry is not obligated to arbitrate with it.

As discussed above, Terry, to enter the securities industry as a broker-dealer, executed a Form U4 agreement, by which she became affiliated with a particular self-regulatory organization ("SRO"), here, FINRA.  See Form U4, FINRA, https://www.finra.org/registration-exams-ce/broker-dealers/registration-forms/form-u4 (last visited Jan. 5, 2024)("Representatives of broker-dealers, investment advisers or issuers of securities must be registered with the appropriate jurisdictions and/or self-regulatory organizations (SROs). The Form U4 (Uniform Application for Securities Industry Registration or Transfer) is used to establish that registration.").  Among the

Form U4's provisions is that Terry agrees to arbitrate her industry-related disputes according to the rules of the SRO with which she registers.  See Standard Form U4 ¶ 5, at 15 ("I agree to arbitrate any dispute, claim or controversy . . . that is required to be arbitrated under the rules, constitutions, or by-laws of the SROs indicated in Section 4 . . . .").  The SRO with which Terry registered, FINRA, requires that an industry professional arbitrate disputes according to two key provisions.  First, Code 13200 requires that an industry professional arbitrate disputes with other industry professionals, specifically that "[e]xcept as otherwise provided in the Code, a dispute must be arbitrated under the Code if the dispute arises out of the business activities of a member or an associated person and is between or among . . . Members[,] Members and Associated Persons[,] or Associated Persons," FINRA Code 13200(a).  Second, Code 12200 requires that an industry professional arbitrate disputes with customers, specifically, that

> [p]arties must arbitrate a dispute under the Code if . . . [a]rbitration under the Code is either . . . [r]equired by a written agreement, or . . . [r]equested by the customer[,] [t]he dispute is between a customer and a member or associated person of a member[,] and [t]he dispute arises in connection with the business activities of the member or the associated person.

FINRA Code 12200.

> The relevant FINRA terms are defined the following ways.  A FINRA "member" is

> any broker or dealer admitted to membership in FINRA, whether or not the membership has been terminated, suspended, cancelled, revoked, the member has been expelled or barred from FINRA or the member is otherwise defunct; and any broker or dealer admitted to membership in a self-regulatory organization that, with FINRA consent, has required its members to arbitrate pursuant to the Code and to be treated as members of FINRA for purposes of the Code, whether or not its membership has been terminated, suspended, cancelled, revoked, the member has been expelled or barred from its self-regulatory organization, or the member is otherwise defunct.

FINRA Code 13100(q).  A FINRA "person associated with a member" is

(1)     A natural person who is registered or has applied for registration under the Rules of FINRA; or

(2)     A sole proprietor, partner, officer, director, or branch manager of a member, or other natural person occupying a similar status or performing similar functions, or a natural person engaged in the investment banking or securities business who is directly or indirectly controlling or controlled by a member, whether or not any such person is registered or exempt from registration with FINRA under the By-Laws or the Rules of FINRA.

FINRA Code 13100(u).  See FINRA Code 13100(b) (defining "associated person" the same as the term "person associated with a member").  Under this portion of the Code, a "customer" is defined thus: "[A] customer shall not include a broker or dealer."  FINRA Code 13100(k).

A separate portion of the FINRA Code defines these terms specifically in respect to customer-related disputes.  See FINRA Code 12100.  In this portion of the Code, a "member" is defined thus:

For purposes of the Code, the term "member" means any broker or dealer admitted to membership in FINRA, whether or not the membership has been terminated, suspended, cancelled, revoked, the member has been expelled or barred from FINRA, or the member is otherwise defunct; and any broker or dealer admitted to membership in a self-regulatory organization that, with FINRA consent, has required its members to arbitrate pursuant to the Code and to be treated as members of FINRA for purposes of the Code, whether or not its membership has been terminated, suspended, cancelled, revoked, the member has been expelled or barred from its self-regulatory organization, or the member is otherwise defunct.

FINRA Code 12100(s).  In this portion of the FINRA Code, an associated person is defined thus:

The term "person associated with a member" means:

(1)     A natural person who is registered or has applied for registration under the Rules of FINRA; or

(2)     A sole proprietor, partner, officer, director, or branch manager of a member, or other natural person occupying a similar status or performing similar functions, or a natural person engaged in the investment banking or securities business who is directly or indirectly controlling or controlled by a member, whether or not:

(A)   Any such person is registered or exempt from registration with FINRA under the By-Laws or the Rules of FINRA; or

(B)   Any such person's registration is revoked, cancelled, or suspended, the person has been expelled or barred from FINRA, or the person's registration has been terminated for a minimum of 365 days.

For purposes of the Code, a person formerly associated with a member is a person associated with a member.

FINRA Code 12100(w).  See FINRA Code 12100(b) (defining "associated person" the same as the term "person associated with a member").  Last, in this part of the FINRA Code, a "customer" is defined thus: "A customer shall not include a broker or dealer."  FINRA Code 12100(k).

Terry is a FINRA "associated person."  Motion to Confirm ¶¶ 15-16, at 4.  Waked and Stone are also FINRA "associated person[s]."  Motion to Confirm ¶¶ 15-16, at 4.  FINRA Code 13200, by way of Terry's Form U4 agreement, therefore, requires that Terry arbitrate Waked and Stone's dispute with her.  See FINRA Code 13200(a).  There thus exists a valid agreement to arbitrate among Terry, Waked and Stone.  Maestro Global, however, is neither a FINRA associated person, nor a FINRA member, nor a FINRA customer, and Waked and Stone never have argued that Maestro Global falls into any of these FINRA categories.  See Motion to Vacate at 5.  Accordingly, neither FINRA Code 13200 nor FINRA Code 12200, by way of Terry's Form U4 agreement, requires that Terry arbitrate Maestro Global's dispute with her.

In part, therefore, the Court agrees with Terry that her situation is analogous to the case Brean Cap., LLC v. NewOak Cap. LLC, 2014 WL 7269750 (N.Y. Sup. Ct. Dec. 22, 2014)("Brean").  There, a corporate entity neither was a FINRA associated person, nor a FINRA member, nor a FINRA customer; for this reason, there was no agreement or obligation to arbitrate

under FINRA.  See Brean, 2014 WL 7269750, at *5 ("NewOak cannot compel FINRA arbitration against Brean because NewOak is not a Member or Associated Person (under Rule 13200) nor is NewOak a customer of Brean (under Rule 12200).").  Like in Brean, that Maestro Global has no FINRA status means that Terry, herself a FINRA associated person, did not agree to arbitrate with Maestro Global on the basis of her FINRA registration.  As a threshold matter, therefore, Terry did not agree to arbitrate with Maestro Global.

> **2.      Maestro Global's Participation in the Arbitration Proceedings Is Not Fatal to Terry's Liability Under the Award, Because -- Although Terry Did Not Agree to Arbitrate with Maestro Global, and Although She Did Not Waive Her Lack-of-Agreement Objection -- the Arbitrators Awarded No Remedy to Maestro Global and Decided as a Matter of Merits that All Terry's Liability Could Be Predicated on Her Relationship Alone with Waked and Stone.**

Despite the conclusions the Court reaches above that Terry did not agree to arbitrate with Maestro Global, that conclusion is not fatal to her liability under the Award.  Apparently adopting Waked and Stone's suggestion that possible problems with the award could be avoided by leaving out Maestro Global, see June 25 Tr. at 2, 20:10-14 (Pratt)("[W]e can avoid . . . these FINRA members going to court and saying we don't have to abide by the submission agreements that we signed, simply by awarding all the damages to [Waked] and [Stone] individually.  Or [to Waked, Stone, and Maestro Global] joined in separately."), the FINRA arbitrators awarded Maestro Global nothing under the Award.  That the arbitrators awarded no remedy to Maestro Global indicates that they believed, as a matter of the underlying merits, that Terry's liability could be founded solely upon her relationship with Waked and Stone.  Maestro Global's participation, alone, as a formal party to the arbitration does not render invalid the ultimate Award.  The Court reaches this conclusion, because, given that the arbitrators afforded it no remedy, the Court can confidently

conclude that the arbitrators decided, as a matter of the dispute's merits, that some amount of Terry's liability to Waked and Stone exists independently of her potential liability to Maestro Global.

This factual setting calls for vacatur under none of the FAA vacatur factors, nor under any of the NMUAA vacatur factors.  The FAA and NMUAA permit vacatur:

> (1)    where the award was procured by corruption, fraud, or undue means;

> (2)    where there was evident partiality or corruption in the arbitrators, or either of them;

> (3)    where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or

> (4)    where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a).  The NMUAA permits vacatur on similar grounds:

> (1)    the award was procured by corruption, fraud or other undue means;

> (2)    there was:

> > (A)    evident partiality by an arbitrator appointed as a neutral arbitrator;

> > (B)    corruption by an arbitrator; or

> > (C)    misconduct by an arbitrator prejudicing the rights of a party to the arbitration proceeding;

> (3)    an arbitrator refused to postpone the hearing upon showing of sufficient cause for postponement, refused to consider evidence material to the controversy or otherwise conducted the hearing contrary to Section 16, so as to prejudice substantially the rights of a party to the arbitration proceeding;

> (4)    an arbitrator exceeded the arbitrator's powers;

(5)     there was no agreement to arbitrate, unless the person participated in the arbitration proceeding without raising the objection under Section 16(c) not later than the beginning of the arbitration hearing; or

(6)     the arbitration was conducted without proper notice of the initiation of an arbitration . . . so as to prejudice substantially the rights of a party to the arbitration proceeding.

N.M.S.A. § 44-7A-24(a).  The bias- and corruption-, and failure-to-schedule-related grounds do not apply here.  See 9 U.S.C. § 10(a)(1)-(2); N.M.S.A. § 44-7A-24(a)(1), (a)(2)(A), (a)(2)(B).  The grounds that best would seem to apply in this situation also do not supply grounds for vacatur -- that, under the FAA, the arbitrators engaged in "misbehavior by which the rights of any party have been prejudiced, [or] . . . the arbitrators exceeded their powers," 9 U.S.C. § 10(a)(3)-(4); or that, under the NMUAA, the arbitrators engaged in "misconduct . . . prejudicing the rights of a party to the arbitration proceeding, . . . an arbitrator exceeded the arbitrator's powers, . . . [or] there was no agreement to arbitrate," N.M.S.A. § 44-7A-24(a)(3) to 24(a)(5).  Moreover, to the extent that "manifest disregard" remains an available ground for vacatur, cf. THI of New Mexico at Vida Encantada, LLC v. Lovato, 864 F.3d at 1085 ("This exception's viability has been uncertain, however, since the Supreme Court's decision in Hall Street"), that too, does not supply reason to vacate here.  These grounds do not provide reason to vacate Terry's liability under the Award as to Waked and Stone.

To conclude otherwise requires improperly inquiring into the dispute's underlying merits. If the Court were to conclude that Maestro Global's participation alone in the arbitration renders impermissible the Award, the Court would need to hold, for example, that any evidence introduced during the proceedings to demonstrate Terry's liability to Maestro Global cannot also support Terry's liability to Waked and Stone.  This decision is a merits one, and an issue properly left to the arbitrators.  The FINRA arbitrators evidently decided that as matter of the pertinent bodies of

substantive law -- contract law, third-party beneficiary law, corporate law, etc. -- that any evidence as to Terry's liability to Maestro Global also supported her liability to Waked and Stone. Any decision that Terry cannot be liable to Waked and Stone without also being liable to Maestro Global is a merits decision. This decision is one that the Court cannot examine on the Motion to Vacate and the Motion to Confirm. Cf. United Steelworkers of Am. v. Am. Mfg. Co., 363 U.S. at 569 ("When the judiciary undertakes to determine the merits of a grievance under the guise of interpreting the grievance procedure of collective bargaining agreements, it usurps a function which under that regime is entrusted to the arbitration tribunal.").

This situation is distinct from a hypothetical one in which the Award did award damages in an indivisible lump sum to Waked, Stone, and Maestro Global. In such a situation, the Court would not be able to determine what liability is due only to proper plaintiffs in the arbitration; without an explanation, the Court would not be able to determine whether any liability was owed to plaintiffs with whom Terry did agree to arbitrate (i.e., Waked and Stone), that was separable from liability owed to a plaintiff with whom Terry did not agree to arbitrate (i.e., Maestro Global). See Comedy Club, Inc. v. Improv W. Assocs., 553 F.3d at 1288 ("If an arbitrator exceeded the scope of his authority in issuing an award, and that award is divisible, we may vacate part of the award and leave the remainder in force."). The Court reiterates here its earlier conclusions that, Terry did not waive her lack-of-agreement protest, and indeed Terry did not agree to arbitrate with Maestro Global. Nevertheless, those conclusions do not, in the end, matter, because the arbitrators decided that Terry did not owe Maestro Global anything. Terry, in effect, lacks standing to argue she was harmed by the participation in the proceeding of a party to whom, ultimately, she is not liable and who is not now seeking to impose on her any liability.

In related cases, federal courts have suggested that, if among the issues arbitrated are issues that a party has not agreed to arbitrate, then, if arbitrated through to the conclusion, this situation can compromise the ultimate award.  See Adult Use Holdings Inc. v. FaZe Clan Inc., 631 F. Supp. 3d 174, 182-83 (S.D.N.Y. 2022)(Vyskocil, J.)(indicating that an award would exceed the arbitrators' power because "the Arbitrator may very well have decided the motion to dismiss on grounds other than those initially contemplated by the parties").  If an impurity (an unagreed-upon subject) is among those thrown in to the mix, then the resulting mixture will be impure if there is no indication that ultimately excluded from the mixture is the impurity -- i.e., where the award is unexplained and it may be in part based on liability predicated on the subject that the party did not agree to arbitrate.  Where, as here, however, the Award makes clear that absent is the impurity from the mixture -- i.e., Maestro Global -- then the Court can be confident that the remaining mixture is pure, in the sense that the arbitrators decided, as a substantive, merits matter, that some liability toward Waked and Kerr exists independently of any possible liability to Maestro Global. Like a similar set of doctrines around severability of unlawful contractual terms, the wrongful inclusion of Maestro Global here does not compromise the ultimate Award.  Cf. Poublon, 846 F.3d at 1272 ("[A] contract is permeated with unlawfulness (and severance is inappropriate) where '[t]he good cannot be separated from the bad, or rather the bad enters into and permeates the whole contract, so that none of it can be said to be good.'" (quoting Keene v. Harling, 392 P.2d 273 (Cal. 1964)).  The Award as to Terry is not invalid because Maestro Global participated in the arbitration as a party.  Moreover, although the Court determines that Kerr's liability under the Award is invalid, the Court may affirm Terry's liability under the Award, because the Award provides for distinct liability and thus is reasonably divisible.  Cf. Comedy Club, Inc. v. Improv W. Assocs.,

553 F.3d at 1288 ("If an arbitrator exceeded the scope of his authority in issuing an award, and that award is divisible, we may vacate part of the award and leave the remainder in force.").

C.   **AS A NON-SIGNATORY, TERRY CANNOT INVOKE THE ARBITRATION PROVISION IN KERR'S EMPLOYMENT CONTRACT, SO THAT PROVISION'S ENFORCEABILITY DOES NOT AFFECT THE VALIDITY OF TERRY'S LIABILITY UNDER THE AWARD.**

The Award as to Terry is valid independent of the enforceability of the arbitration provisions of Kerr's Maestro Global contract, because, even if that contract's arbitration provision supersede FINRA's arbitration rules as to Kerr, they do not supersede the FINRA arbitration rules as to Terry because she is not a party to the Maestro Global contracts.  Because Terry is not a party to the Maestro Global contracts, no agreement to arbitrate exists under that framework, so she could not be bound to those contracts' provisions for arbitration.  The most straightforward way to approach the analysis is to consider whether, in the absence of Terry's outstanding agreement to arbitrate as a FINRA registered representative, she could be required to arbitrate under the Maestro Global contract; that is, if, instead of two competing provisions for arbitration -- the FINRA-forum Form U4 agreement and the non-FINRA forum Maestro Global agreement -- there existed only the latter, would Terry be bound to arbitrate under that provision?  The answer is no, because, as a non-signatory, Terry cannot be bound to an agreement to arbitrate because no exception to the general rule applies that non-signatories cannot be bound to an agreement to arbitrate.  Because, therefore, only one of two competing agreements to arbitration possibly could apply to Terry (the FINRA-forum Form U4 agreement), the other agreement's enforceability (the non-FINRA-forum Maestro Global agreement) does not affect the validity of the FINRA arbitration as to Terry.  The Court agrees with Waked and Stone that the Defendants' arguments

regarding the Maestro Global arbitration agreement do not have any bearing on Terry's liability under the Award.

Terry did not sign Kerr's Maestro Global contract -- unsurprising, given that this contract is not for Terry's employment.  See Kerr Employment Contract at 1-8.  Terry executed a contract with Maestro Global to provide it consulting services, in transitioning her practice and clients during the transfer in ownership to Waked and Stone.  See Purchase Sale Agreement at 33-35.[14] The consulting contract, however, does not contain the same, non-FINRA arbitration provision as does Kerr's contract.  Compare Purchase Sale Agreement at 33-35, with Kerr Employment Contract ¶ G(1)-(5), at 6-7; Rivera Employment Contract ¶ (G)(1)-(5), at 6-7.  Indeed, the consulting agreement contains no arbitration provision at all.  See Purchase Sale Agreement at 33-35.  Nor, moreover, does the overall Purchase Sale Agreement between Terry, Waked and Stone, which instead provides for a jury trial under New Mexico law for disputes arising under the contract.

> (i)    Jurisdiction and Jury Trial.   This Purchase Agreement and the legal relations between the parties hereto shall be governed by, and construed in accordance with, the laws of the State of New Mexico, without reference to the conflict of laws principles thereof. In the event of any claim or action concerning the interpretation or enforcement of any provision or term hereof, the prevailing party shall be entitled to recover its costs and expenses incurred in connection with said claim or action, including, without limitation, court costs, reasonable attorney's fees, paralegal fees, expert witness fees and other legal expenses.

Purchase Sale Agreement ¶ 21(i), at 12.

---

[14]The consulting agreement that Terry executed with Maestro Global appears on pages 33 through 35 of the Purchase Sale Agreement that Waked and Stone filed as Document 23-8.  The consulting agreement is not internally paginated, so the Court cites to the Purchase Sale Agreement to discuss Terry's consulting agreement.

Terry thus is a non-signatory to the contracts containing the would-be governing arbitration provision, and non-signatories typically cannot be bound to arbitrate according to agreements to arbitrate that they did not sign.  The rule of arbitration law is that it is a matter of contract and agreement between the parties.  See AT&T Mobility LLC v. Concepcion, 563 U.S. 333, 339 (2011)(noting the "fundamental principle that arbitration is a matter of contract.").  Usually, a non-signatory cannot be bound to an agreement to arbitrate.  See Hensiek v. Bd. of Directors of Casino Queen Holding Co., Inc., 514 F. Supp. 3d 1045, 1054 (S.D. Ill. 2021)("The general rule is that non-signatories are not bound to arbitration agreements." (quoting A.D. v. Credit One Bank, N.A., 885 F.3d 1054, 1060 (7th Cir. 2018))).  Some exceptions to the rule allow a non-signatory to be bound to arbitrate, including where the person is an agent of a signatory or where the non-signatory knowingly sought the benefits of the arbitration provision-containing contract.  See A.D. v. Credit One Bank, N.A., 885 F.3d at 1059-60 (listing five "limited exceptions . . . (1) assumption, (2) agency, (3) estoppel, (4) veil piercing, and (5) incorporation by reference").  A non-signatory can also be bound to arbitrate if the claims against the signatory and non-signatory "are based on the same facts and are inherently inseparable."  Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH, 206 F.3d 411, 417 (4th Cir. 2000)(quoting J.J. Ryan & Sons v. Rhone Poulenc Textile, S.A., 863 F.2d 315, 320-21 (4th Cir. 1988)).  None of these exceptions apply here.[15]

---

[15]The Supreme Court of New Mexico has not determined explicitly New Mexico law on the subject of the circumstances under which a non-signatory can be bound to an arbitration agreement.  The Court, executing its Erie-mandated duty to follow state law and to predict the position that New Mexico's highest court would take on a subject it has not yet spoken to, see Chisholm's Vill. Plaza, LLC v. Travelers Com. Ins. Co., 621 F. Supp. 3d 1195, 1230 (D.N.M. 2022)(Browning, J.)("[I]if a district court exercising diversity jurisdiction cannot find a Supreme Court of New Mexico 'opinion that [governs] a particular area of substantive law . . . [the district court] must . . . predict how the Supreme Court of New Mexico would [rule].'" (quoting Guidance Endodontics, LLC v. Dentsply Int'l., Inc., 708 F. Supp. 2d 1209, 1224-25 (D.N.M. 2010)(Browning, J.))), predicts that the Supreme Court of New Mexico would adopt the position

First, Terry is not Kerr's agent, and no party claims she is. Accordingly the carveout for agents to bind them as non-signatories to arbitrate cannot apply here. Cf. See A.D. v. Credit One Bank, N.A., 885 F.3d at 1059-60 (noting agency provides a basis for compelling non-signatories to arbitrate). Second, Terry did not seek intentionally to benefit as a third party from Kerr and Rivera's Maestro Global contracts. There has been discussion throughout this litigation of third-party beneficiary law, but it is about whether Waked and Stone are third-party beneficiaries of the Kerr and Rivera Maestro Global contracts; the issue there is that Waked and Stone are that corporate entity's natural person-proprietors. See Kerr FA Agreement at 1; Rivera FA Agreement at 1; TJ Rivera Testimony at 1-5. Although Kerr and Rivera's continued employment at the firm was a precondition of the Purchase Sale Agreement, see Purchase Sale Agreement ¶16(e), at 9; Stone-Terry Email at 1, still those employment contracts were not intended to benefit Terry, but were for Waked and Stone's benefit and to cinch the deal. Accordingly, the second carveout, for third-party beneficiaries, also does not apply to require Terry as a non-signatory to arbitrate under the Maestro Global contracts. Cf. Nguyen v. Barnes & Noble Inc., 763 F.3d 1171, 1179 (9th Cir.

---

widely shared among jurisdictions across the country that at least five circumstances exist under which a non-signatory may be bound to an arbitration provision. Cf. A.D. v. Credit One Bank, N.A., 885 F.3d at 1059-60 (listing five "limited exceptions . . . (1) assumption, (2) agency, (3) estoppel, (4) veil piercing, and (5) incorporation by reference"); Domke on Arbitration § 13:2 supra ("The Supreme Court has held that traditional principles of state law allow a contract to be enforced by or against nonparties to the contract through assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary theories, waiver and estoppel." (citing Arthur Andersen LLP v. Carlisle, 556 U.S. 624 (2009))). New Mexico's appellate courts have recognized already some of these bases. See Horanburg v. Felter, 2004-NMCA-121, 136 N.M. 435, 99 P.3d 685. The Court has not identified any cases, treatises, or law review articles that reject these bases for binding to an arbitration agreement non-signatories. While the Supreme Court of New Mexico expresses at times hostility toward arbitration agreements, the Court has no real reason to conclude that the Supreme Court of New Mexico would not adopt these exceptions, narrowly construed and closely guarded, for binding to an arbitration non-signatories.

2014)("[A] non-signatory to an arbitration agreement may be compelled to arbitrate where the nonsignatory 'knowingly exploits' the benefits of the agreement and receives benefits flowing directly from the agreement." (citing MAG Portfolio Consultant, GMBH v. Merlin Biomed Grp. LLC, 268 F.3d 58, 61 (2d Cir. 2001)).  Nor does veil-piercing, applicable in the corporate-agent signatory apply, or incorporation-by-reference apply.  Cf. A.D. v. Credit One Bank, N.A., 885 F.3d at 1059-60

Last, the conspiratorial action -- also called the estoppel doctrine -- carveout cannot supply grounds to require that Terry arbitrate under the Maestro Global contracts.  Cf. Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH, 206 F.3d at 417 (permitting compelling non-signatories to arbitrate if claims against non-signatories and signatories are "based on the same facts and are inherently inseparable").  Although one of Waked and Stone's claims against Terry was for civil conspiracy with Kerr and Rivera, and the underlying facts involve their concerted efforts to harm Waked and Stone's business interests, other theories of liability that Waked and Stone assert against Terry are based on her actions alone, including tortious interference with contract and misrepresentation torts.  Because the Award does not specify the theoretical basis for the liability, it could be premised on any of the theories that revolve around Terry's actions alone.  Moreover, given that arbitration is per se a matter of agreement and contract, binding non-signatories to arbitrate is appropriate in rare circumstances, and not merely when coordinated action is alleged among signatories and non-signatories: as all conspirators in a criminal prosecution must be prosecuted together to sustain a conviction of one defendant for conspiracy, see United States ex rel. Head v. Kane Co., 798 F. Supp. 2d 186, 201 (D.D.C. 2011)(Kessler, J.)("[I]t is well-settled that 'all co-conspirators need not be joined to permit any one or more to be held liable for an unlawful conspiracy.'" (quoting Ass'n for Intercollegiate Athletics for Women

v. Nat'l Collegiate Athletic Ass'n, 558 F. Supp. 487, 498 (D.D.C. 1983)(Jackson, J.))), so too all conspirators need not be involved in the same civil proceedings, e.g., the same arbitration, when among the theories of liability is civil conspiracy. To bind to an arbitration agreement she did not sign any person accused of concerted action would expand inappropriately what should be a narrow carveout for binding to arbitration non-signatories and upset the background rule that arbitration is a matter of contract, consent, and agreement. Accordingly, the final carveout, for conspiracy with signatories or estoppel, cannot be basis upon which to compel Terry to arbitrate under the Maestro Global contract.

The enforceability of the Maestro Global contracts' non-FNRA arbitration provisions, therefore, do not affect the validity of Terry's liability under the Award, because the Maestro Global arbitration provisions do not bind Terry as a non-signatory. As discussed above, Terry's registration status with FINRA constitutes an enforceable agreement to arbitrate, which the competing Maestro Global provision does not affect, sufficient for the FAA's purposes. Thus, Terry agreed to arbitrate with Waked and Stone, and her protests to the contrary are unconvincing as a ground to vacate the Award.

**D.     THE AWARD IS VALID AS TO TERRY.**

Ultimately, even though Terry did not agree to arbitrate before FINRA with Maestro Global, see Section II.B.1, and even though Terry did not waive that lack-of-agreement objection, see Section II.B.2, Terry's liability under the Award to Waked and Stone is valid irrespective of Maestro Global's participation in the arbitration process. As discussed above, the Court also holds that the separate provision for non-FINRA arbitration contained in Kerr's employment contract has no bearing on the validity of Terry's liability under the Award, because that provision does not bind her as a non-signatory. Having decided all the legal issues that pertain to Terry's liability

under the Award, no reason presents itself to vacate the Award as to her.  The Court denies the Motion to Vacate as it relates to Terry's liability under the Award and grants the Motion to Confirm as it relates to Terry's liability under the Award, and confirms the Award as to her liability under the Award.

**III.    THE COURT VACATES KERR'S LIABILITY TO WAKED AND STONE UNDER THE AWARD, BECAUSE KERR'S AGREEMENT TO ARBITRATE WITH MAESTRO GLOBAL IN A NON-FINRA FORUM SUPERSEDES HER OUTSTANDING AGREEMENT TO ARBITRATE BEFORE FINRA, AND BINDS WAKED AND STONE TO ARBITRATE AS THIRD-PARTY BENEFICIARIES IN THE NON-FINRA FORUM.**

The Court holds that Kerr's liability to Waked and Stone under the Award is invalid and vacates it.  The non-FINRA arbitration provision in Kerr's Maestro Global contract binds Waked and Stone, because they are the contract's intended beneficiaries.  That provision -- in a "battle" of the arbitration provisions -- displaces the FINRA arbitration provision, because the Maestro Global contractual provision is a more specific agreement that supersedes the agreement to arbitrate before FINRA.  Accordingly, the Court vacates Kerr's liability under the Award under 9 U.S.C. § 10(a)(4), because the arbitrators exceeded their powers in imposing liability on Kerr.

Although Kerr possessed an outstanding agreement to arbitrate in FINRA -- because she was an associated person under FINRA's rules -- she executed a different, conflicting provision for arbitration in a non-FINRA forum with Maestro Global, an agreement that supersedes the background FINRA arbitration framework.  Moreover, although the superseding contract specifically was with Maestro Global, the Court concludes that Waked and Stone nonetheless may be bound as non-signatories to the non-FINRA arbitration agreement.  The Court reaches this conclusion, because Waked and Stone's claims of liability against Kerr arise from Kerr's employment relationship with Maestro Global, the corporate entity that Waked and Stone

- 118 -

established specifically for this business.  Accordingly, because they seek relief as third-party beneficiaries to Kerr's employment contract with Maestro Global, as third-party beneficiaries they must assume the contract's obligations, including its obligation to arbitrate in a non-FINRA forum. In addition, although Waked and Stone also assert tort claims – such as tortious interference with contract – all the alleged conduct arises ultimately out of the employment conduct that the contract governs and thus the non-FINRA arbitration forum is the appropriate one.  The Court explains these conclusions below.

Because FINRA's arbitration rules are contractual in nature, they can be contracted away, as here.  Although the Court acknowledges that FINRA has released guidance expressing the opposite view – that its arbitration rules are not contractual in nature and that parties cannot, via pre-dispute agreements, agree to arbitrate in a non-FINRA forum -- that viewpoint does not bind the Court, because it owes no deference to FINRA's interpretation of its own rules.  By directing, as their corporate agent, that Maestro Global execute the non-FINRA arbitration provision, Waked and Stone waived their ability to invoke FINRA arbitration vis-à-vis Kerr in a dispute with her. Accordingly, because the Court may vacate in part the invalid portion of a divisible arbitration award, see Comedy Club, Inc. v. Improv W. Assocs., 553 F.3d at 1288 ("If an arbitrator exceeded the scope of his authority in issuing an award, and that award is divisible, we may vacate part of the award and leave the remainder in force." (citing Lyle v. Rodgers, 18 U.S. (5 Wheat.) 394, 409, 5 L.Ed. 117 (1820)(Marshall, C.J.); Coutee v. Barington Cap. Grp., L.P., 336 F.3d 1128, 1134 (9th Cir. 2003))), the Court will vacate Kerr's liability to Waked and Stone under the Award, because her agreement to arbitrate in a non-FINRA forum displaces her agreement to arbitrate before FINRA, and so the FINRA arbitration panel exceeded its powers in imposing liability on Kerr.

A.   **ALTHOUGH NON-SIGNATORIES, WAKED AND STONE ARE BOUND TO THE ARBITRATION PROVISION IN KERR'S EMPLOYMENT CONTRACT, BECAUSE THEY ARE THE CONTRACT'S INTENDED THIRD-PARTY BENEFICIARIES.**

The Court's analysis as it pertains to Kerr is fundamentally concerned with allegedly conflicting arbitration provisions.  Namely: the FINRA arbitration, on the one hand, and the non-FINRA arbitration outlined in the Maestro Global contract, on the other.  Before the Court addressees directly this conflict, however, a crucial preliminary question arises: whether the Maestro Global contract -- and its concomitant arbitration agreement -- binds Waked and Stone (as individuals) to arbitrate with Kerr in a non-FINRA forum.  As discussed above, see Factual Background supra, at 4-6, Kerr's Maestro Global employment contract, on its face, is only between Maestro Global and Kerr.  The question of whether this contract binds only these parties, or whether it also binds Waked and Stone, is not merely a speculative inquiry: if Waked and Stone are not bound by the Maestro Global contract, there are, arguably, no conflicting arbitration agreements, and therefore no conflict to resolve.  For the reasons explained in below, however, the Court agrees with Kerr that Waked and Stone can be bound to arbitrate with her according to the non-FINRA arbitration provision in the Maestro Global contract, despite that they are non-signatories.  The Court reaches this conclusion based on considerations rooted in the substantive contract principles that govern the Maestro Global contract.

First, the non-FINRA forum provision can bind Waked and Stone as non-signatories, because the knowingly sought the direct benefits of the contract containing the relevant provision: they, as Maestro Global's sole owners, directed the corporation to execute the contracts with Kerr, and, through Maestro Global, Waked and Stone sought the benefit of Kerr's services.  As a matter of New Mexico State law, an arbitration agreement can, in some situations, bind non-signatories

to arbitrate.  Cf. THI of N.M. at Hobbs Ctr., LLC v. Spradlin, 893 F. Supp. 2d 1172, 1189 (D.N.M. 2012)(Vázquez, J.)("[T]he issue of whether a non-signatory can be bound by, or compel arbitration under, an arbitration agreement is governed by state law." (citing Arthur Andersen LLP v. Carlisle, 556 U.S. 624 (2009))).  New Mexico courts recognize in some circumstances that an arbitration provision can bind non-signatories, and though there is no explicit recognition of equitable estoppel as a basis for binding non-signatories to an arbitration provision, i.e., in the context of intrinsically interrelated claims and parties, nevertheless, New Mexico decisions have decided along similar lines:

> [E]ven if we were to assume that a non-signatory to an arbitration agreement can compel arbitration by virtue of equitable estoppel, we do not believe that equitable estoppel is appropriate in this case.  *See Thomson–CSF, S.A. v. Am. Arbitration Ass'n,* 64 F.3d 773, 779 (2d Cir. 1995)(declining to apply equitable estoppel theory when claim was not "integrally related to the contract containing the arbitration clause"). In [Grigson v. Creative Artists Agency L.L.C., 210 F.3d 524 (5th Cir. 2000)("Grigson")] and [MS Dealer Serv. Corp. v. Franklin, 177 F.3d 942 (11th Cir. 1999)("MS Dealer")], the claims had the characteristics of both types of circumstances that the courts recognized as bases for equitable estoppel; the claims were dependent upon the agreement and also alleged substantially interdependent and concerted misconduct. In this case, neither circumstance is fully present: Plaintiff's claims against Dr. Felter are not alleged to be derived from the agreement between Plaintiff and Lovelace, and Dr. Felter's alleged conduct, which has not been determined to be within the course and scope of his employment, is not the concerted type of conduct addressed by the *Grigson* and *MS Dealer* line of cases.
>
> Moreover, because arbitration is essentially a matter concerning the agreement of the parties, *Grigson* and *MS Dealer* recognize that equitable estoppel is appropriate to avoid rendering meaningless the purpose of the signatories agreement, an arbitration, in the absence of a non-signatory. *Grigson,* 210 F.3d at 527; *MS Dealer,* 177 F.3d at 947. But, we do not believe that the parties' agreement to arbitrate would be rendered meaningless if Dr. Felter were not involved in the arbitration. Although Plaintiff's claims against Lovelace for constructive discharge, intentional infliction of emotional distress, and violation of the New Mexico Human Rights Act, involve Dr. Felter, Plaintiff also asserts claims against Lovelace for retaliation and negligent hire and retention, which appear to involve a previous discrimination claim and subsequent disciplinary action, not involving conduct by Dr. Felter. Despite a level of connectedness, Plaintiff's claims against Dr. Felter for

> assault and battery can be determined separately from her claims against Lovelace.
> We cannot say that the intent of the arbitration agreement embraces Plaintiff's
> forfeiture of her ability to pursue her claims against Dr. Felter through the regular
> court process. *See Pueblo of Laguna,* 101 N.M. at 344, 682 P.2d at 200 (declining
> consolidated arbitration because it was not contemplated by the parties).

Horanburg v. Felter, 2004-NMCA-121, ¶¶ 18-19, 136 N.M. 435, 440, 99 P.3d 685, 690.  One basis

other courts have recognized is where a non-signatory to arbitration agreement is an intended

beneficiary of the contract containing the arbitration provision.   See E.I. DuPont de Nemours &

Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S., 269 F.3d 187, 195 (3d Cir. 2001)("E.I.

DuPont")("[W]hether seeking to avoid or compel arbitration, a third party beneficiary has been

bound by contract terms where its claim arises out of the underlying contract to which it was an

intended third party beneficiary.").  It is clear that Waked and Stone were the intended beneficiaries

of Kerr's contract with Maestro Global; accordingly, because they knowingly sought the benefits

of the contract that they directed Maestro Global to execute with Kerr, then the arbitration

agreement contained in that contract can bind Waked and Stone as non-signatories.  As intended

beneficiaries of the contract, they can be bound to arbitrate according to its terms.  See E.I. DuPont,

269 F.3d at 195.

Other bases, however, are unavailing for binding Waked and Stone, as non-signatories, to

the non-FINRA arbitration provision.  Veil-piercing, for example is one basis for biding non-

signatories to an arbitration agreement.  See A.D. v. Credit One Bank, N.A., 885 F.3d at 1059-60

(listing five "limited exceptions . . . (1) assumption, (2) agency, (3) estoppel, (4) veil piercing, and

(5) incorporation by reference").  There is no contention here that Maestro Global, a corporate

entity, was an alter-ego of Waked and Stone in the way that veil-piercing doctrines require; for

example, there is no claim Maestro Global is inadequately funded or was incorporated with a

fraudulent purpose.  Cf. Scott v. AZL Res., Inc., 1988-NMSC-028, ¶ 9, 107 N.M. 118, 122, 753

P.2d 897, 901 ("Mere control by the parent corporation is not enough to warrant piercing the corporate veil. Some form of moral culpability attributable to the parent, such as use of the subsidiary to perpetrate a fraud is required.").  While agency is another basis for binding a non-signatory to an arbitration agreement, see A.D. v. Credit One Bank, N.A., 885 F.3d at 1059-60 (listing five "limited exceptions . . . (1) assumption, (2) agency, (3) estoppel, (4) veil piercing, and (5) incorporation by reference"), a corporation is not an agent of its shareholders; a corporation-as-agent assertion is another way of articulating an argument that a corporation is its shareholders' alter ego, i.e., equivalent to a veil-piercing claim, which, as just noted, does not lie on these facts. To assert that a subsidiary corporation is an agent of its parent corporation is to effectively claim that the subsidiary is the alter ego of the parent, i.e., to pierce the subsidiary's corporate veil.  See E.I. DuPont, 269 F.3d at 199 ("[U]nlike Pritzker, appellants seek to hold DuPont liable [to an arbitration agreement that a corporate subsidiary executed] as a principal, not as an agent; moreover, unlike Pritzker, DuPont could act on its own. Appellants' attempt to bind DuPont on agency principles fails." (citing Pritzker v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 7 F.3d 1110, 1113 (3d Cir. 1993))).  The agency basis applies to the more typical situation where a non-corporate person executes on a principal's behalf an arbitration agreement, or where a principal's arbitration agreement binds the principal's agent if the dispute concerns the agent's actions.  See E.I. DuPont, 269 F.3d at 199 ("[W]here the principal is bound to arbitration and the complaints arise out of the agent's conduct on behalf of that principal, the agent is bound by the principal's agreement to arbitrate disputes.").  Accordingly, here neither the veil-piercing nor the agency bases apply to bind as non-signatories Waked and Stone to the arbitration provision.  Instead, only the intentionally-seeking-the-benefits theory applies.

Waked and Stone are unlike Terry, who, as the Court discusses above, cannot be bound as non-signatory to the arbitration provision in the Maestro Global contract.  Terry falls under none of the carveout doctrines for binding non-signatories to an arbitration agreement: she is not Kerr's agent, nor the Kerr employment contract's intended beneficiary; and the mere existence of a conspiracy among her and Kerr, a signatory, is not sufficient to compel her to the terms of an arbitration agreement she did not sign. Cf. A.D. v. Credit One Bank, N.A., 885 F.3d at 1060 ("The general rule is that non-signatories are not bound to arbitration agreements.").  Moreover, the only possible basis for compelling her to arbitrate as a non-signatory -- the equitable estoppel or substantial interdependence doctrine -- is more narrow than it sounds. Cf. Horanburg v. Felter, 2004-NMCA-121, ¶¶ 18-19, 136 N.M. 435, 440, 99 P.3d 685, 690 (holding that, "[d]espite a level of connectedness" in party's claims against signatory and non-signatory, non-signatory could not be bound to agreement where "the parties' agreement to arbitrate would [not] be rendered meaningless if [non-signatory] were not involved in the arbitration");  Cf. MS Dealer Serv. Corp. v. Franklin, 177 F.3d 942, 947-48 (11th Cir. 1999)(holding that a signatory is equitably estopped from avoiding arbitration with a non-signatory where the signatory's claims "make[] reference to and presumes the existence of" the arbitration-providing contract and "each of [the signatory's] fraud and conspiracy claims depends entirely upon [that] . . . contract").  The existence of alleged wrongful cooperation does not necessitate that all involved parties must participate in the same arbitration proceeding; in a similar way, the criminal conspiracy prosecution of all alleged conspirators is not a prerequisite for the prosecution of a single conspirator. See United States ex rel. Head v. Kane Co., 798 F. Supp. 2d at 201 ("[I]t is well-settled that 'all co-conspirators need not be joined to permit any one or more to be held liable for an unlawful conspiracy.'" (quoting

Ass'n for Intercollegiate Athletics for Women v. Nat'l Collegiate Athletic Ass'n, 558 F. Supp. at 498)).

Where Terry's alleged liability to Waked and Stone can be predicated on Terry's own contracts with Waked and Stone, and not solely on Kerr's contracts with Maestro Global, then the equitable estoppel doctrine does not apply.  Indeed, Terry sought initially arbitration before FINRA, and did not indicate that any dispute among her, Waked, and Stone had to be according to the terms of the Maestro Global contract's non-FINRA provision.  See State Court Motion to Compel at 4-5.  Accordingly, because Terry was not a signatory to the Maestro Global contract's arbitration provision, and because none of the exceptions for binding non-signatories applies to her, then her dispute with Waked and Stone properly was before the FINRA arbitration, as discussed above, and the Award was valid as to her.

Unlike with Terry, however, the Maestro Global contract's non-FINRA arbitration provision binds Waked and Stone, as non-signatories, in their dispute with Kerr.  As noted, a contract's arbitration provision may bind a non-signatory if he or she is the contract's intended beneficiary.  See E.I. DuPont, 269 F.3d at 195 ("[W]hether seeking to avoid or compel arbitration, a third-party beneficiary has been bound by contract terms where its claim arises out of the underlying contract to which it was an intended third party beneficiary.").  Waked and Stone are intended beneficiaries of Kerr's Maestro Global employment contract.

Kerr's employment, though it was with Maestro Global, was meant to benefit Waked and Stone.  The financial advisor agreements among Kerr, Waked and Raymond James indicated that Kerr serves as a registered representative of Raymond James and that Waked employs her.  See Kerr FA Agreement at 1.  Waked and Stone's purchase from Terry of her financial practice explicitly was made contingent on Kerr's continued employment.  See Stone-Terry Email at 1.

Kerr acknowledged during testimony at the arbitration proceedings that she knew her employment contract, though with Maestro Global, was for Waked and Stone's benefit.  See Rivera-Kerr Testimony at 5.  Waked and Stone argued that they are the employment contracts' intended beneficiaries, because that proposition was important for establishing Kerr's liability to them given Kerr's alleged contractual breaches of the Maestro Global contract.  See Statement of Claim at 16-17; June 25 Tr. at 2, 20:4-7 (Pratt)("It is basic third party beneficiary law that third party beneficiaries such as Shawn and Theresa are of the employment agreement [among Maestro Global and Kerr and Rivera], can sue to enforce that agreement.").

Accordingly, Waked and Stone are intended beneficiaries of the contract containing the non-FINRA arbitration provision, and so that provision binds them.  Cf. E.I. DuPont, 269 F.3d at 195 ("[W]hether seeking to avoid or compel arbitration, a third party beneficiary has been bound by contract terms where its claim arises out of the underlying contract to which it was an intended third party beneficiary.").  If, for example, Maestro Global tried to sue Kerr in court for contract breach, Maestro Global would be bound to arbitrate its dispute with Kerr.  If Waked and Stone tried to sue Kerr for contract breach, the same result ultimately follows: they would have a claim for contract breach, because they are the contract's intended beneficiaries, but they would have to maintain it in the arbitration forum that the contract identifies.

Finally, that Waked and Stone also asserted tort claims does not mean they thereby are exempt from the contract's arbitration provision.  The Maestro Global arbitration provision covers all claims concerning Kerr's employment.  See Kerr Employment Contract ¶ G, at 6 ("Any dispute arising out of or relating to this Agreement or any other employment related disputes . . . shall . . . be resolved in [non-FINRA] arbitration.").  Merely styling claims as tort claims does not exempt them from arbitration according to the contract's provision.  Cf. MS Dealer

<u>Serv. Corp. v. Franklin</u>, 177 F.3d 942, 948 n.4 (11th Cir. 1999)("We acknowledge that Franklin has cast all of her claims against MS Dealer as tort claims rather than contract claims. 'However, it is well established that a party may not avoid broad language in an arbitration clause by attempting to cast its complaint in tort rather than contract.'" (quoting <u>Sunkist Soft Drinks, Inc. v. Sunkist Growers, Inc.</u>, 10 F.3d 753, 758 (11th Cir. 1993))).

In a world in which the Maestro Global contract was the only possible source of an agreement to arbitrate, the result would be relatively straightforward. Waked and Stone would have to arbitrate in that contract's non-FINRA forum any claims -- contract or tort -- against Kerr relating to her employment, because Waked and Stone are intended third-party beneficiaries of the contract. Waked and Stone, however, would not have to arbitrate in the Maestro Global contract's preferred forum any claims against Terry, because Terry is a non-signatory to the Maestro Global contract, and no exception for non-signatories applies to bring her within the Maestro Global contract's fold. In conclusion, because Waked and Stone, notwithstanding any other possible arbitration agreement, would be bound to arbitrate their dispute with Kerr according to the Maestro Global contract's provision, the issue is whether the Maestro Global contract's non-FINRA arbitration provision displaces or supersedes the agreement to arbitrate before FINRA according to FINRA Code 13200.

**B.  KERR'S EMPLOYMENT CONTRACT'S ARBITRATION PROVISION CONFLICTS WITH FINRA CODE 13200, AND THE NON-FINRA ARBITRATION AGREEMENT INCLUDED IN THE EMPLOYMENT CONTRACT SUPERSEDES CODE 13200, BECAUSE KERR CAN CONTRACT EX ANTE OUT OF FINRA ARBITRATION.**

The Maestro Global non-FINRA arbitration agreement and Code 13200's FINRA arbitration agreement directly conflict, and the former supersedes the latter, as a tailored, specially

made provision the parties made to arbitrate their disputes.  The tailor-made arbitration provision displaces the FINRA agreement, because FINRA's arbitration rules are contractual in nature and so can be contracted out of and around, like default rules found in the UCC.  This rule is so despite the fact that FINRA is a self-regulatory organization, a quasi-governmental entity that self-regulates the securities brokerage industry.  While self-regulatory organizations possess quasi-governmental, agency-like status, and in some contexts their rules have the force of law, yet their provisions for dispute resolution -- FINRA's arbitration rules -- do not carry the same force-of-law weight, unlike their substantive rules imposed on members.  Despite that FINRA itself views its arbitration rules as not capable of being contracted around, the Court does not owe deference to FINRA's view, expressed in its Regulatory Notice 16-25, that its arbitration rules are mandatory and not contractual in nature.

Accordingly, Waked and Stone effectively, in the execution of the Maestro Global contract, waived their rights under FINRA Code 13200 to arbitrate in FINRA their dispute with Kerr.  The Court follows the result that the Second, Ninth, and Fourth Circuits reach that FINRA's arbitration rules can be contracted around, and concludes that the parties sufficiently contracted around the rules here.  See Credit Suisse Sec. (USA) LLC v. Tracy, 812 F.3d 249 (2d Cir. 2016)("Tracy"); Goldman, Sachs & Co. v. Golden Empire Sch. Fin. Auth., 764 F.3d 210 (2d Cir. 2014)("Golden Empire"); Goldman, Sachs & Co. v. City of Reno, 747 F.3d 733 (9th Cir. 2014)("City of Reno"); UBS Fin. Servs., Inc. v. Carilion Clinic, 706 F.3d 319 (4th Cir. 2013)("Carilion Clinic").  Indeed, an old Tenth Circuit case indicates its agreement with this line of cases.  See Schooley v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 1997 WL 45271, at *2 (10th Cir. Feb. 5 1997)(table)[16]("[T]he

---

[16]Schooley v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 1997 WL 45271 (10th Cir. Feb. 5 1997)(table), is an unpublished opinion, but the Court can rely on an unpublished opinion to the

arbitration rules of a securities exchange are themselves 'contractual in nature,' and they are 'sufficient to compel arbitration of exchange-related disputes in the absence of a specific written arbitration agreement.'" (quoting Spear, Leeds & Kellogg v. Central Life Assurance Co., 85 F.3d 21, 26 (2d Cir. 1996)(quoting Georgiadis, 903 F.2d at 113).  The Third Circuit's holding in its case, Reading Health System v. Bear Stearns & Co., 900 F.3d 87 (3d Cir. 2018)("Reading Health"), is not wholly to the contrary, and is consistent, although it is more cautious about the ability to contract around FINRA's rule and is more amendable to the view that FINRA expresses in its Regulatory Notice 16-25, see Reg. Notice 16-25.  The Court does not agree that the notice has controlling weight, and so the Court ultimately holds that the Maestro Global, non-FINRA arbitration forum agreement displaces the FINRA forum arbitration agreement embodied in Code 13200.

The Court's discussion of these subjects proceeds in the following manner.  First, the Court compares FINRA Code 13200 and the arbitration provision in Kerr's employment contract and determines that they conflict with each other.  Second, the Court turns to several decisions from the Courts of Appeals addressing such contractual-and-FINRA-arbitration conflicts: (i) Fourth

---

extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A) ("Unpublished decisions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . And we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005).  The Court concludes that Schooley v. Merrill Lynch, Pierce, Fenner & Smith, Inc. has persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Amended Order.

Circuit, Second Circuit, and Ninth Circuit decisions about arbitrating customer disputes under FINRA Code 12200 hold that parties may contract around FINRA's arbitration rules; (ii) a Third Circuit decision that postdates those decisions reaches the opposite conclusion, namely that parties to FINRA Code 12200 cannot contract around FINRA's arbitration framework; and (iii) another Second Circuit decision addressing FINRA Code 13200, in a decision that, similar to the Second Circuit's customer disputes case, holds that parties can ex ante contract around FINRA's arbitration framework.   Third, the Court discusses FINRA Regulatory Notice 16-25, which expresses FINRA's view that private parties cannot contract out of its arbitration rules for either customer disputes or industry disputes; this viewpoint, the Court next explains, is not entitled to deference on the basis of FINRA's status as a self-regulatory organization; finally, the Notice's view lacks statutory basis.   Fourth, the Court concludes that, under the circumstances here, Kerr contracted out of FINRA's arbitration rules and displaced them, when the issue is conceptualized either as a matter of waiver or as contract supersession.

### 1.    FINRA Code 13200 and the Maestro Global Non-FINRA Forum Agreement are Incompatible With Each Other.

The Maestro Global arbitration provision and Code 13200 of FINRA are incompatible with each other, because they cover the same broad set of disputes, and provide for separate arbitration frameworks.   The Maestro Global arbitration provision requires arbitration for all disputes arising out of Kerr's employment as a broker-dealer of securities.   See Kerr Employment Contract ¶ G, at 6 ("Any dispute arising out of or relating to this Agreement or any other employment related disputes . . . shall . . . be resolved in [non-FINRA] arbitration.").   FINRA Code 13200 mandates arbitration of all disputes arising out of a person's role as a securities industry professional.   See FINRA Code 13200(a) ("Except as otherwise provided in the Code, a dispute must be arbitrated

under the Code if the dispute arises out of the business activities of . . . an associated person and is between or among . . . Associated Persons."). Although the phrasing is slightly different, in essence these address the same set of disputes: the employment-related disputes that the Maestro Global arbitration provision addresses cover Kerr's work as a securities professional, and Code 13200 mandates that she arbitrate all her industry-related disputes.

The two arbitration provisions concern the same disputes, and they provide for different arbitration frameworks. The Maestro Global contract for arbitration according to the NMUAA, before a single arbitrator in Santa Fe, New Mexico. See Kerr Employment Contract ¶ G(1), at 6-7 ("Arbitration will be by one arbitrator and will proceed in accordance with the New Mexico Uniform Arbitration Act . . . . If the parties are unable to agree upon the selection of an arbitrator, then [a State court in Santa Fe] . . . shall appoint the arbitrator upon a motion by the applicable party."). Code 13200 provides for arbitration according to FINRA's Arbitration Code for Industry Disputes, a developed body of arbitration rules before a panel of three FINRA arbitrators. See FINRA Code 13200(a) ("[A] dispute must be arbitrated under the Code if the dispute arises out of the business activities of . . . an associated person and is between or among . . . Associated Persons."). Both provisions are mandatory. It is immaterial that the Maestro Global arbitration provision does not state explicitly it is displacing any potential FINRA scheme. Cf. Tracy, 812 F.3d at 251 (finding conflict where the contract conflicted with Code 13200 scheme and called for arbitration "'conducted by a single arbitrator, or . . . a panel of three arbitrators supplied by JAMS or the American Arbitration Association'" (quoting parties' contract)); id. at 254 ("Because the Credit Suisse EDRP requires that arbitration take place in a non-FINRA forum, it is clearly inconsistent with Rule 13200."). The two provisions conflict irreconcilably because they call for different arbitration frameworks. The question is which provision prevails.

2. **Federal Appellate Decisions Hold that Private Parties Can Contract ex ante out of FINRA's Arbitration Framework.**

Several federal appellate decisions have held that private parties can -- like Kerr and Maestro Global here -- contract out of FINRA framework for arbitration.  In some instances, courts have treated the existence of two conflicting agreements to arbitrate as a matter of waiver, i.e., whether the party, by executing a second arbitration agreement, waives its rights to arbitration that the first agreement conferred.  See Reading Health, 900 F.3d at 102 ("We agree with the Fourth Circuit that the question is one of waiver.").  In other instances, the issue may be considered one of contract law principles, i.e., which agreement to arbitrate represents the parties' true intentions regarding their agreements to arbitrate with each other.  Cf. Mumin v. Uber Techs., Inc., 239 F. Supp. 3d 507, 522 (E.D.N.Y. 2017)(Garaufis, J.)("'It is a well settled principle of contract law that a new agreement between the same parties on the same subject matter supersedes the old agreement.'" (quoting Ottawa Office Integration Inc. v. FTF Bus. Sys., Inc., 132 F. Supp. 2d 215, 219 (S.D.N.Y. 2001)(Stein J.))); Domke on Arbitration supra § 8:15 ("An agreement to arbitrate requires a clear and unequivocal manifestation of an intention to arbitrate because it involves the surrender of the right to resort to the courts. . . . A court determining the parties' intent in an arbitration clause must consider the contract as a whole.").  The courts considering the issue have not explicitly separated out these justifications, but the Court sees as beneficial separating out the doctrinal justifications.

a. **The Fourth Circuit, Second Circuit and Ninth Circuits Have Permitted Waiver or Supersession of FINRA Code 12200 Regarding a Customer's Right to Compel FINRA Arbitration.**

In a series of cases involving securities customers' rights under Code 12200, three federal appellate cases permit a conflicting arbitration agreement to displace provision for FINRA

arbitration.    The Second Circuit, the Fourth Circuit, and the Ninth Circuit all agree that FINRA's

arbitration rules can be contracted around.  See Golden Empire, 764 F.3d at 216 ("[P]rovisions

require[ing] that disputes arising out of the broker-dealer agreements be adjudicated in the

Southern District of New York . . . supersede the background FINRA arbitration rule."); Carilion

Clinic, 706 F.3d at 328 ("At the outset, we agree with UBS and Citi that the obligation to arbitrate

under FINRA Rule 12200 can be superseded and displaced by a more specific agreement between

the parties.");  City of Reno, 747 F.3d at 741 ("As a threshold matter, we agree with Goldman that

a contract between the parties can supersede the default obligation to arbitrate under the FINRA

Rules.").  In a long ago, unpublished decision, the Tenth Circuit indicated its agreement with this

line of doctrine.  See Schooley v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 1997 WL 45271,

at *2 (stating that "the arbitration rules of a securities exchange are themselves 'contractual in

nature,'" and they are "'sufficient to compel arbitration of exchange-related disputes in the absence

of a specific written arbitration agreement'" (quoting Spear, Leeds & Kellogg v. Central Life

Assurance Co., 85 F.3d at 26 (quoting Georgiadis, 903 F.2d at 113))).  The Tenth Circuit, however,

has not had occasion since then to develop further that doctrinal line.

In a series of decisions on related sets of facts, the Fourth Circuit, Second Circuit and Ninth

Circuit agreed that parties could contract around FINRA's arbitration rules, but they disagreed

whether, in the particular instances before them, the parties had contracted around the FINRA

rules.  In these cases,  financial advisory firms wrote into their contracts with clients that disputes

arising from the contract would be resolved in a particular venue in federal court.  See Carilion

Clinic, 706 F.3d at 328 ("UBS and Citi . . . rely on the forum selection clause which provides at

its core, 'all actions and proceedings arising out of this Agreement . . . shall be brought in the

United States District Court the County of New York.'" (quoting parties' contract)); Golden

Empire, 764 F.3d at 212 (involving forum-selection clause providing that "all actions and proceedings arising out of this Broker-Dealer Agreement or any of the transactions contemplated hereby shall be brought in the United States District Court in the County of New York'" (quoting parties' contract)); City of Reno, 747 F.3d at 741 ("Goldman argues that . . . Reno disclaimed its right to arbitrate by agreeing to the forum selection clauses in the 2005 and 2006 Broker-Dealer Agreements. These forum selection clauses recite that 'all actions and proceedings . . . shall be brought in the . . . District of Nevada.'" (quoting parties' contract)).   The issue was whether execution of contracts containing these terms superseded a customer's right under FINRA 12200 to compel FINRA arbitration.

The Fourth Circuit, in Carilion Clinic, treated the issue as a matter of waiver: whether the customer, by executing the agreement, waived its right to FINRA arbitration under Code 12200. See Carilion Clinic, 706 F.3d at 329 ("[T]the question presented is whether the forum selection clause in the broker-dealer agreements provides that Carilion's right to arbitrate under FINRA Rule 12200 is superseded, displaced, or waived. This comes down to a straightforward issue of contract interpretation.").   The Fourth Circuit states explicitly that it would be possible for the customer to do so.   See Carilion Clinic, 706 F.3d at 328 ("At the outset, we agree with UBS and Citi that the obligation to arbitrate under FINRA Rule 12200 can be superseded and displaced by a more specific agreement between the parties.").   The only issue was that in that instance, the customer had not so waived its 12200 right, because the SDNY-forum provision was insufficiently clear that it displaced the FINRA 12200 right to effectuate waiver.   See Carilion Clinic, 706 F.3d at 330 ("[W]e believe that it would never cross a reader's mind that the clause provides that the right to FINRA arbitration was being superseded or waived. No word even suggesting supersedence, waiver, or preclusion exists in the sentence.").

The Second Circuit and the Ninth Circuits took another approach, also holding that parties could contract around FINRA arbitration rules, but finding that the parties had contracted around the FINRA rules by executing contracts with provisions for bringing all disputes in federal district court.  See Golden Empire, 764 F.3d at 217 ("[T]he forum selection clause at issue in these cases is plainly sufficient to supersede FINRA Rule 12200."); City of Reno, 747 F.3d at 743 ("[W]e turn to the text of the forum selection clauses and conclude that Reno has clearly and unambiguously disclaimed any right it might otherwise have had to FINRA arbitration.").  All three courts held that there could be waiver of FINRA's arbitration rules, i.e., that parties could contract around those rules, tailoring dispute-resolution mechanisms of their choosing.  See Carilion Clinic, 706 F.3d at 328 ("At the outset, we agree with UBS and Citi that the obligation to arbitrate under FINRA Rule 12200 can be superseded and displaced by a more specific agreement between the parties."); Golden Empire, 764 F.3d at 216 ("[P]rovisions requir[ing] that disputes arising out of the broker-dealer agreements be adjudicated in the Southern District of New York . . . supersede the background FINRA arbitration rule."); City of Reno, 747 F.3d at 741 ("As a threshold matter, we agree with Goldman that a contract between the parties can supersede the default obligation to arbitrate under the FINRA Rules.").  As a matter of waiver doctrine, these agreements may supersede the FINRA arbitration rules by waiving the parties' rights and obligations thereunder.

> **b.   The Third Circuit's Decision in <u>Reading Health</u> Holds that No Implicit Waiver of a Customer's 12200 FINRA Arbitration Lies on a Provision that All Disputes be Brought in Federal Court.**

More recently, the Third Circuit addressed this same issue: whether and under what circumstances a party's contractual arrangement supplants an agreement to arbitrate according to FINRA's Code.  See Reading Health, 900 F.3d 87.  The Third Circuit, like the Fourth Circuit, treats the issue as one of waiver: whether the customer, by executing a contract providing that "all

actions and proceedings arising out of this Broker-Dealer Agreement . . . shall be brought in the

United States District Court in the County of New York," Reading Health, 900 F.3d at 91, waives

the customer's right to compel arbitration under FINRA Code 12200. See Reading Health, 900

F.3d at 102 ("We agree with the Fourth Circuit that the question is one of waiver."). The Third

Circuit ended up agreeing with the Fourth Circuit that a contract provision essentially the same as

those seen by the prior courts is an insufficiently clear statement of an intent to waive. See Reading

Health, 900 F.3d at 102 ("We agree . . . that the forum-selection clauses did not implicitly waive

Reading's right to FINRA arbitration.").

A number of features of the Third Circuit's case are particularly important. First, the Third

Circuit's decision was issued after FINRA issued its Regulatory Notice 16-25, and the Third

Circuit makes extensive use of that notice:

> In July 2016, FINRA issued a regulatory notice, disagreeing with the reasoning of *Golden Empire* and *City of Reno* and reminding its members "that customers have a right to request arbitration at FINRA's arbitration forum at any time and do not forfeit that right under FINRA rules by signing any agreement with a forum selection provision specifying another dispute resolution process or an arbitration venue other than the FINRA arbitration forum." FINRA, Reg. Notice 16-25, at 1. FINRA concluded that "any member firm's denial, limitation or attempt to deny or limit a customer's right to request FINRA arbitration, even if the customer seeks to exercise that right after having agreed to a forum selection clause specifying a venue other than a FINRA arbitration forum, would violate FINRA Rules 2268 and 12200." *Id.* Nothing in this Opinion precludes FINRA from sanctioning one of its members for attempting to avoid its duty to arbitrate via contract. *See* FINRA Rule 12212 (permitting an arbitration panel to "sanction a party for failure to comply with any provision of the Code"); FINRA IM-12200 (providing that "[i]t may be deemed conduct inconsistent with just and equitable principles of trade and a violation of Rule 2010 for a member . . . to: (a) fail to submit a dispute to arbitration under the Code as required by the Code"); *see also* FINRA, Reg. Notice 16-25, at 5 ("FINRA Rules. . . . are not default rules that may be overridden by more specific or separate contractual terms without consequences under FINRA rules."). . . .
> As FINRA has observed, enforcing purported contractual waivers of the right to arbitrate under FINRA rules would impermissibly permit "FINRA member firms to deny investors the benefits of FINRA's arbitration program, which may,

as a practical matter, foreclose customers from asserting their claims, particularly small claims." FINRA, Reg. Notice 16-25, at 4.

Reading Health, 900 F.3d 87, 102 n.76, 104 n.82.  Second, the Third Circuit, departing from the Second Circuit, the Ninth Circuit, and even the Fourth Circuit, indicates that FINRA's arbitration rules are not contractual in nature and so cannot be opted out of like default rules under the UCC:

> [W]e are reluctant to find an implied waiver here. Reading's right to arbitrate is not contractual in nature, but rather arises out of a binding, regulatory rule that has been adopted by FINRA and approved by the SEC. By condoning an implicit waiver of Reading's regulatory right to arbitrate, we would erode investors' ability to use an efficient and cost-effective means of resolving allegations of misconduct in the brokerage industry and thus undermine FINRA's ability to regulate, oversee, and remedy any such misconduct. In so holding, we split with some of our sister circuits, but begin the process of closing this contractual loophole to FINRA's compulsory arbitration rule.

Reading Health, 900 F.3d at 103-04.  On its face, Reading Health appears to reject the proposition that FINRA's rules are contractual in nature.  See Reading Health, 900 F.3d at 103 ("Reading's right to arbitrate is not contractual in nature, but rather arises out of a binding, regulatory rule that has been adopted by FINRA and approved by the SEC.").  The Court notes, however, that implicit in the Third Circuit's consideration whether there was effective waiver implies that the Third Circuit could, under the right circumstances, have found waiver; the Third Circuit does not outright reject the possibility that a customer could waive explicitly her rights under FINRA's arbitration code, i.e., by contracting out of them.  See Reading Health, 900 F.3d at 103 ("[W]e are reluctant to find an implied waiver here. . . . By condoning implicit waiver of Reading's regulatory right to arbitrate, we erode investors' [protections].").  This statement implies that, despite the Third Circuit's hesitation, it nevertheless implicitly endorses the proposition that FINRA's arbitration rules are contractual in nature, and can be opted out of like default rules -- only, like the Fourth Circuit, the Third Circuit found no such opting out on these facts.

The Third Circuit disavows possible reliance on 15 U.S.C. § 78cc(a), a provision, which as the Court will discuss further, hypothetically could be read to take as binding FINRA's arbitration rules.  See Reading Health, 900 F.3d at 104 n.84 ("[W]e need not address whether an explicit waiver of the right to arbitrate would be invalid and unenforceable under Section 29(a) of the Exchange Act, as *amicus* and Reading argue.").  Accordingly, as a matter of waiver doctrine, the Third Circuit does not find waiver on the provision that "all actions and proceedings arising out of this Broker-Dealer Agreement . . . hereby shall be brought in the United States District Court in the County of New York." Reading Health, 900 F.3d at 91.  The Third Circuit also notes that, in a sense, the contract provision does not effect a later contract superseding Code 12200, because the Code 12200 agreement to arbitrate with that particular customer only comes into agreement once the entity becomes a customer; this moment in time coincides with the execution of the allegedly superseding contract, such that, in a sense, neither agreement to arbitrate could be a later contract but rather they came into existence simultaneously:

> Even if Rule 12200 is the functional equivalent of a private contract, this [later-executed agreement] analysis presumes that the "agreement to arbitrate" embodied in FINRA Rule 12200 *predates* the execution of the broker-dealer agreements. That position is hard to reconcile with the fact that an investor's right to demand arbitration under FINRA Rule 12200 stems from its status as a "customer," a status that J.P. Morgan contends is created by the broker-dealer agreements. Reply Br. at 6. J.P. Morgan's position in that regard implies that the agreement to arbitrate under Rule 12200 comes into existence only *after* the parties executed the broker-dealer agreements, not beforehand, which contradicts the notion that the agreements are somehow later-in-time agreements that "superseded" or "displaced" Rule 12200.

Reading Health, 900 F.3d at 102 n.68.

In conclusion, these cases on contractual provisions that conflict with a customer's Code 12200 right to compel FINRA arbitration lend insight to the Court.  Critically, the Second, Fourth, and Ninth Circuits all are in agreement that FINRA's arbitration rules are contractual in nature and

can be contracted around.  See Golden Empire, 764 F.3d at 216; Carilion Clinic, 706 F.3d at 328;

City of Reno, 747 F.3d at 741.  The Third Circuit, on its face, rejects that proposition, see Reading

Health, 900 F.3d at 103, but if the Third Circuit would permit an explicit waiver, which it does not

out-of-hand reject, then it must permit some allowance for contracting around FINRA's arbitration

rules, see Reading Health, 900 F.3d at 104 n.83.  The Tenth Circuit in the past has indicated its

agreement with the former line of cases that an SRO's arbitration rules are contract-like.  See

Schooley v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 1997 WL 45271, at *2.  The Court takes

it as largely agreed upon, among the federal appellate courts that have considered the issue, that

FINRA's arbitration Code is contractual in nature and, under the right circumstances, can be

contracted around and a person's rights waived thereunder.[17]

---

[17]The Court's 2015 decision, Presbyterian, 122 F. Supp. 3d 1157, involved this contractual language, but the Court did not there speak to whether that provision effected waiver by contracting around FINRA's rules.  There, Presbyterian Healthcare Services contracted with finance firm Goldman Sachs to help Presbyterian Healthcare finance its development projects, with a contract that included a provision that "all actions and proceedings arising out of this Broker-Dealer Agreement or any of the transactions contemplated hereby shall be brought in the United States District Court in the County of New York."  Presbyterian, 122 F. Supp. 3d at 1166.  After the relationship went awry, Presbyterian Healthcare filed suit with the Court to compel Goldman Sachs to arbitrate before FINRA Presbyterian Healthcare's dispute with it.  See Presbyterian, 122 F. Supp. 3d at 1168 (describing procedural background).  Because the Court agreed with Goldman Sachs that the Court should transfer the case to the Southern District of New York, the Court declined to go further in deciding the merits of the case, leaving these issues for the New York federal court; specifically the Court declined to address whether this forum selection language effected waiver of Presbyterian Healthcare's FINRA Code 12200 arbitration right by contracting-around FINRA's arbitration rules:

Presbyterian Healthcare argues that the Court should follow the Fourth Circuit's ruling in Carilion, which, Presbyterian Healthcare contends, found that "identical language in a broker-dealer agreement does not supersede an existing obligation to arbitrate," Response at 23 (citing Carilion, 706 F.3d at 330), as well as the United States District Court for the District of Minnesota, which agreed with Carilion's reasoning in UBS Securities LLC v. Allina Health System, rather than follow the cases in the Second and Ninth Circuits, which found otherwise. A closer reading of

c.       **The Second Circuit Has Held That Code 13200 Can Be Superseded by a Different Contractual Arrangement For <u>Deciding Industry Professional Related Disputes</u>.**

In a decision with similar facts as the present case, the Second Circuit in <u>Tracy</u>, 812 F.3d 249, held that a contract's tailored, non-FINRA forum arbitration provision supplants FINRA Code 13200, the applicable code provision here.  In <u>Tracy</u>, the Second Circuit reaffirms its caselaw that FINRA's arbitration rules are contractual in nature and, therefore, can be contracted around by parties' more specific, tailored contractual provision for arbitration.  See <u>Tracy</u>, 812 F.3d at 256 ("Our decisions addressing a conflict between an SRO's broad arbitration rules and a specific pre-dispute agreement between an SRO member and an employee or customer hold that the more

---

<i>Carilion,</i> however, reveals that the Court need not make that choice here, because <i>Carilion</i> supports transferring this case.

<u>Presbyterian</u>, 122 F. Supp. 3d at 1207.  The Court held there only that such litigation as Presbyterian Health's motion to compel FINRA arbitration had to be brought in the Southern District for New York, <u>i.e.</u>, Presbyterian had to file its suit to compel Goldman Sachs to arbitrate with it before FINRA in the Southern District of New York, instead of in the District of New Mexico:

> While <i>Carilion</i> certainly held that the forum-selection clause did not supersede the FINRA arbitration provision, it did not find that the entire forum-selection clause was invalid in light of it. This distinction makes considerable difference in this case, because, under <i>Carilion,</i> the forum-selection clause's power to compel <i>litigation</i> to be brought in a certain forum <i>survives</i> its finding that the clause does not supersede arbitration actions. Thus, applying <i>Carilion</i> to this case is a straightforward exercise, and achieves a result contrary to Presbyterian Healthcare's assertions: Presbyterian Healthcare has brought before the Court an "action or proceeding" and, pursuant to the forum-selection clause in the Broker-Dealer Agreement, Presbyterian Healthcare must bring such action or proceeding in the United States District Court in the County of New York.

<u>Presbyterian</u>, 122 F. Supp. 3d at 1208.  Accordingly, the Court did not then address the issue it faces now: whether, and under what circumstances, a party's tailored contractual arrangement supplants an outstanding agreement to arbitrate under FINRA's Code.

specific agreement will prevail."). There, employees of a FINRA member executed an employment contract that provided for arbitration of employment related disputes in a non-FINRA forum. See Tracy, 812 F.3d at 251 ("'All arbitrations under the Program will be conducted by a single arbitrator[] or . . . a panel of three arbitrators, supplied by JAMS or the American Arbitration Association[,' which] . . . [b]ecause [it] . . . requires that arbitration take place in a non-FINRA forum, [] is clearly inconsistent with Rule 13200." (quoting parties' agreement)). The Second Circuit held that this provision effected a clear displacement of Code 13200's arbitration framework for employee disputes. See Tracy, 812 F.3d at 257 ("[W]e conclude that Rule 13200 does not prohibit the enforcement of pre-dispute waivers of a FINRA arbitral forum.").

The Tracy court notes that FINRA, if it had wanted to, could have made clear that the FINRA arbitration forum could not be opted out of for industry disputes. See Tracy, 812 F.3d at 255 n.12 ("Had FINRA wished to clearly state that Rule 13200 cannot be waived, it could have done so. In the customer-member context, FINRA requires that a predispute arbitration agreement not include any condition that 'limits or contradicts the rules of any self-regulatory organization.'" (quoting FINRA Code 2268(d)(1))). Tracy also considers, in arriving at its conclusion, the views FINRA has expressed in various sources: Tracy considers the views FINRA expresses in both regulatory notices and in decisions rendered by FINRA's board of directors:

> Employees also point to a FINRA "guidance letter" regarding a proposed change to Rule 13204. The letter, written by a FINRA assistant chief counsel and addressed to the SEC, states that members may not "prohibit employees from arbitrating their disputes with the firm in FINRA's dispute resolution forum." However, the FINRA Board of Governors expressed a contrary view in *In re Dep't of Enforcement v. Charles Schwab & Co.,* No. 2011029760201, 2014 WL 1665738 (FINRA Bd. of Governors Apr. 24, 2014), which provides that "there are no restrictions upon firms regarding the content of predispute arbitration agreements with employees." *Id.* at *8.

- 141 -

Tracy, 812 F.3d at 256 n.14.  What is important about this, as the Court will discuss further, see Section IV.B.2.d infra, is that the Second Circuit suggests its amenability to deferring to FINRA's views on these subjects, and considers them, at least, as having some persuasive value -- both insofar as FINRA expresses its views formally, through its rulemaking, cf. Tracy, 812 F.3d at 255 n.12 (discussing FINRA's views as manifest in FINRA Code 2268(d)(1)) , and informally, through regulatory notices and board of directors' opinions, cf. Tracy, 812 F.3d at 856 n.14 (discussing FINRA guidance letters and Board of Governors' decision-making).

Important, moreover, to the Tracy court's decision was that the parties had not waived arbitration altogether, but only had provided for arbitration under a non-FINRA framework, much like that here.  Cf. Tracy, 812 F.3d at 256 ("Rather than waive the ability to arbitrate, Employees merely waived the right to arbitrate in a FINRA forum. Forum preference does not raise the same public policy concern as a complete waiver of arbitration." (citing Credit Suisse First Bos., LLC v. Groves, 333 F. Supp. 2d 229, 232 (S.D.N.Y.2004)("[N]othing in Jameson or in the law extends the public policy favoring arbitration to the point of favoring a particular arbitral forum, or one forum over another."))).

What makes Tracy not entirely on all fours is that, since Tracy, FINRA has expressed its view on this subject, via Regulatory Notice 16-25.  Regulatory Notice 16-25 makes clear that FINRA disagrees with the Second Circuit.  The Court now turns to this guidance document.

### 3.     FINRA Regulatory Notice 16-25's Position That Private Parties Cannot Contract Around FINRA's Arbitration Rules Is Not Entitled to Deference and Is Not Persuasive, Because It Contradicts Decades of Federal Appellate Decisions and Lacks Statutory Basis.

FINRA's Regulatory Notice 16-25, which expresses FINRA's view that private parties cannot ex ante contract out of its arbitration framework, is not entitled to deference and does not

persuade the Court that Kerr could not contract out of Code 13200's provision for FINRA arbitration.  The federal Courts of Appeals long have held otherwise.  FINRA's status as a self-regulatory organization does not entitle it to judicial deference.  Finally, one obvious statutory basis for FINRA's position, 15 U.S.C. § 78cc, provides for the opposite conclusion -- § 78cc and judicial interpretations thereof suggest that private parties can ex ante contract around FINRA's arbitration rules.

> **a.  FINRA's Regulatory Notice 16-25 States That FINRA Views Its Rules Not as Contractual in Nature, and so Cannot Be Contracted Out of Through Predispute Agreements, but This Position is Misguided.**

FINRA thinks that its required arbitration provisions, rules 12200 and 13200, cannot be contracted out of ex ante.  In pertinent part, its argument runs thus:

> The holdings of these courts rest on the assumption that the duty to arbitrate under FINRA rules, or to arbitrate in FINRA's arbitral forum, is merely "contractual" and can be superseded or waived. This assumption is inconsistent with the fact that the Exchange Act requires most broker-dealers to be members of FINRA and that FINRA's rules are approved by the Securities and Exchange Commission (SEC), binding on FINRA member firms and associated persons, and have the force of federal law. FINRA rules are not mere contracts that member firms and associated persons can modify.

Reg. Notice 16-25 (footnotes omitted).

As noted above, the Third Circuit in Reading Health relies in substantial part on Regulatory Notice 16-25, in holding that the contract provision there effected no waiver.  See Reading Health, 900 F.3d at 103 ("[W]e are reluctant to find an implied waiver here. Reading's right to arbitrate is not contractual in nature, but rather arises out of a binding, regulatory rule that has been adopted by FINRA and approved by the SEC."); id. at 102 n.73 & 104 n.82 (discussing the views that Reg. Notice 16-25 expresses).

Also as noted, the Second Circuit in <u>Tracy</u> itself indicates its willingness to listen to FINRA's interpretations of its own rules, and the Second Circuit indicates that it will look and consider both formal interpretations (<u>i.e.</u>, as embodied in FINRA's rules, <u>cf.</u> <u>Tracy</u>, 812 F.3d at 855 n.12), and informal interpretations (<u>i.e.</u>, as embodied FINRA's regulatory notices and its board of governor decisions, <u>cf.</u> <u>Tracy</u>, 812 F.3d at 855 n.14).   The Second Circuit has not, since Regulatory Notice 16-25, considered the impact of that statement of FINRA's viewpoint, but it would seem that the Second Circuit would at least strongly consider it.

FINRA's view in 16-25, however, invokes very serious tensions.   FINRA does not only take issue with the particular results reached in such recent cases as <u>Golden Empire</u>, <u>City of Reno</u>, and in <u>Tracy</u> whether, specifically, 12200 and 13200 can be displaced.   <u>See</u> Reg. Notice 16-25 ("FINRA is aware of federal appellate court decisions that have held that [certain] forum selection clauses . . . supersede [FINRA's arbitration] requirements. . . . FINRA notes that the reasoning giving rise to these decisions is mixed and conflicts with FINRA's views regarding the application of its arbitration rules.").   Instead, FINRA takes issue with a line of doctrine -- standing behind the proposition that its arbitration rules are contractual in nature -- that stretches back thirty years:

> [T]hose courts that have upheld forum selection clauses have relied on authority that traces back to two appellate decisions in the 1990s that never actually decided whether a member firm may obtain and enforce a waiver of its obligation to arbitrate as set forth in FINRA Rules 12200 and 13200.[] Subsequent court decisions repeatedly assumed that the issue had already been resolved and failed to recognize the mandatory nature of the FINRA rules' requirement that FINRA arbitration must be available upon the customer's request, even in the absence of an agreement to arbitrate.[] As one federal appellate court has correctly indicated, Rule 2268(d) -- which provides that member firms may not include terms in predispute arbitration agreements with customers that "limit[] or contradict[] the rules of" FINRA—is a clear statement that member firms cannot require customers to waive Rule 12200 in those agreements

Reg. Notice 16-25 (footnotes omitted).  The Regulatory Notice critiques two Second Circuit decisions -- Kidder, 41 F.3d 861, and Georgiadis, 903 F.2d 109 -- and subsequent reliance thereon for the proposition that FINRA's rules are contractual in nature.  The Regulatory Notice notes Kidder's "express[] state[ment] that it did 'not consider the broader issue of whether a customer can waive entirely the option to arbitrate conferred by the broker's exchange membership obligations,' and that its prior decision in Georgiadis also did not address that question."  Reg. Notice 16-25 n.10 (citing Kidder, 41 F.3d at 864).  In turn, according to FINRA, "Georgiadis addressed only whether the parties could agree to an arbitral forum different from the forum specified in an exchange's constitution. . . . The court thus had no occasion to determine whether a customer's right to arbitration conferred by an SRO's arbitration rules could validly be waived by a pre-dispute agreement."  Reg. Notice 16-25 n.10 (citing Georgiadis, 903 F.2d at 112).

FINRA disputes a doctrine settled in the Courts of Appeals for twenty years, but FINRA is not correct in asserting that the doctrine lacks solid foundations.  FINRA's reading of Kidder-Georgiadis is too narrow, because the Second Circuit holds there that FINRA's predecessor's arbitration rules are contractual in nature and that a more tailored provision for arbitration can supersede the FINRA arbitration rules, see Kidder, 41 F.3d at 863-64  ("'The rules of a securities exchange are contractual in nature. . . [and] the constitution of the exchange 'may be superseded by a more specific customer agreement,' [thereby] . . . 'giving effect to the parties' contractual choice of arbitral fora.'" (quoting Georgiadis, 903 F.2d at 112, 113)(alterations added)), even if Kidder declines explicitly to state whether, as a consequence, "a customer can waive entirely the option to arbitrate conferred" by an SRO's rules, Kidder, 41 F.3d at 864.  Although FINRA may characterize this approach as an uncritical assumption, nevertheless, several Courts of Appeals have followed Kidder-Georgiadis' principle that parties can opt out of FINRA's arbitration

rules -- including the Tenth Circuit. See Schooley v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 1997 WL 45271, at *2 (stating that "the arbitration rules of a securities exchange are themselves 'contractual in nature,'" and that they are "'sufficient to compel arbitration of exchange-related disputes in the absence of a specific written arbitration agreement.'" (quoting Spear, Leeds & Kellogg v. Central Life Assurance Co., 85 F.3d at 26 (quoting Georgiadis, 903 F.2d at 113). See also INTL FCStone Fin. Inc. v. Jacobson, 950 F.3d 491, 503 (7th Cir. 2020)("Although we express no opinion on the merits of this issue, among the circuits that have, the obligation to arbitrate under FINRA Rule 12200 can be superseded or waived by specific agreement of the parties." (citing Reading Health, 900 F.3d at 102-03; City of Reno, 747 F.3d at 741; Carilion Clinic, 706 F.3d at 328; In re Am. Exp. Fin. Advisors Sec. Litig., 672 F.3d 113, 132 (2d Cir. 2011))); Tracy, 812 F.3d at 256 ("Our decisions addressing a conflict between an SRO's broad arbitration rules and a specific pre-dispute agreement between an SRO member and an employee or customer hold that the more specific agreement will prevail."); City of Reno, 747 F.3d at 741 ("As a threshold matter, we agree with Goldman that a contract between the parties can supersede the default obligation to arbitrate under the FINRA Rules."); Carilion Clinic, 706 F.3d at 328 ("At the outset, we agree with UBS and Citi that the obligation to arbitrate under FINRA Rule 12200 can be superseded and displaced by a more specific agreement between the parties."); Luckie v. Smith Barney, Harris Upham & Co., 999 F.2d 509, 513 (11th Cir. 1993)(rejecting "appellants' contention that customers cannot 'contract away' their option under the AMEX[, an SRO,] Constitution of electing arbitration before the AAA. . . . We join the Second Circuit in holding that 'the arbitration provision of the AMEX Constitution may be superseded by a more specific customer agreement between the parties.'" (quoting Georgiadis, 903 F.2d at 108). On FINRA's side on the subject, the Third Circuit is alone. Cf. Reading Health, 900 F.3d at 103 ("Reading's right to arbitrate is not

contractual in nature, but rather arises out a of a binding, regulatory rule that has been adopted by

FINRA and approved by the SEC.").  Finally, the Court identifies no instance in which, in all the

thirty years of the existence of this doctrine, the Securities and Exchange Commission, FINRA's

source of authority, has itself come out against the view that FINRA's rules are contractual in

nature.

> **b.      FINRA's Status as a Self-Regulatory Organization Under the SEC's Auspices Does Not Entitle It to Deference.**

FINRA's views on this subject are not entitled to great deference because FINRA has no

agency stature that would empower its views before the Court.  A SRO is a private industry-

government cooperative enterprise to have industry regulate itself and to share in some

governmental functions, as one scholar describes:

> The most enduring SRO models to emerge from [the New Deal] period [when SROs first arose] were those under the oversight of the Securities and Exchange Commission (SEC) and Commodity Futures Trading Commission (CFTC).  These schemes provided the original blueprint for, and continue to shape, the defining features of SROs.  First, Congress devises nearly all SRO schemes and mandates that SROs implement authority delegated to an administrative agency. Although the courts have not directly tested the necessity of such legislative enabling acts, that they are functionally required is both descriptively and normatively accurate: Explicit legislative authority stands behind nearly every SRO, and the legislative process both lends legitimacy to the model's use and offers opportunities for oversight once the model is implemented.  The involvement of the oversight agency is also a critical component of the model.  As described in more detail below, the private nondelegation doctrine prevents direct delegations of authority to entities not within the federal government.  As such, an SRO's authority is properly viewed as derivative of the oversight agency's authority.

Emily Hammond, Double Deference in Administrative Law, 116 Colum. L. Rev. 1705, 1713-15

(2016).  Although SRO rules and regulations carry the SEC's or the CFTC's imprimatur, they do

not share fully in the SEC or CFTC's power.  See McDaniel v. Wells Fargo Invs., LLC, 717 F.3d

668, 673 (9th Cir. 2013)("Congress has vested the Financial Industry Regulation

Authority . . . with the power to promulgate rules that, once adopted by the SEC, have the force of law." (citing 15 U.S.C. § 78s(b))); NASDAQ Stock Mkt., LLC v. Sec. & Exch. Comm'n, 961 F.3d 421, 424-26 (D.C. Cir. 2020)(explaining that a recent law "altered [the approval] scheme . . . providing that such a[n SRO's] rule change 'take[s] effect upon filing with the Commission' and 'may be enforced by [the SRO] to the extent it is not inconsistent with' the Exchange Act and its applicable regulations." (quoting 15 U.S.C. § 78s(b)(3)(A), (C) (alterations added))).   A Senate report stresses that an SRO's authority is owing only to the parent executive-branch agency and that SROs are not themselves due the deference afforded agencies:

> [C]are should be exercised, lest the use of phrases such as "partnership" and "cooperative regulation" lead to the impression that the industry and the government fulfill the same function in the regulatory framework or that they enjoy the same order of authority or deserve the same degree of deference . . . The self-regulatory organizations exercise authority subject to SEC oversight. They have no authority to regulate independently of the SEC's control.

Nat'l Ass'n of Sec. Dealers, Inc. v. S.E.C., 431 F.3d 803, 806-07 (D.C. Cir. 2005)(quoting S. Rep. No. 94-75, at 23 (1975), as reprinted in 1975 U.S.C.C.A.N. 179, 201).   SROs do not have the same stature as the SEC under whose authority they operate; this great gulf in authority is made evident in the fact that SROs have sued their parent agency, the SEC, based on actions the SEC has taken that an SRO views as harmful to its interests.   See NASDAQ Stock Mkt., LLC v. Sec. & Exch. Comm'n, 961 F.3d 421, 424-26 (D.C. Cir. 2020)(involving a dispute wherein NASDAQ, a SRO, sought judicial review of an SEC action that rejected a rule change the SRO sought to make effective).   That SROs have sued their executive branch benefactor indicates the extent to which their authority before the judiciary are not on par: while the SEC is entitled to the full sweep of pertinent deference doctrines, see e.g. Dreiling v. Am. Express Co., 458 F.3d 942, 953 n.11 (9th Cir. 2006)("The SEC's interpretation of its own regulations is controlling unless plainly erroneous

or inconsistent with the regulation." (citing Auer v. Robbins, 519 U.S. 452 (1997))), no court has

ever afforded Chevron or a lesser deference to an SRO such as FINRA, cf. Morgan Keegan & Co.

v. Shadburn, 829 F. Supp. 2d 1141, 1152 (M.D. Ala. 2011)(Watkins, C.J.)(declining to decide

whether "Auer deference applies to a FINRA decision," because "[u]nder any standard, no

deference is due here because the decision is unaccompanied by reason or analysis").  Indeed, one

scholar has at length critiqued the admin-law-within-admin-law issues that surround FINRA's

relationship with the SEC, suggesting that problems which beset administrative law

generally -- concerns about accountability, for example -- are particularly heightened in the self-

regulatory organization space:

> On its face, the SEC scheme seems to have the greatest oversight role for the
> agency, especially considering that it reviews both FINRA rules and orders de
> novo. But a deeper look reveals a number of disruptions to that story. For example,
> although the FINRA rulemaking procedures have the appearance of being similar
> to those of agencies, the participants are clearly stacked in favor of industry. And
> when those rules go to the SEC, there is a negotiation process between the agency
> and FINRA. FINRA responds to comments received, and the agency almost always
> approves rules, generally not making use of its authority to modify rules.
> Furthermore, proposed rules can become effective -- binding law -- if the SEC fails
> to meet its review deadlines.

Hammond supra, at 1737-39.

Here, FINRA's 16-25 regulatory notice is effectively an interpretation of FINRA's own

rules -- to defer to this would be to give Auer deference to FINRA.  Auer deference -- the rule

being that federal courts sometimes should defer to an agency's interpretation of its own rules and

regulations, see Commodity Futures Trading Comm'n v. EOX Holdings, L.L.C., 90 F.4th 439,

444 (5th Cir. 2024)("When . . . a regulation is ambiguous, an agency may seek judicial deference

to the agency's interpretation under Auer v. Robbins . . . .") -- is a doctrine fraught with

controversy and cabined in recent years, see Kisor v. Wilkie, 139 S. Ct. 2400, 2408 (2019)("Auer

deference is sometimes appropriate and sometimes not.").  As discussed, the Court identifies no judicial decision that has deferred even on less controversial deference doctrines to FINRA's views.  Cf. Morgan Keegan & Co. v. Shadburn, 829 F. Supp. 2d at 1152 (declining to decide whether "Auer deference applies to a FINRA decision," because, "[u]nder any standard, no deference is due here because the decision is unaccompanied by reason or analysis").  Where FINRA here would seek Auer deference to its views of its own regulations and rules, and of their scope and force, the Court will not opt to invoke in its favor a doctrine, Auer, which the Supreme Court cautions should be used only sparingly.  See Kisor v. Wilkie, 139 S. Ct. at 2408 ("Auer deference is sometimes appropriate and sometimes not.").

Although the Second Circuit indicates its willingness to hear out FINRA on its viewpoints, cf. Tracy, 812 F.3d at 255 n.12 ("Had FINRA wished to clearly state that Rule 13200 cannot be waived, it could have done so.  In the customer-member context, FINRA requires that a predispute arbitration agreement not include any condition that 'limits or contradicts the rules of any self-regulatory organization.'" (quoting FINRA Code Rule 2268(d)(1))); Tracy, 812 F.3d at 256 n.14 (considering viewpoints FINRA has expressed in guidance letters and in its Board of Governors' decisions), and the Third Circuit relies at length on Regulatory Notice 16-25, cf. 900 F.3d at 102-104 , 102 n.73, 104 n.82 (discussing Reg. Notice 16-25's views and stating that "we are reluctant to find an implied waiver here.  Reading's right to arbitrate is not contractual in nature, but rather arises out of a binding, regulatory rule that has been adopted by FINRA and approved by the SEC"), nonetheless, those cases do not stand for the proposition that any kind of deference is owed FINRA in its views per se, beyond for persuasive value.  It is not clear that the FINRA regulatory notice represents a position that the SEC has approved; while the SEC approves all FINRA rules, cf. Hammond supra, at 1735 ("When FINRA files a rule with the SEC, the statute contemplates

that the SEC will review it, conduct notice and comment, and determine whether it conforms with the Exchange Act."), it is not clear that the SEC approves of FINRA's regulatory notices.

As the Court notes above, FINRA's views expressed in Regulatory Notice 16-25 are not persuasive.  Although they provide an easy answer, the notice is inadequately reasoned.  For one, it boldly resists a proposition -- that its arbitration rules are contractual in nature and so can be contracted around and out of -- that has proceeded in the federal Courts of Appeals for thirty years. See INTL FCStone Fin. Inc. v. Jacobson, 950 F.3d at 503 (noting widespread agreement); Tracy, 812 F.3d at 256 ("Our decisions addressing a conflict between an SRO's broad arbitration rules and a specific pre-dispute agreement between an SRO member and an employee or customer hold that the more specific agreement will prevail."); City of Reno, 747 F.3d at 741 (same proposition); Carilion Clinic, 706 F.3d at 328 (same); Luckie v. Smith Barney, Harris Upham & Co., 999 F.2d at 513 (same).  FINRA's critique of that proposition's foundations also is misguided, because it suggests that the issue was never decided in the first place; even if the Second Circuit's decisions in the nineteen-nineties did not address the issue head-on, a long lineage of cases has affirmed the proposition that at least some of a self-regulatory organization's rules are contractual in nature. See Tracy, 812 F.3d at 256.  Moreover, in the thirty years since, the SEC, FINRA's source of authority, has never disclaimed the position that the federal Courts of Appeals have taken.

Finally, the Courts of Appeals have the better position.  FINRA's position is a power grab and is even micro-management.  The Second Circuit, Fourth Circuit and Ninth Circuit's positions respect freedom of contract.  Professionals in the securities business are sophisticated and do not need FINRA's protections.  FINRA has never explained adequately why it thinks freedom of contract should not be respected and preserved.

The Court, in sum, does not believe that FINRA's views expressed in regulatory notice 16-25 are binding on the Court or even are persuasive.  FINRA is not an agency within the executive branch of government such that, as part of a co-equal branch of government, it would be entitled to deference.  Nor are the views expressed in its notice persuasive, primarily because FINRA baldly resists a long-standing doctrine, i.e., that FINRA's arbitration rules are contractual in nature, and does so with little argumentation and, apparently, without the support of the SEC, its source of authority.  For these reasons, the Court will not follow the views that FINRA expresses in its regulatory notice 16-25 that a more specific, conflicting provision for arbitration cannot supersede Code 13200.

> **c.    15 U.S.C. § 78cc(a) Does Not Prohibit a Party from Waiving Arbitration Rights and Obligations Under FINRA's Code of Arbitration.**

A potential statutory basis for holding that FINRA's arbitration rules cannot be superseded does not apply.  Notably absent from the regulatory notice 16-25 is any reliance on 15 U.S.C. § 78cc(a), which arguably supports FINRA's position.  As noted, litigants offered this argument to the Third Circuit in Reading Health.  See Reading Health, 900 F.3d at 104 n.83 ("[W]e need not address whether an explicit waiver of the right to arbitrate would be invalid and unenforceable under Section 29(a) of the Exchange Act, as amicus and Reading argue.").  Section 78cc(a) provides: "Any condition, stipulation, or provision binding any person to waive compliance with any provision of this chapter or of any rule or regulation thereunder, or of any rule of a self-regulatory organization, shall be void."  15 U.S.C. § 78cc(a).  As one decision explains about the neighboring provision, § 78cc(b) -- which provides that "[e]very contract made in violation of . . . of this chapter or of any rule or regulation thereunder . . . shall be void," 15 U.S.C.

§ 78cc(b) -- this code provision merely articulates the principle that contracts made in violation of

the law are void or voidable:

> [F]or rescission under 15 U.S.C § 78cc(b), a party must show 'that (1) the contract
> involved a prohibited transaction, (2) he is in contractual privity with the [opposing
> party], and (3) he is in the class of persons the Act was designed to protect.' This
> test manifests the common-law principle that a contract to perform an illegal act is
> void.

Ema Fin., LLC v. Vystar Corp., 336 F.R.D. 75, 80-81 (S.D.N.Y. 2020)(Gorenstein, M.J.)(quoting

RWP Consol., L.P. v. Salvatore, 534 F. Supp. 2d 364, 368 (D. Conn. 2008)(Arterton, J.)).

Hypothetically, this 78cc(a) provision would seem to bar a party from contracting around

the arbitration rules of a SRO like FINRA, yet that is not the turn the law has taken.   In

Shearson/American Express, Inc. v. McMahon, 482 U.S. 220 (1987)("McMahon"), the Supreme

Court held that 78cc(a) applies only to bar contracts that effect waiver of the substantive rights

which the Securities Exchange Act confers:

> The McMahons contend that an agreement to waive this jurisdictional
> provision is unenforceable because § 29(a) voids the waiver of "any provision" of
> the Exchange Act. The language of § 29(a), however, does not reach so far. What
> the antiwaiver provision of § 29(a) forbids is enforcement of agreements to waive
> "compliance" with the provisions of the statute. But § 27 itself does not impose any
> duty with which persons trading in securities must "comply." By its terms, § 29(a)
> only prohibits waiver of the substantive obligations imposed by the Exchange Act.
> Because § 27 does not impose any statutory duties, its waiver does not constitute a
> waiver of "compliance with any provision" of the Exchange Act under § 29(a).

McMahon, 482 U.S. at 228.

That holding extends directly to waiver of an SRO's non-substantive rules like FINRA's.

A party, without violating 78cc(a), permissibly can contract for forum-selection matters such as

under what kind of arbitration framework the parties' dispute resolution will occur; the selection

of an arbitration framework is not a "substantive obligation," McMahon, 482 U.S. at 228, that

§ 78cc(a) forbids a party from contracting out of, as courts have long held, see Roney & Co. v.

- 153 -

Goren, 875 F.2d 1218, 1220-21 (6th Cir. 1989)("Roney")("According to the McMahon Court, an agreement that waives access to a judicial forum does not run afoul of the anti-waiver provision because the Exchange Act provision providing for exclusive jurisdiction in the District Court does not impose any substantive statutory duties."); Roney, 875 F.2d at 1221 ("The location of arbitration proceedings and the procedure followed are not substantive obligations triggering application at the Exchange Act's anti-waiver provision especially given the substantial similarities between NYSE and NASD procedures."). Indeed, this Supreme Court case paved the way for the Second Circuit's key holding that FINRA's arbitration rules are contractual in nature and so could be contracted around like default rules. See Georgiadis, 903 F.2d at 112 ("[T]he arbitration provision of the AMEX Constitution may be superseded by a more specific customer agreement of the parties." (citing Roney & Co. v. Goren, 875 F.2d 1218)). Indeed, in the lower court decision preceding the Second Circuit's Tracy decision, the Honorable Naomi Reice Buchwald, United States District Judge for the United States District Court for the Southern District of New York, rejected the proposition that 15 U.S.C. §78cc(a) prohibits contracting around an SRO's arbitration rules:

> Despite the overwhelming weight of judicial authority, Respondents contend that the Exchange Act itself precludes a court from enforcing a waiver of an SRO's arbitration rules. Respondents rely on the text of § 29(a) of that Act, which states: "Any condition, stipulation, or provision binding any person to waive compliance with any provision of this [Act] or of any rule or regulation thereunder, or of any rule of a self-regulatory organization, shall be void." 15 U.S.C. § 78cc(a).

> This argument cannot be reconciled with precedent. The Supreme Court rejected a similar argument in concluding that § 29(a) did not void a predispute agreement to arbitrate claims under the Exchange Act, notwithstanding a provision of that Act conferring exclusive jurisdiction of statutory claims on the federal courts. *Shearson/Am. Express, Inc. v. McMahon,* 482 U.S. 220, 227-28 (1987). In reaching its conclusion, the Court explained that § 29(a) "only prohibits waiver of . . . substantive obligations." *Id.* at 228. Thus, a rule governing the forum in

- 154 -

which disputes are to be heard is not the type of "substantive obligation" whose waiver could be deemed void under § 29.

Further, Respondents' interpretation of § 29 is inconsistent with the Second Circuit's repeated explanations that an SRO's arbitration rules "may be superseded by a more specific . . . agreement of the parties," *Georgiadis,* 903 F.2d at 112; *see Zinsmeyer Trusts,* 41 F.3d at 864; *Golden Empire,* 764 F.3d at 214–15. Indeed, we have found no judicial authority for the proposition that § 29 precludes enforcement of an arbitration agreement selecting a non-SRO arbitral forum.[] As Respondents' statutory argument cannot be reconciled with the law as explained by the Supreme Court and the Second Circuit, we decline to adopt it.

Credit Suisse Sec. (USA) LLC v. Tracy, No. CIV 14-8568, 2015 WL 170241, at \*6-7 (S.D.N.Y.

January 8, 2015)(Buchwald, J.).

It is thus no surprise that FINRA Regulatory Notice 16-25 does not invoke § 78cc(a) as a basis to say that its rules cannot be waived, including in its discussion why, in its view, the Second Circuit's Kidder and Georgiadis decisions are wrong.  Cf. Reg. Notice 16-25 (containing no reference to 15 U.S.C. §78cc(a)); id. n.10 (critiquing Kidder and Georgiadis but omitting reference to § 78cc(a)).  Although the Third Circuit declined to address whether 78cc(a) could form a basis for holding that an apparently superseding agreement did not effect waiver, cf. Reading Health, 900 F.3d at 104 n.83 ("[W]e need not address whether an explicit waiver of the right arbitrate would be invalid and unenforceable under Section 29(a) of the Exchange Act . . . ."), the Court concludes that the correct answer to that question is that 78cc(a) does not prohibit waivers of forum-selection issues such as under what arbitration framework the parties' dispute resolution will proceed.

It is with this understanding that the two following propositions can be reconciled: (i) FINRA's rules have the force of law, see McDaniel v. Wells Fargo Invs., LLC, 717 F.3d 668, 673 (9th Cir. 2013)("Congress has vested the Financial Industry Regulation Authority . . . with the power to promulgate rules that, once adopted by the SEC, have the force of law." (citing 15 U.S.C.

§ 78s(b))); and (ii) FINRA's arbitration rules can be contracted around, see Tracy, 812 F.3d at 256 ("Our decisions addressing a conflict between an SRO's broad arbitration rules and a specific pre-dispute agreement between an SRO member and an employee or customer hold that the more specific agreement will prevail."). 15 U.S.C. § 78cc(a) seemingly would be the statutory basis for the argument that, because FINRA's rules approved by the SEC have the force of law, they cannot be contracted around; yet that proposition holds no water, because McMahon and later cases hold that § 78cc(a) applies only to substantive obligation waivers. The force-of-law principle for SRO rules thus does not operate, as a matter of waiver or contract supersession, to non-substantive matters like forum-selection and dispute resolution frameworks. Thus, even aside from the possible persuasive value of FINRA's views on the subject expressed in regulatory notice 16-25, there is no statutory basis in 78cc(a) for holding that parties cannot contract around FINRA's arbitration rules.

        **4.**     **The Non-FINRA Arbitration Provision in Kerr's Employment Contract Supersedes the Background FINRA Arbitration Agreement.**

Having held that, as a theoretical matter, a party may, either as a matter of waiver or contract supersession, opt out of FINRA's arbitration framework in favor of a non-FINRA framework, the Court turns to whether, under the circumstances here, Kerr opted out of FINRA's arbitration framework. The Court holds that Kerr contracted around FINRA's arbitration framework, because the non-FINRA arbitration provision in her Maestro Global employment contract, which post-dates her FINRA arbitration agreement, effectuates a supersession of that earlier provision. The matter here is best conceptualized as a matter of contract supersession, rather than as a matter of waiver.

The Maestro Global contract's arbitration displaces the background FINRA arbitration rule, because that contract effects contract supersession.  As a matter of straightforward contract law, a later agreement between the same parties displaces an earlier agreement on the same subject, if the two agreements are inconsistent with each other.  See Juarez v. THI of N.M. at Sunset Villa, LLC, 2022-NMCA-056, ¶ 18, 517 P.3d 918, 923 (Black, J.)("Superseding requires two separate agreements, instruments, or contracts between the parties that take place at different times."); Mumin v. Uber Techs., Inc., 239 F. Supp. 3d at 522 ("'It is a well settled principle of contract law that a new agreement between the same parties on the same subject matter supersedes the old agreement.'" (quoting Ottawa Office Integration Inc. v. FTF Bus. Sys., Inc., 132 F. Supp. 2d at 219)).  Here, the later-dated agreement is the non-FINRA arbitration agreement.  Kerr's Maestro Global contract was executed on April 5, 2019.  See Kerr Employment Contract at 1.  Although the parties did not supply Kerr's Form U4 agreement that effected her membership in FINRA, it is clear that she already was a FINRA-associated person by the time she executed the Maestro Global employment contract.  See Motion to Confirm ¶ 16, at 4.  Accordingly, the Maestro Global contract, with its non-FINRA arbitration provision, post-dates Kerr's agreement to arbitrate in FINRA that her Form U4 effectuated.

These circumstances are distinguishable from the Third Circuit's suggestion in Reading that the point in time at which the FINRA agreement to arbitrate arises is open to interpretation in the context of Code 12200 customer arbitration agreements:

> Even if Rule 12200 is the functional equivalent of a private contract, this analysis presumes that the "agreement to arbitrate" embodied in FINRA Rule 12200 *predates* the execution of the broker-dealer agreements. That position is hard to reconcile with the fact that an investor's right to demand arbitration under FINRA Rule 12200 stems from its status as a "customer," a status that J.P. Morgan contends is created by the broker-dealer agreements. Reply Br. at 6. J.P. Morgan's position in that regard implies that the agreement to arbitrate under Rule 12200

> comes into existence only *after* the parties executed the broker-dealer agreements, not beforehand, which contradicts the notion that the agreements are somehow later-in-time agreements that "superseded" or "displaced" Rule 12200.

Reading, 900 F.3d at 102 n.68.  On the Third Circuit's interpretation, a Code 12200 agreement to arbitrate comes to life, so to speak, only when a person becomes the customer of a FINRA-licensed associated person or member, a moment simultaneous with the execution of the contract containing the non-FINRA forum arbitration agreement; on this view there arguably is no contract supersession because neither agreement precedes or postdates the other.  See Reading, 900 F.3d at 102 n.68.  Here, however, Kerr was already, when she executed the Maestro Global contract, a FINRA associated person and already party to the Code 13200 agreement to arbitrate inter-industry disputes.  See Motion to Confirm ¶ 16, at 4; FINRA Code 13200 ("Except as otherwise provided in the Code, a dispute must be arbitrated under the Code if the dispute arises out of the business activities of a member or an associated person and is between or among . . . Associated Persons.").  Accordingly, her Maestro Global agreement is a later-executed, inconsistent contract on the same subject matter that superseded the earlier Code 13200 arbitration agreement.  As the Court discusses above, the Maestro Global contract's non-FINRA arbitration provision and the FINRA arbitration under Code 13200 cover the same subjects, and are inconsistent with each other.  Cf. Tracy, 812 F.3d at 251 (finding conflict where contract conflicted with Code 13200 scheme where contract called for arbitration "'conducted by a single arbitrator, or . . . a panel of three arbitrators supplied by JAMS or the American Arbitration Association'" (quoting parties' contract)); id. at 254 ("Because the Credit Suisse EDRP requires that arbitration take place in a non-FINRA forum, it is clearly inconsistent with Rule 13200.").  As a matter of contract supersession, therefore, Kerr's non-FINRA arbitration agreement is the later-dated one and displaces the earlier arbitration provision on the same subject.  Insofar, therefore, as the Maestro Global's non-FINRA arbitration

agreement effects supersession of the FINRA arbitration framework, Waked and Stone, as third-party beneficiaries to the contract, are bound as non-signatories to its non-FINRA arbitration provision that supersedes Kerr's earlier agreement to arbitrate under FINRA.

Under a waiver model, execution of the Maestro Global contract and its non-FINRA arbitration provision constitutes an action inconsistent with invocation of rights to FINRA arbitration. As a matter of waiver -- which is an issue pertinent to arbitration law, rather than to contract law per se -- a party may waive his or her right to invoke arbitration by taking actions inconsistent with that right. See Healey v. Cox Commc'ns, 790 F.3d at 1116 (enumerating six-factors that courts should consider in determining whether "a party has waived its right to demand arbitration", including "whether the party's actions are inconsistent with the right to arbitrate"). By means of the Maestro Global's non-FINRA provision, the Court may deem Kerr to have waived effectively her right to invoke her Code 13200 FINRA arbitration right. Kerr is in the same position as the securities customers who waived their right to Code 12200 arbitration by executing contracts that provide for dispute resolution in federal court. See Reading Health, 900 F.3d at 102 ("We agree with the Fourth Circuit that the question is one of waiver.").

It is relatively straightforward to say that Kerr waived her own rights by executing the Maestro Global contract, but less straightforward to say that Waked and Stone waived their rights in the same way, because they are not signatories to the Maestro Global contract. The Court cannot find waiver on the act alone of signing the pertinent agreement, as the Court can find for Kerr. The Court could find Waked and Stone's waiver on the basis of their knowing invocation of a contract containing a non-FINRA arbitration framework, i.e., one inconsistent with their Code 13200 rights.

While that doctrinal route is available, however, the contract supersession approach offers the more straightforward answer. The Maestro Global contract, with its non-FINRA arbitration

provision, post-dates and is inconsistent with the arbitration agreement arising out of Kerr's associated person status with FINRA, so the former agreement supersedes the latter. Waked and Stone, as third-party beneficiaries, are bound to that superseding agreement's arbitration framework. Insofar as FINRA is incorrect that parties may not contract around its arbitration rules, the Court holds that, on the facts here, the Maestro Global arbitration provision effected such a contracting-around as a later-executed, inconsistent contract that supersedes the earlier one.

### C.    BECAUSE KERR'S EMPLOYMENT CONTRACT'S NON-FINRA AGREEMENT SUPERSEDES THE CODE 13200 AGREEMENT TO ARBITRATE, THE COURT VACATES KERR'S LIABILITY TO WAKED AND STONE UNDER THE AWARD AS INVALID.

Because the Court holds that the FINRA arbitrators exceeded their powers in imposing on Kerr liability to Waked and Stone, the Court vacates Kerr's liability under the Award. See 9 U.S.C. § 10(a)(4) (providing for vacatur "where the arbitrators exceeded their powers"). The Maestro Global contracts provide for a non-FINRA arbitration forum for the same set of disputes for which FINRA Code 13200 provides a forum. Compare Kerr Employment Contract ¶ G(1), at 6-7 ("Arbitration will be by one arbitrator and will proceed in accordance with the New Mexico Uniform Arbitration Act . . . . If the parties are unable to agree upon the selection of an arbitrator, then [a State court in Santa Fe] . . . shall appoint the arbitrator upon a motion by the applicable party."), with FINRA Code 13200(a) ("[A] dispute must be arbitrated under the Code if the dispute arises out of the business activities of . . . an associated person and is between or among . . . Associated Persons."). These provisions are incompatible. Cf. Tracy, 812 F.3d at 254 ("Because the Credit Suisse EDRP requires that arbitration take place in a non-FINRA forum, it is clearly inconsistent with Rule 13200.").

The non-FINRA Maestro Global arbitration provision displaces the Code 13200 FINRA arbitration provision, best conceptualized as a later agreement superseding an earlier one, cf. City of Reno, 747 F.3d at 744 (inquiring whether "Goldman had intended to contract out of its duty to arbitrate . . . us[ing] general state-law principles of contract interpretation to effectuate the intent of the parties"); Mumin v. Uber Techs., Inc., 239 F. Supp. 3d at 522 ("'It is a well settled principle of contract law that a new agreement between the same parties on the same subject matter supersedes the old agreement.'" (quoting Ottawa Office Integration Inc. v. FTF Bus. Sys., Inc., 132 F. Supp. 2d at 219)).  If it is a question of contract interpretation and whether a later-executed contract supersedes an earlier one, then Kerr and Maestro Global demonstrated unequivocally their intent to arbitrate their disputes outside of FINRA; because Waked and Stone invoke that contract as its intended third-party beneficiaries, the contract's non-FINRA arbitration provision binds them.  As a matter of contract law, the Kerr-Maestro Global contract evinces an intent to arbitrate outside FINRA's framework.  See City of Reno, 747 F.3d at 744; Mumin v. Uber Techs., Inc., 239 F. Supp. 3d at 522.  If it is a matter of waiver, then Waked and Stone waive their FINRA Code 13200 rights to FINRA arbitration insofar as they seek dispute resolution with Kerr, because Kerr's liability to Waked and Stone is a matter of liability to third-party beneficiaries of a contract that provides for non-FINRA arbitration.  See Reading Health, 900 F.3d at 102 (treating the issue as one of waiver).

FINRA's views on the subject expressed in regulatory notice 16-25 neither bind nor convince the Court that Kerr did not supersede her Code 13200 agreement to arbitrate.  Because, therefore, the Award was the product of an arbitration in a forum in which Kerr did not agree to arbitrate, the arbitrators exceeded their power and the Award is invalid as to Kerr's liability.  See 9 U.S.C. §10(a)(4) (providing for vacatur "where the arbitrators exceeded their powers").

Because, however, the Award is divisible, and the portion related to Terry's liability is valid, the Court will vacate only that part related to Kerr.  Cf. Comedy Club, Inc. v. Improv W. Assocs., 553 F.3d at 1288 ("If an arbitrator exceeded the scope of his authority in issuing an award, and that award is divisible, we may vacate part of the award and leave the remainder in force.").

**IT IS ORDERED** that: (i) the Plaintiffs' Motion to Confirm Arbitration Award and Enter Judgment Thereon, filed August 11, 2022 (Doc. 1), is granted in part and denied in part; (ii) the Defendants Jane Terry, Kathleen Kerr, and Timothy Rivera's Opposition to Plaintiffs' Motion to Confirm Arbitration Award and Cross Motion to Vacate Arbitration Award, filed August 24, 2022 (Doc. 20), is granted in part and denied in part; and (iii) the Court will (a) confirm the Award (dated July 25, 2022), filed August 11, 2022 (Doc. 1-1)("Award"), as it relates to Defendant Jane Terry's liability under the Award, and (b) vacate the Award as it relates to Defendant Kathleen Kerr's liability under the Award.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Stephen Ingram
Cavin & Ingram, P.A.
Albuquerque, New Mexico

-- and --

Paul Flack
Reagan Pratt
Pratt & Flack
Houston, Texas

      *Attorneys for the Plaintiffs*

David J. Abell
Abell Law Ltd. Co.
Albuquerque, New Mexico

-- and –

Christopher T Saucedo
SaucedoChavez, P.C.
Albuquerque, New Mexico

      *Attorneys for the Defendants*